BEFORE THE MEDICAL REVIEW PANEL
OF THE STATE OF WYOMING

IN THE MATTER OF THE CLAIM OF    )
MICHELLE OLIVER                  )
                                 )
         Claimant,               )
vs.                              )   MRP 14-30
                                 )
POWELL VALLEY HEALTHCARE, INC.,  )
JEFFREY HANSEN, M.D., and        )
HEALTHTECH MANAGEMENT            )
SERVICES, INC.                   )
                                 )
         Respondents.            )

## RESPONDENT HEALTHTECH MANAGEMENT SERVICES, INC.'S RESPONSE TO CLAIMANT'S REQUEST FOR AN ORDER OF DISMISSAL

COMES NOW the Respondent, HealthTech Management Services, Inc., by and through

its attorneys, Sundahl, Powers, Kapp & Martin, LLC, and hereby submits its Response to

Claimant's Request for Order of Dismissal.

### I.    BACKGROUND OF INSTANT PROCEEDING

#### A.    Summary of Prior Pleadings and Actions

Claimant, Michelle Oliver, filed her Application for Claim Review (hereafter

"Application") with the Wyoming Medical Review Panel (hereafter "WMRP") on or about

August 13, 2014. In this Application Claimant named Powell Valley Healthcare, Inc. (hereafter

"PVHC"), Jeffery N. Hansen, M.D. (hereafter "Hansen") and HealthTech Management Services,

Inc. (hereafter "HealthTech") as "healthcare providers against whom a claim has been filed."

*Application at 2.* Thereafter on August 15, 2014 Claimant filed a lawsuit in the United States

1



District Court for the District of Wyoming against HealthTech and William Patten, a HealthTech employee. *See Complaint, attached hereto as Exhibit A.*

HealthTech and all of the other named respondents filed answers to the Application. On October 22, 2014 this agency served its Notice of Service of Answer and Notice of Expert Report, acknowledging receipt of the answers and setting dates for Claimant to serve her expert reports pursuant to W.S. § 9-2-1519(b).

In addition, on November 6, 2014 HealthTech filed its initial response to the pending federal court complaint. *See Defendant's Motion to Dismiss Without Prejudice or in the Alternative Motion to Stay Proceedings Pending Resolution of Medical Review Panel Proceedings and Joinder of Necessary Parties (hereafter "Motion to Dismiss or Stay"), attached as Exhibit B.* The Claimant/Plaintiff filed her Response in Opposition to Defendant's Motion to Dismiss or Stay on November 20, 2014. The pending Request for Order of Dismissal was filed with the WMRP one day later on November 21, 2014.

### B.   Summary of Underlying Allegations and Legal Theories

Claimant/Plaintiff's claim arises from the alleged medical malpractice of Jeffery Hansen, M.D. In her Application Claimant begins by referencing an allegedly negligent surgery that was performed by Jeffery Hansen, M.D., on August 21, 2012. She also claims that Dr. Hansen negligent in his post-surgical care, including two subsequent follow-up procedures performed on March 5, 2013 and April 20, 2013. *Application at 3-4.* The claims against HealthTech are based upon allegations that HealthTech had contracted with PVHC to provide PVHC with a CEO and that the CEO was responsible for "negligently credentialing, hiring, supervising, disciplining, monitoring, reviewing, training, and extending privileges to Dr. Hansen." *Application at 6.* The Complaint filed against HealthTech in federal court also names William Hansen, a HealthTech

2

employee and the currently serving CEO of PVHC as a party. Otherwise the Complaint generally repeats the same allegations contained in the Application almost verbatim. *See Complaint, Exhibit A, at ¶¶ 10-24, 32- 33, and 44-45.*

Under Wyoming law, any claim for negligent credentialing of a physician depends upon proof of malpractice on the part of the involved physician. Without evidence of predicate negligence on the part of the physician, no claim against HealthTech or any other entity for negligent hiring or credentialing can exist. *Beavis v Campbell County Memorial Hospital*, 2001 WY 32, ¶¶ 19-20, 20 P.3d 508, 515-16 (Wyo. 2001) and cases cited therein. In short, until the issue of Hansen's alleged malpractice is determined in favor of the Claimant/Plaintiff, no claim against HealthTech can be successfully pursued. Thus the claims relating to Hansen's alleged malpractice, as framed by the Application pending before the WMRP, provide the essential foundation of any legal claim that the Claimant/Plaintiff may pursue against HealthTech and/or Hansen.

## II.    ARGUMENT

### A.    Oliver's Claim Against HealthTech is a Claim Within the Scope of the Wyoming Medical Review Panel Act.

In her Application the Claimant identified HealthTech as one of several "health care providers" against whom claims were being made. She did not object, when HealthTech filed its answer and entered its appearance before the WMRP. She did not object, when the WMRP entered its order acknowledging that answer and directing her to file her expert reports. She did not dispute HealthTech's right to participate in these proceedings, until after HealthTech responded to her federal court complaint by filing its Motion to Dismiss or Stay, a motion that in part asserted that the federal lawsuit would have to be dismissed or at least stayed until after the WMRP had addressed the pending claim against HealthTech and the other respondents.

Now, in her Request for Order of Dismissal, the Claimant argues for the first time that, notwithstanding the plain language of her WMRP Application, HealthTech is not protected by the Wyoming Medical Review Panel Act, W.S. §§ 9-2-1513 et seq. (the "Act"), and that her claims against HealthTech are not medical malpractice claims. She is wrong on both counts.

1. **In order to protect health care facilities, such as PVHC, and give effect to the intent of the Wyoming Legislature, the Act should be interpreted to include entities such as HealthTech, which supply critical executive officers to health care facilities.**

The Claimant argues that HealthTech does not qualify as a "health care provider." She points to the Answer that HealthTech filed and asserts "HealthTech has not alleged that it is in any way licensed, certified or authorized to provide health care under Wyoming law." Of course, there was no need for HealthTech to make any such assertions in its Answer. The Claimant had already identified HealthTech as a health care provider in her Application. HealthTech did not need to make additional factual allegations or provide further support for Claimant's admission that HealthTech was a proper party to these proceedings. HealthTech had no reason or duty to make any further affirmative statements to support or otherwise justify the Claimant's decision to name HealthTech as a party. In any event, when Act is read in its entirety and with an eye to the purposes behind the Act, it is clear that HealthTech is entitled to be heard in this case.

When the Act was enacted, one of its primary stated purposes was "[t]o prevent where possible the filing in court of **actions against health care providers and their employees** for professional liability in situations where the facts do not permit at least a reasonable inference of malpractice." *W.S. § 9-2-1514(a)(i) (emphasis supplied)*. In furtherance of that purpose, the Act requires that, before any civil action alleging malpractice can be filed against a health care

provider, a claim must be made to the WMRP and a decision must be rendered.  *W.S. § 9-2-1518.*

The term "health care provider" is defined.  In relevant part the term "means a person or facility licensed, certified or otherwise authorized by the law of this state to provide health care in the ordinary course of business or practice of a profession * * *."  W.S. § 9-2-1515(a)(i).  Under this definition, the respondent, Dr. Hansen, is clearly qualified as a "person" under this definition and the respondent, PVHC, qualifies as a "facility."  But now the Claimant asserts that her decision to identify HealthTech as a "health care provider" was an error – a simple consequence of being overly cautious – and one that she now wishes to correct in light of HealthTech's Motion to Dismiss or Stay her federal lawsuit.  However, her narrow reading of the statute would defeat one of the stated purposes of the Act.  When the Act is read as a whole and with an eye to the express purposes behind the Act, it is clear that both HealthTech and William Patten are proper parties to these proceedings.

HealthTech contracted with PVHC to supply PVHC with a HealthTech employee, who would then serve as the CEO of PVHC.  *See Agreement for Management Services ("Agreement"), attached as Exhibit C.*  When acting as CEO and when discharging the functions assigned to him by PVHC under the terms of the Agreement, the actions of the HealthTech employee filling that CEO position are taken under the direction and authority of the PVHC Board.  The Agreement between HealthTech and PVHC simply eliminated the need for PVHC to employ directly the person, who would serve as PVHC's CEO.

The Agreement between HealthTech and PVHC specifically provides that the CEO is an at-will employee of HealthTech.  *Agreement, Exhibit C at § 2.2.1.*  However, it goes on to define the CEO's on-site responsibilities as follows:

5

> The CEO shall perform the usual and customary functions of a hospital CEO's position **subject to appropriate direction from the [PVHC] Board**. In that respect and in addition to the other applicable responsibilities described earlier in this Agreement, **the CEO of the Hospital has a CEO's responsibility for and has commensurate authority to lawfully and reasonably accomplish the duties set forth below subject to direction by the Board**: * * *.

*Id. (emphasis supplied)*. HealthTech provided PVHC with a CEO, who served the various interests of both HealthTech and PVHC. For some functions, the CEO may be considered solely as a HealthTech employee. However, when exercising his CEO functions under Wyoming law, this CEO wore at least two hats. For some functions directly relating to the operation of the hospital, the CEO may be considered to be a borrowed servant, employed by HealthTech but serving PVHC. *See Franks v Olson*, 975 P.2d 588, 593 (Wyo. 1999). Alternatively for other functions the CEO may be considered to be a joint employee of both HealthTech and PVHC. *See Stratman v. Admiral Beverage Corp.*, 760 P.2d 974, 980 (Wyo. 1988). In truth, it may not be possible to define the role(s) of the CEO with precision at this time or in the context of these proceedings. However, one thing is clear. The actions of the CEO, as allegedly performed by the CEO and as described in the Application to the WMRP, were undertaken in fulfillment of duties that would otherwise have been performed by an employee of PVHC, a facility that even the Claimant would agree is a health care provider under the terms of the Act.

One of the express purposes of the Act is to protect facilities, such as PVHC, and their employees from lawsuits alleging malpractice. A health care facility, such as PVHC or any other corporate entity, exists as separate entity and may be treated as a person as a matter of law, but it only acts through the people acting on its behalf. Accordingly the protections of the Act should extend to and include all persons performing the critical functions that make the facility work, including service providers such as HealthTech. HealthTech contracted to provide PVHC with a CEO, who would in turn provide important services to PVHC under the direction of PVHC's

board.  A suit against HealthTech and the CEO that HealthTech supplied to PVHC under these

circumstances is the substantial equivalent of a suit against an employee of PVHC.  The CEO

supplied by HealthTech under the Agreement was filling shoes that otherwise would have to be

filled by a PVHC employee.  Accordingly HealthTech and Patten should be entitled to stand on

equal footing with PVHC and thus should be entitled to claim the same protections afforded to

PVHC under the terms of the Act.

> **2.  A claim for negligent supervision and/or credentialing of a physician arises out of an alleged claim of malpractice, cannot proceed in the absence of such malpractice and therefore qualifies as a "malpractice claim" under the Act.**

Claimant next argues that HealthTech cannot claim protection under the Act, because her

claims against HealthTech are not malpractice claims.  This argument ignores the language of

the Act as well as the elements of a negligent credentialing claim.  It is without merit.

First, this entire argument simply misses the mark, given the applicable language of the

Act.  Under the Act, it does not matter whether Claimant's claim against HealthTech is a

malpractice claim; it does not matter whether there is a *"malpractice claim" against HealthTech*.

Instead, the key is whether the claimant claims that *someone* committed malpractice: "Unless

submission to the panel is waived in accordance with W.S. 9-2-1519(a), **no complaint alleging**

**malpractice shall be filed in any court** against a health care provider before a claim is made to

the panel and its decision is rendered." *W.S. § 9-2-1518(a)* (emphasis supplied).  Thus, the key is

whether the Claimant alleges malpractice, regardless of whom exactly is accused of malpractice.

In this case, whether or not HealthTech itself is deemed to be accused of malpractice or the

subject of a "malpractice claim," Claimant undeniably alleges malpractice on the part of Dr.

Hansen.  Thus, the WMRPA by its express terms applies here, regardless of whether Claimant

has asserted what can be deemed a "malpractice claim" against HealthTech.

Moreover, the negligent credentialing and supervision claims against HealthTech are derived from and depend upon the allegations of malpractice asserted against Dr. Hansen. HealthTech may not have committed malpractice itself, but the claim incorporates a malpractice claim against Dr. Hansen and cannot survive without these allegations. The term "malpractice claim" is defined as "any claim against a health care provider for alleged medical treatment, alleged lack of medical treatment, or any other departure from accepted standards of health care which results in damage to the patient." *W.S.§ 9-2-1515(a)(ii)*. The claims against HealthTech arise from and rely upon an alleged departure of standards of health care by Hansen in the course of his treatment of Claimant. The Wyoming Legislature has clearly has been given the WMRP authority and responsibility to review this portion of the claim.

As previously noted, any claim for negligent supervision, monitoring or credentialing of a physician necessarily rests on a foundational claim that the Claimant has in fact suffered an injury caused by malpractice on the part of a physician. *Beavis v Campbell County Memorial Hospital*, 2001 WY 32, ¶¶ 19-20, 20 P.3d 508, 515-16 (Wyo. 2001). Claimant's reliance on the allegations of malpractice against Hansen to support her claims against HealthTech is reflected in the Application as well as in the Complaint filed in federal court. *See Exhibit A at ¶¶ 21-24*. Any suggestion that her claims against HealthTech somehow exist separate, apart and independent from the predicate claim of malpractice flies in the face of reason and the law.

The cases Plaintiff has cited to support her arguments are not on point. *Wooton v. Singer*, 2008 WL 5705218 (Laramie County District Court, Wyo. 2008) involved a case that was filed against a physician, which included claims of malpractice as well as claims for battery and intentional infliction of emotional distress. While the court did agree that the claims for battery

8

and intentional infliction of emotional distress did not qualify as malpractice under the Act, it nevertheless rejected the Plaintiff's argument that she should be allowed to proceed directly to court and to bypass the WMRP and held that "Plaintiff was required to file a claim with the Medical Review Panel and must await its decision before filing her COMPLAINT." *Id.* at 3. Accordingly. the entire complaint was dismissed pending a final decision from the WMRP.

*Van Slyke v. Columbia Memorial Hospital, Inc.*, 118 Misc.2d 203, 459 N.Y.S.2d 1013 (Sup. Ct. Columbia County, N.Y. 1983) involved an issue regarding the statute of limitations and not the question of whether the claim was reviewable under an act similar the Wyoming Act involved in this case. Moreover, the court did not recognize or discuss the fact that any claim for negligent supervision must incorporate and rest on a predicate claim of malpractice, as recognized by the Wyoming Supreme Court in *Beavis, supra.*

In contrast, when presented with the issue of whether a negligent credentialing claim constituted a health care liability claim under the Texas Medical Liability and Insurance Improvement Act ("MLIIA"), the Texas Supreme Court held that it was covered by the terms of the MLIIA.

> Plaintiffs cannot use artful pleading to avoid MLIIA's requirement when the essence of the suit is a health care liability claim. To determine whether a cause of action falls under the MLIIA's definition of "health care liability claim," we examine the claims underlying nature. If the act or omission alleged in the complaint is an inseparable part of the rendition of health care services, then the claim is a health care liability claim. One consideration in that determination may be whether proving the claim would require the specialized knowledge of a medical expert.

*Garland Community Hospital v. Rose*, 156 S.W. 3d 541, 543-44 (Tex. 2004) (citations omitted). The plaintiff had argued that her credentialing claims against the hospital were not health care liability claims, because they did not occur during her actual medical treatment, but the Texas

Supreme Court rejected this argument, noting that the complaint included allegations of acts and omissions that necessarily occurred during her treatment.

> When a plaintiff's credentialing claim centers on the quality of the doctor's treatment, as it does here, the hospital's alleged acts or omissions in credentialing are inextricably intertwined with the patient's medical treatment and the hospital's provision of health care. Although neither the Hospital as an entity nor the credentialing board actually performed the surgeries on Rose, a doctor lacking credentials could not have performed surgery in that hospital. Likewise, Rose's negligent credentialing claim derives from Dr. Fowler's alleged negligent treatment. Indeed, without negligent treatment, a negligent credentialing claim could not exist. Thus the Hospital's acts or omissions in credentialing Dr. Fowler are an inseparable part of the treatment provided to Rose.

156 S.W.3d at 546. Accordingly The Texas Supreme Court held, "that **negligent credentialing claims involve a claimed departure from an accepted standard of health care** and are therefore 'health care liability claims' governed by the MLIIA." *Id.* (emphasis supplied).

The Indiana Supreme Court has reached a similar conclusion concerning the scope of coverage allowed under the Indiana Medical Malpractice Act in a case involving an alleged failure to maintain medical records. "[R]egardless of what label a plaintiff uses, claims that boil down to a 'question of whether a given course of treatment was medically proper and within the appropriate standard' are the 'quintessence of a malpractice case.'" *Howard Regional Health Sys. v. Gordon*, 952 N.E.2d 182, 185 (Ind. 2011). In resolving the issue in favor of coverage, the *Howard* decision cited earlier case from the Indiana Court of Appeals, which had described the landscape of malpractice actions under the Act as follows:

> Viewed from the historical perspective we believe the conclusion is inescapable that our General Assembly intended that all actions the underlying basis of which is alleged medical malpractice are subject to the act. [T]he obvious purpose of the act is to provide some measure of protection to health care providers from malpractice claims, and to preserve the availability of the professional services of physician and other health care providers in the communities and thereby protect the public health and well-being.

952 N.E.2d at 186, citing *Winona Memorial Hospital v. Kuester*, 737 N.E.2d 824, 828 (Ind. App. 2000), quoting *Sue Yee Lee v Lafayette Home Hospital, Inc.*, 410 N.E.2d 1319, 1324 (Ind. App. 1980). In *Winona*, the Court of Appeals specifically applied these principles and concluded that claims for negligent credentialing were in fact part of that landscape.

> Kuester's claim presents a new wrinkle in that she alleges that two negligent acts occurred to proximately cause her injury. As pleaded, in order for Kuester to prove the tort of negligent credentialing, she must first establish that a negligent act of Dr. Crosby proximately caused her injury before she can proceed against Winona. As a result, it is inappropriate to look only to the credentialing conduct alleged in the complaint to determine whether is sounds in malpractice or in an ordinary, common law cause of action. The credentialing process alleged must have resulted in a definable act of medical malpractice that proximately caused injury to Sharon Kuester or Kuester is without a basis to bring suit for negligent credentialing.

*Winona Memorial Hospital v. Kuester, supra*, 737 N.E.2d at 828.

These cases are fully in line with Wyoming law and with the terms of the Wyoming Act. Plaintiff cannot proceed on her claims for negligent credentialing without first proving medical negligence on the part of Hansen. *Beavis, supra*. Proof of medical negligence on the part of Hansen will require Plaintiff to offer expert testimony. "[T]he standard of care in a medical malpractice case generally must be proven through expert testimony." *Armstrong v. Hrabel*, 2004 WY 39, ¶ 12, 87 P.3d 1226, 1231 (Wyo. 2004), and cases cited therein. The issue of whether or not Hansen committed malpractice is inextricably interwoven in the claims against HealthTech for improper supervision and control. Accordingly to the extent that these claims rely upon proof of medical malpractice, that portion of the claim is must assuredly a "malpractice claim," as defined by the Act. *See W.S. § 9-2-1515(a)(ii)*. The claims for negligent credentialing and supervision are derivative of the underlying medical malpractice claim. The Act says that "the panel shall review all malpractice claims against health care providers filed with the panel." *W.S. § 9-2-1518(a)*. it further states that "no complaint alleging malpractice

shall be filed in any court against a health care provider before a claim is made to the panel and

its decision is rendered." *Id.* Accordingly, the underlying medical malpractice portion of the

claim must be submitted to the WMRP and a decision must be rendered, before any part of the

derivative claims asserted against HealthTech can be heard in any court.

**B.**    **Any Access that HealthTech may have to Confidential Materials Exchanged Before the WMRP is not an Issue, since (1) Claimant Filed her Claim Naming HealthTech as a Health Care Provider, (2) HealthTech is a Proper Party to the WMRP Proceedings and (3) Any Privilege to Claimant's Health Records was Waived, When She Filed Her Lawsuit in Federal Court.**

Claimant's final argument borders on the absurd, when she suggests that HealthTech is

seeking to somehow obtain improper access to Claimant's private health records through the

WMRP. The short answer to this specious claim is "nonsense."

First, HealthTech did not force its way into this proceeding. HealthTech is a party to this

proceeding, because Claimant named HealthTech as a health care provider in her Application.

Claimant may have had second thoughts about her decision in light of the Motion to Dismiss or

Stay that HealthTech filed in the federal law suit, but the fact remains that Claimant made the

decision to join HealthTech.

Second, as demonstrated in the preceding arguments, HealthTech has every right to

participate in this proceeding. Accordingly, HealthTech has every right to share in whatever

discovery can be gathered or developed through the WMRP. The claims against HealthTech

constitute malpractice claims against a health care provider for purposes of the Act.

Third, independent of this proceeding, Claimant has expressly waived any claims of

privilege relating to her private health records, when she filed her lawsuit against HealthTech in

federal court.  Having placed her physical condition and medical treatment in controversy,

Claimant has waived any claims of privilege with respect to this information.  *Wardell v McMillan,* 844 P.2d 1052, 1066 (Wyo. 1992).

### III.   CONCLUSION

Claimant's Request for an Order of Dismissal should be overruled.  Claimant named HealthTech as a health care provider in her Application.  Permitting HealthTech to participate in this proceeding is consistent with the terms and the purpose of the Act.  The claims that Claimant asserts as the basis of her claims do in fact involve malpractice claims against a health care provider.  The fact that Plaintiff has grafted additional claims for negligent credentialing and supervision onto the rootstock of her malpractice claim does not change the fact that the malpractice claim against Dr. Hansen is the primary claim that must be addressed before any other claim.  While the WMRP may not be the appropriate forum to address all aspects of the negligent credentialing claims asserted against HealthTech, it is undeniably the forum entrusted with first determining whether or not any health care provider violated any standard of care with respect to Claimant's medical treatment.  Claimant's attempt to reconfigure her claim is nothing more than a tactic, which she has adopted in an effort to avoid one of HealthTech's arguments for dismissing or staying her federal lawsuit.  The WMRP should not allow itself to be used in this fashion.

**WHEREFORE** Respondent prays that the WMRP deny the Request for order of Dismissal.

DATED this ___ day of December 2014.

George E. Powers, Jr., 5-2062
Paul Kapp, 5-2267
Sundahl, Powers, Kapp & Martin, L.L.C.
P.O. Box 328
Cheyenne, WY  82003-0328
(307) 632-6421
gpowers@spkm.org
*Attorneys for HealthTech Management Services,*
*Inc.*

14

## CERTIFICATE OF SERVICE

I certify the foregoing pleading was served on this ⎽⎽ day of December 2014, and that copies were served as follows:

Robert A. Krause    [ X ] U.S. Mail
Mel C. Orchard, III    [⎽⎽] Fed Ex
Elizabeth A. Richards   [⎽⎽] Fax
The Spence Law Firm   [⎽⎽] Hand Delivered
15 S. Jackson Street, PO Box 548 [ X ] E-mailed
Jackson, WY 83001

William L. Simpson    [ X ] U.S. Mail
Burg, Simpson, Eldredge, Hersh & [⎽⎽] Fed Ex
Jardine, PC      [⎽⎽] Fax
1135 14th Street     [⎽⎽] Hand Delivered
PO Box 490      [ X ] E-mailed
Cody, WY 82414

Eric A. Easton, Director   [ X ] U.S. Mail
Wyoming Medical Review Panel [⎽⎽] Fed Ex
P.O. Box 1507     [⎽⎽] Fax
Casper, WY 82602    [⎽⎽] Hand Delivered
          [ X ] E-mailed

Brian J. Marvel     [ X ] U.S. Mail
Williams, Porter, Day & Neville P.C. [⎽⎽] Fed Ex
159 North Wolcott, Suite 400  [⎽⎽] Fax
PO Box 10700     [⎽⎽] Hand Delivered
Casper, WY 82602    [ X ] E-mailed

Christopher Voigt    [ X ] U.S. Mail
Crowley Fleck Attorneys PLLP  [⎽⎽] Fed Ex
Transwestern Plaza II490 N. 31st Street [⎽⎽] Fax
Billings, MT 59101-1288   [⎽⎽] Hand Delivered
          [ X ] E-mailed

_____
George E. Powers, Jr.

Robert A. Krause; krause@spencelawyers.com
Mel C. Orchard, III; orchard@spencelawyers.com
Elizabeth A. Richards; richards@spencelawyers.com
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290
(307) 733-5248 Fax

Attorneys for Plaintiff

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2014 AUG 15   AM 10 58

STEPHAN HARRIS, CLERK
CHEYENNE

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF WYOMING

| | |
|---|---|
| MICHELLE OLIVER,<br><br>    Plaintiff,<br><br>v.<br><br>HEALTHTECH MANAGEMENT<br>SERVICES, INC., and WILLIAM D.<br>PATTEN,<br><br>    Defendants. | Civil No. *14 CV 168-S*<br><br>COMPLAINT & JURY DEMAND |

Plaintiff, by and through her attorneys, Robert A. Krause, Mel C. Orchard, III and

Elizabeth A. Richards of The Spence Law Firm, LLC, pleads and alleges her causes of

action against the Defendants as follows:

### PARTIES

1. Michelle Oliver is a resident of the State of Montana who is a citizen of Montana
   for the purpose of determining diversity.

2. William Patten is a resident of the State of Wyoming who is a citizen of
   Wyoming for the purpose of determining diversity.


EXHIBIT
A

3.  HealthTech Management Services, Inc. (HealthTech), is an Oregon Corporation with its business headquarters and principal place of business in the State of Tennessee, and it is doing business in the State of Wyoming. HealthTech is a citizen of Oregon and Tennessee for the purpose of determining diversity. The name and address of its registered agent in Wyoming is Corporation Service Company, 1821 Logan Ave., Cheyenne, Wyoming 82001.

4.  Under the doctrine of *respondeat superior*, HealthTech is vicariously liable for any act or omission of an officer, agent, servant or employee made while acting in the scope of authority delegated by the company, or within the scope of the duties of the employee, which were the direct and proximate cause of the injuries and the resulting damages alleged herein.

5.  Because for at least a portion of the time and place of the events described herein William Patten was, on information and belief, acting as an officer, agent, servant and/or employee of HealthTech, working within the scope of his employment or agency, to further the interests of HealthTech, HealthTech is vicariously liable for William Patten's negligent acts and omissions.

6.  Oliver does not believe that the claims against William Patten and HealthTech asserted herein are subject to the Wyoming Medical Review Panel Act of 2005, Wyo. Stat. Ann. §§ 9-2-1513 through 9-2-1523, in that neither defendant is a "health care provider" as that term is defined in Wyo. Stat. Ann. § 9-2-1515(a).

7.  Nevertheless, to the extent she was required to do so, Oliver complied with the Wyoming Medical Review Panel Act of 2005. Out of an abundance of caution, on August 11, 2014, Plaintiff filed an Application for Claim Review with the

2

Wyoming Medical Review Panel (MRP) for claims against HealthTech and other individuals and entities. The Director of the MRP has not yet signed an Order of Dismissal.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the suit is between citizens of different states, and the amount in controversy of each claim exceeds seventy-five thousand dollars ($75,000) exclusive of interest and costs.

9. Pursuant to 28 U.S.C. §1391(a), proper venue for this action is the United States District Court for the District of Wyoming because a substantial part of the events or omissions giving rise to the claims occurred within the District of Wyoming.

## STATEMENT OF FACTS

10. On July 20, 2012, Michelle Oliver suffered a work-related trauma to her left knee.

11. Dr. Jeffrey Hansen, an employee of Powell Valley Healthcare, Inc. (PVHC), evaluated Oliver's injury, and performed a left ACL reconstruction on August 21, 2012.

12. Following the surgery, Oliver experienced pain and still had very limited movement in her knee.

13. Dr. Hansen performed two additional procedures, on March 5, 2013 and on April 30, 2013, but Oliver's pain and limited movement persistent.

14. Eventually, a specialist performed a left ACL reconstruction on October 4, 2013, to repair the damage caused by Dr. Hansen's surgery.

15. Oliver has improved since this surgery, although she has been told that due to bone damage she will likely need a full knee replacement in the near future.

16. Oliver's injuries were caused, in part, by the negligent conduct of Dr. Hansen.

17. Specifically, on August 21, 2012, Dr. Hansen performed an ACL reconstruction, partial medial meniscectomy and lateral meniscus repair on Oliver.

18. Dr. Hansen's surgical actions fell below the standard of care in that the femoral tunnel placement of his graft was grossly inappropriate, resulting in graft failure and continued knee instability.

19. This instability contributed materially to the development of arthrofibrosis and continued degenerative changes to the knee.

20. Consequently, several additional surgical interventions were necessary, and, ultimately, a complete anterior reconstruction was required.

21. Dr. Hansen's duty of care owed to Oliver was breached through Dr. Hansen's negligent acts and omissions.

22. As a direct and proximate result of Dr. Hansen's negligent acts and omissions, Oliver sustained serious physical and emotional injuries, including, but not limited to, a botched ACL reconstruction necessitating additional surgery, rehabilitation and the risk of full knee replacement.

23. Dr. Hansen's negligence occurred at the facilities of PVHC, in Powell, Wyoming.

24. Dr. Hansen became employed by PVHC in 2006.

25. In 2006, PVHC had a management services contract with Brim Healthcare, Inc. (Brim) under which Brim provided a CEO, along with management and other services described in the contract to assist PVHC in operating PVHC's facilities.

4

26. Under that contract, Brim agreed to provide, and did provide, a CEO to oversee the recruitment, hiring, discharge, supervision, discipline and management of PVHC employees, including employed physicians such as Dr. Hansen.

27. In 2006, at the time Dr. Hansen became employed by PVHC and received medical staff privileges at PVHC, Rod Barton was the CEO of PVHC.

28. In 2006, PVHC's facilities were operated by PVHC, and also by Brim.

29. On information and belief, HealthTech purchased Brim in 2010.

30. On information and belief, HealthTech assumed liability for Brim, its agents, employees or servants such that HealthTech is liable for the acts and omissions of Brim's agents, employees or servants who worked at or provided any services to PVHC.

31. As of 2010, PVHC's facilities are operated by PVHC, and also by HealthTech.

32. In 2010, PVHC entered into a management services contract with HealthTech, under which HealthTech provided a CEO, along with management and other services described in the contract to assist PVHC in operating PVHC's facilities.

33. HealthTech agreed to provide, and did provide, a CEO to oversee the recruitment, hiring, discharge, supervision, discipline and management of PVHC employees, including employed physicians such as Dr. Hansen.

34. In February 2012, William Patten became the CEO of PVHC.

35. Prior to the events giving rise to this case, Patten and HealthTech became aware of complaints that Dr. Hansen was not competent to perform the procedures for which he was granted privileges.

5

36. Prior to the events giving rise to this case, Patten and HealthTech were aware of complaints made by patients and other healthcare providers about Dr. Hansen's competency.

37. Prior to the events giving rise to this case, Patten and HealthTech were aware of Dr. Hansen's rate of surgical complications, and his failure to conform to the standards of care applicable to orthopedic surgeons.

38. Nevertheless, on information and belief, Patten and HealthTech either failed to take steps, or took insufficient steps, to investigate, oversee and monitor Dr. Hansen's performance to ensure patient safety.

39. As a direct and proximate result of the acts and omissions of Patten and HealthTech, Oliver sustained serious physical and emotional injuries, including, but not limited to, a botched ACL reconstruction necessitating additional surgery, rehabilitation and the risk of full knee replacement.

### FIRST CAUSE OF ACTION
### NEGLIGENCE

40. Plaintiff incorporates and adopts by reference all the facts and allegations above as though fully set forth herein.

41. At the time and the place of the events herein, Patten and HealthTech owed a duty of reasonable care to medical patients, including Oliver, to avoid causing her injury.

42. At the time and the place of the events described herein, Patten and HealthTech owed a duty of reasonable care to medical patients, including Oliver, to properly grant, extend, and continue medical staff privileges to physicians, including Dr. Hansen.

6

43. At the time and the place of the events described herein, Patten and HealthTech owed a duty of reasonable care to medical patients, including Oliver, to maintain adequate supervision, oversight and review of the treatment rendered by Dr. Hansen.

44. Patten and HealthTech were negligent in credentialing, hiring, supervising, disciplining, monitoring, reviewing, training, and extending privileges to Dr. Hansen, and such negligence breached the duties of care owed by Patten and HealthTech to Oliver.

45. The negligence of Patten and HealthTech includes, but is not limited to, the following:

    a.    Negligently failing to properly exercise their authority in granting, extending and continuing medical staff privileges to Dr. Hansen;

    b.    Negligently failing to supervise and review Dr. Hansen's exercise of his medical staff privileges;

    c.    Negligently misleading patients, including Oliver, into believing that Dr. Hansen was a suitable and competent physician;

    d.    Negligently failing to modify and/or terminate the medical staff privileges granted to Dr. Hansen based upon his failure to provide appropriate patient care;

    e.    Negligently failing to protect patients, including Oliver, from obtaining care from Dr. Hansen based upon information known to him about his credentials, training, experience, suitability and abilities;

7

    f.      Negligently failing to investigate Dr. Hansen's surgical practices and post-surgical care;

    g.      Negligently failing to adopt and enforce bylaws, policies and procedures sufficient for providing quality and safe health care to patients; and

    h.      Negligently failing to act reasonably under the circumstances.

46. As a direct and proximate result of the negligence of Patten and HealthTech, Oliver suffered the serious injuries set forth above, and in the "Damages" section of this Complaint.

## DAMAGES

47. Plaintiff incorporates and adopts by reference all the facts and allegations above as though fully set forth herein.

48. As a direct result of the negligent acts and omissions set forth herein, Oliver is entitled to be compensated and to recover the following damages:

    a.      Past and future physical pain and suffering in an amount to be proven at trial;

    b.      Past and future emotional pain and suffering in an amount to be proven at trial;

    c.      Past and future loss of enjoyment of life in an amount to be proven at trial;

    d.      Past and future disability in and amount to be proven at trial;

    e.      Past and future loss of wages, income and earning capacity in an amount to be proven at trial;

    f.      Other past and future pecuniary loss in an amount to be proven at trial;

g.   Past and future medical and related expenses in an amount to be proven at
trial;

h.   All allowable costs, expense and fees associated with this litigation; and

i.   Plaintiff reserves the right, if demonstrated by the evidence, to assert a
claim for punitive damages as is fair and just.

WHEREFORE, Plaintiff prays that the Court enter judgment against the Defendants
in an amount supported by the allegations of this Complaint, as follows:

1.   Judgment against the defendants for general damages in an amount consistent
with the allegations contained herein and to be proven at trial; and

2.   Judgment against the defendants for special damages in an amount consistent
with the allegations contained herein and to be proven at trial; and

3.   Judgment for costs, interests, and such other and further relief as this Court deems
just and equitable.

DATED this 14th day of August, 2014.

Robert A. Krause
Mel C. Orchard, III
Elizabeth A. Richards
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290

Attorneys for the Plaintiff

9

## DEMAND FOR JURY TRIAL

Plaintiff, by and through counsel and pursuant to Federal Rule of Civil Procedure 38, hereby requests that this matter be tried to a jury of six and submits the requisite fee herewith.

DATED this 14th day of August, 2014.

Robert A. Krause

10



THE SPENCE LAW FIRM, LLC

TO:

Robert A. Krause
The Spence Law Firm, LLC
P.O. Box 548
Jackson, WY  83001

15 S. JACKSON ST. · POST OFFICE BOX 548 · JACKSON WY 83001



UNITED WE STAND

02 1P
0003191290
MAILED FROM ZIP CODE 83001

$001.610
SEP 08 2014
PITNEY BOWES

UNITED STATES POSTAL SERVICE



THE SPENCE LAW FIRM, LLC

TO: Corporation Services Company
1821 Logan Avenue
Cheyenne, WY 82001
(Registered Agent for
Healthtech Management Srvcs., Inc.)

15 S. JACKSON ST. • POST OFFICE BOX 548 • JACKSON, WY 83001



7012 3050 0001 9897 6187



UNITED WE STAND

02 1P
0003181290
MAILED FROM ZIP CODE 83001

$ 008.50
SEP 08 2014

Paul Kapp #5-2267
George E. Powers, Jr., WSB #5-2062
Sundahl, Powers, Kapp & Martin, LLC
1725 Carey Avenue
P.O. Box 328
Cheyenne, Wyoming 82003
(307) 632-6421 telephone
*Attorney for Defendants HealthTech*
*and William D. Patten*

## UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

| | |
|---|---|
| MICHELLE OLIVER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil No. 14-CV-168-S |
| ) | |
| HEALTHTECH MANAGEMENT ) | |
| SERVICES, INC., and WILLIAM D. ) | |
| PATTEN, ) | |
| ) | |
| ) | |
| Defendants. ) | |

### DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE OR IN THE ALTERNATIVE TO STAY PROCEEDINGS PENDING RESOLUTION OF MEDICAL REVIEW PANEL PROCEEDINGS AND JOINDER OF NECESSARY PARTIES

COMES NOW the Defendants, HealthTech Management Services, Inc. ("HealthTech"), and William D. Patten ("Patten"), by and through their attorneys, Sundahl, Powers, Kapp & Martin, LLC, and hereby move this Court for its order dismissing this case without prejudice, pursuant to Federal Rules of Civil Procedure 12(b)(6) and/or 12(b)(7) and 19. In the alternative, Defendants would respectfully ask that further proceedings in this matter be stayed pending resolution of matters currently pending before the Wyoming Medical Review Panel and related issues of joinder. In support of this Motion, Defendants would respectfully show this Court as follows:

1



1.      On August 15, 2014 Plaintiff sued HealthTech and Patten claiming that she had sustained various injuries as a result of medical negligence or malpractice on the part of Dr. Jeffrey Hansen. *Complaint at ¶¶ 10-39.* Specific facts alleged in the Complaint include the following:

   a)   Dr. Hansen was an employee of Powell Valley Healthcare, Inc. ("PVHC"), when he performed surgery on Plaintiff on August 21, 2012 and several additional procedures. *Complaint at ¶¶ 11-13.*

   b)   Plaintiff's alleged injuries are the result of negligence on the part of Dr. Hansen in the course of his work at PVHC. *Complaint at ¶¶ 16-24.*

   c)   PVHC had a contract with HealthTech to provide management services to PVHC. *Complaint at ¶¶ 25-32.*

   d)   HealthTech was to provide a CEO to oversee the recruitment, hiring, discharge, supervision, discipline and management of PVHC employees, including employee physicians. Patten assumed the position of CEO in 2012. *Complaint at ¶¶ 33-34.*

   e)   HealthTech and Patten allegedly became aware of complaints relating to Dr. Hansen and failed to take steps to investigate, oversee or monitor his performance, which was a cause of the injuries sustained by Plaintiff because of the alleged negligence of Dr. Hansen. *Complaint at ¶¶ 35-39.*

2.      Based on these alleged facts, Plaintiff has asserted a cause of action for negligence. Plaintiff alleges that Defendants owed her a duty of care with respect to: a) granting Dr. Hansen surgical privileges, b) supervising the exercise of Dr. Hansen's surgical privileges, c) misleading patients into believing that Dr. Hansen was a suitable, competent physician, d) failing to modify or terminate Dr. Hansen's surgical privileges, e) failing to protect patients from obtaining care from Dr. Hansen, f) negligently investigating Dr. Hansen's surgical practices, g) failing to adopt bylaws policies and procedures to provide quality care and h) failing to act reasonably under the circumstances. *Complaint at ¶¶ 40-46.*

3. On August 13, 2014 Plaintiff also filed an *Application for Claim Review* (the "WMRP Claim") with the Wyoming Medical Review Panel ("WMRP"), Claim Number 14-30. *See*

2

*Complaint (Doc. 1) at ¶¶ 6-7*. A true and accurate copy of the *Application for Claim Review*, Claim Number 14-30, is attached hereto and incorporated herein by this reference as Exhibit A. This WMRP Claim names PVHC, Jeffrey Hansen, M.D., and HealthTech as "health care providers against whom a claim has been made." The WMRP Claim is still pending and subject to further proceedings before the WMRP. *Complaint at ¶ 7*. The Court may consider the contents of this WMRP Claim in support of this motion and can compare the allegations in the WMRP Claim to the allegations contained in the Complaint. The Tenth Circuit has held that a document that is central to the Plaintiff's claim and referred to in the complaint may be considered in resolving a Rule 12(b) motion to dismiss, where the authenticity of the document is not in question. *Utah Gospel Mission v Salt Lake City Corp.*, 425 F.3d 1249, 1253-54 (10th Cir. 2005) *and cases cited therein.*

4.     The facts and circumstances recited in the WMRP Claim are the same facts and circumstances that Plaintiff has alleged as the basis for the claims of medical negligence in this lawsuit. The only material difference between the factual allegations contained in the WMRP Claim and the factual allegations contained in the Complaint filed herein is that Plaintiff did not name Patten as a health care provider in the WMRP Claim.

5.     Under Wyoming law a Plaintiff may not file a lawsuit against a health care provider until the Plaintiff has complied with the Medical Review Panel Act of 2005, W.S. §§ 9-2-1514 *et seq.* The Act specifically provides "no complaint alleging malpractice shall be filed in any court against a health care provider before claim is made to the panel and its decision is rendered." W.S. § 9-2-1518(a). The Tenth Circuit Court of Appeals held that compliance with the Act furthers the State of Wyoming's goal of preventing lawsuits against healthcare providers, where the facts do not permit a reasonable inference of malpractice. *Van Dyke v. United States*,

457 Fed. Appx. 721, 726 (10th Cir. 2012). The Court then affirmed the dismissal of the lawsuit and adopted the following rule, quoting in part from the Appellee's Brief. "[A] claimant's compliance with the Wyoming [Medical Review Panel] Act's 'requirements is mandatory, even if a healthcare provider ultimately chooses not to participate in the process.'" *Id.* Accordingly, this lawsuit simply cannot proceed, until and unless the WMRP Claim currently pending before the WMRP has been resolved and a final order has been issued. Accordingly, this lawsuit should be dismissed or, at the very least, stayed until the proceedings before the WMRP have been concluded.

6.    In addition, by filing this lawsuit before the WMRP Claim has been resolved, Plaintiff has improperly split her cause of action. HealthTech and Patten have been sued in this court, but at the same time Plaintiff has initiated another proceeding arising out of the same operative facts against HealthTech and other entities before the WMRP. In the WMRP Claim before the WMRP Plaintiff has made claims against HealthTech and additional claims against at least two other parties, Hansen and PVHC. These claims allegedly arise out of the same alleged acts of negligence, which form the foundation for the claims currently before this Court. However, whether analyzed under federal law or under state law, this blatant attempt to split her common cause of action must not and cannot be permitted.

7.    The Tenth Circuit will not permit a plaintiff to split a cause of action or maintain multiple, concurrent lawsuits on the same claim.

> District Courts have discretion to control their dockets by dismissing duplicative cases. See *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L. Ed. 2d 483 (1976) ("As between federal district courts . . . though no precise rule has evolved, the general principle is to avoid duplicative litigation."). Long ago, the United States Supreme Court captured the general principle regarding claim-splitting:

> When the pendency of a [previously filed] suit is set up to defeat another, the case must be the same. There must be the same parties, or, at least, such as represent the same interests; there must be the same rights asserted and the same relief prayed for; the relief must be founded upon the same facts, and the title, or essential basis, of the relief sought must be the same.

*The Haytian Republic*, 154 U.S. 118, 124, 14 S. Ct. 992, 38 L.Ed. 930 (1894) (quotation omitted); *see also Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir.2000) ("[P]laintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time."). We have noted that "more recent cases analyze claim-splitting as an aspect of res judicata." *Hartsel*, 296 F.3d at 986 (collecting cases); *see also Stone v. Dep't of Aviation*, 453 F.3d 1271, 1278 (10th Cir.2006) ("A plaintiff's obligation to bring all related claims together in the same action arises under the common law rule of claim preclusion prohibiting the splitting of actions.").

*Katz v. Girardi*, 655 F.3d 1212, 1217-18 (10th Cir. 2011). Plaintiff cannot maintain this lawsuit and the pending WMRP Claim without running afoul of the rule against claim splitting. Moreover, HealthTech can invoke the rule against claim splitting here and now.

> Our precedent cannot be clearer: the test for claim splitting is not whether there is finality of judgment, but whether the first suit, assuming it were final, would preclude the second suit. This makes sense, given that the claim-splitting rule exists to allow district courts to manage their docket and dispense with duplicative litigation. If the party challenging a second suit on the basis of claim splitting had to wait until the first suit was final, the rule would be meaningless. The second, duplicative suit would forge ahead until the first suit became final, all the while wasting judicial resources.

655 F.3d at 1218-19. Plaintiff cannot split her cause of action against HealthTech by maintaining her claims before this Court, while she also pursues the same claim before the WMRP.

8.   Wyoming law will not permit a plaintiff to split their cause of action or claims in this fashion either. "[A] single wrong gives rise to one cause of action for which only one suit may be maintained, however numerous the elements of damages resulting therefrom." *Fioanini v Brinton*, 855 P.2d 1238, 1240 (Wyo. 1993) quoting *Lane Co. v. Busch Dev. Inc.*, 662 P.2d 419,

421 (Wyo. 1983). "The purpose of the rule against splitting causes of action is 'to promote fairness to the parties by protecting defendants against fragmented, harassing, vexatious, and costly litigation, and the possibility of conflicting outcomes.'" *R.C.R, Inc. v. Deline*, 2008 WY 96, 190 P.3d 140, 152 (Wyo. 2008).    Plaintiff cannot split her cause of action against HealthTech and cannot maintain or pursue two separate actions arising out of the same alleged wrong.

     9.    Furthermore, PVHC and Dr. Hansen are also "persons to be joined if feasible" under Rule 19(a) of the Federal Rules of Civil Procedure. That rule provides as follows:

> (a) PERSONS REQUIRED TO BE JOINED IF FEASIBLE.
>     (1) *Required Party*. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>         (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>         (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>             (i) as a practical matter impair or impede the person's ability to protect the interest; or
>             (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.
>     (2) *Joinder by Court Order*. If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.
>     (3) *Venue*. If a joined party objects to venue and the joinder would make venue improper, the court must dismiss that party.

     10.    The adjudication of the claims alleged against the Defendants will necessarily require that Plaintiff first establish that her injuries were caused by medical negligence on the part of Dr. Hansen.    Any claim that Dr. Hansen was negligently hired, retained supervised or credentialed necessarily rests upon the predicate of Dr. Hansen's alleged negligence. *See Beavis v Campbell County Memorial Hospital*, 2001 WY 32, 20 P.3d 508, 515-16 (Wyo. 2001). The

*Beavis* case cites *Benedict v. St. Luke's Hospital*, 365 N.W. 499, 504-05 (N.D. 1985) with approval for its holding that a breach of the duty to provide competent medical staff cannot be maintained without evidence that the relevant doctor acted negligently. The allegations contained in the Complaint in this lawsuit simply confirm that Plaintiff's claims against HealthTech and Patten are inextricably tied to the very same claims that have been asserted against HealthTech, PVHC and Hansen in the WMRP Claim.

11. Rule 19 is founded upon principles of equity that have been part of this county's jurisprudence for more than a century. In *Shields v Barrow*, 58 U.S. 130, 139 (1854) the Court used the following language to describe "necessary parties": "Persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it." This is reflected in the language of Rule 19(a)(1)(A) and the comments of the Advisory Committee on the 1966 Amendments regarding the equivalent language of this Rule, as it was written before the 2007 amendments.[1]

> Clause (1) [now codified as Clause (a)(1)(A)] stresses the desirability of joining those persons in whose absence the court would be obliged to grant partial or "hollow" rather than complete relief to the parties before the court. The interests that are being furthered here are not only those of the parties, but also that of the public in avoiding repeated lawsuits on the same essential subject matter.

Unless PVHC and Hansen are joined, not only will the action against HealthTech be split, but the same essential claims will have to be litigated and adjudicated in yet another proceeding. The same witnesses, the same evidence and the same principles of law will have to be presented to another jury. HealthTech witnesses, as well as other parties and persons with knowledge may be

---

[1] The 1987 and the 2007 amendments to Rule 19 were "technical" and "stylistic only." Advisory Committee Notes, 1987 Amendments and 2007 Amendments. No substantive change was intended, so the interpretive notes from 1966 are still applicable to the current form of the rule.

subjected to repeated discovery requests and depositions.  Without joinder, the parties will be

compelled to squander the time and resources of the parties, the witnesses and the court pursuing

parallel actions, which in the end may only breed confusion rather than resolution, particularly if

the actions result in conflicting verdicts and judgments.  Different juries could apportion fault

differently.  Different juries could award different amounts of damages.  Different findings of

fact could inject issues of res judicata and/or collateral estoppel into the actions and needlessly

confound the rights of the parties to receive a fair hearing on the merits.  The threat of

multiplicity of actions is one of the evils that Rule 19 was meant to ameliorate and is an

appropriate and necessary factor for this Court to consider.  *Ramsey v. Bomlin Testing, Inc.*, 68

F.R.D. 335, 337 (W.D. Okla. 1975).

      12.    In addition, just as joinder under Rule 19(a)(1)(A) is appropriate to protect the

interests of HealthTech and Patten, joinder under Rule 19(a)(1)(B) is appropriate to protect the

interests of the non-parties, PVHC and Hansen.  In weighing the factors relating to the ability of

a non-party to protect an interest in the litigation, the issue is not simply whether or not the non-

party may be bound by a decision made in its absence.  In *Provident Tradesmens Bank & Trust

Co. v. Patterson*, 390 U.S. 102 (1967), the Supreme Court wrote: "[A]s Rule 19(a) expresses it,

the court must consider the extent to which the judgment may 'as a practical matter impair or

impede his ability to protect' his interest in the subject matter."  *Id.* at 111.  Resolution of the

issue will depend upon and require "weighing the factual situation presented in a particular cause

in light of the factors enumerated in Rule 19 and all other relevant factors."  *Bixby v Bixby*, 50

F.R.D. 277,280 (S.D. Ill. 1970).  Proceeding in the absence of PVHC and Hansen may subject

these non-parties to a variety of potential prejudice, including duplicative and cumulative

discovery, conflicting findings of fact or law that may prejudice related rights of indemnity, and

waste of time and resources due to redundant litigation. Many of these same issues would also prejudice the parties, HealthTech and Patten, compounding the problems created by Plaintiff's improper attempt to split her cause of action.

13.     To the extent that Plaintiff may have a claim against anyone for her alleged injuries, any and all such claims require an adjudication of the fault, if any, of Dr. Hansen. Permitting this case to proceed in a piecemeal fashion will compromise and defeat the Court's ability to accord complete justice to the parties. It will also impair or impede the ability of HealthTech, Patten, Dr. Hansen and PVHC to protect their respective interests. At the same time, permitting the case to proceed in a piecemeal fashion will leave HealthTech and Patten subject to the risk of double, multiple or otherwise inconsistent obligations.

14.     So long as the WMRP proceeding against PVHC, Hansen and HealthTech remains open and undetermined, there is no way to bring PVHC and Hansen into this suit, because no lawsuit can be filed or maintained against PVHC or Hansen, until the WMRP proceedings have been concluded. *Van Dyke v. United States, supra*. Accordingly, this suit should be dismissed without prejudice pursuant to Rule 12(b)(6). In the alternative, this matter should also be dismissed without prejudice for failure to join parties to be joined if feasible, pursuant to 19(b) and/or Rule 12(b)(7). Finally, in the alternative to all of the foregoing, this Court may also consider ordering all further action on this case to be stayed pending the final resolution of the pending WMRP proceedings and joinder of both PVHC and Hansen to this suit.

15.     Fortunately, aside from the WMRP issues described *supra*, there is no other apparent jurisdictional reason why PVHC and Dr. Hansen cannot be joined in this lawsuit as Defendants, once the proceedings before the WMRP have been concluded. Joinder will not divest the court of its subject matter jurisdiction. It appears from the allegations in the WMRP

Claim that both PVHC and Hansen are residents and citizens of Wyoming. Since Plaintiff is allegedly a citizen of Montana, this Court would retain jurisdiction based on diversity of citizenship. Under these circumstances the interests of all parties as well as the public interest against multiple lawsuits are all aligned and joinder under Rule 19 is both proper and necessary.

**WHEREFORE** Defendants HealthTech and Patten, pray that this Court enter its order dismissing this action without prejudice pursuant to Rule 12(b)(6) and/or Rules 12(b)(7) and 19. Plaintiff has split her cause of action in violation of Wyoming law and this action cannot proceed until and unless all claims and parties are properly joined. In the alternative, Defendants pray that this Court stay all further action in this case, until Plaintiff has met the following conditions:

A.   All actions and claims pending before the WMRP in Claim Number 14-30 are resolved and an order dismissing the WMRP Claim has been entered by the WMRP; and

B.   Plaintiff has filed an amended complaint that names and joins PVHC and Hansen as defendants in this action.

Defendants further pray for such other and further relief as may be just and proper in the premise.

Dated this 6th day of November 2014.

Paul Kapp #5-2267
George E. Powers, Jr. #5-2062
Sundahl, Powers, Kapp & Martin, LLC
1725 Carey Avenue (82001)
P.O. Box 328
Cheyenne, WY 82003-0328
(307) 632-6421
*Attorneys for Health Tech Management*
*Services, Inc. and William D. Patten*

10

## CERTIFICATE OF SERVICE

I certify the foregoing pleading was served on this 6th day of November 2014, and that copies were served as follows:

Robert A. Krause,                    [_____] U.S. Mail
Mel C. Orchard, III,                 [__X__] Electronically
Elizabeth A. Richards,               [_____] Fax
The Spence Law Firm, LLC             [_____] Hand Delivered
15 S. Jackson Street
PO Box 548
Jackson, WY 83001

_____
George E. Powers, Jr.

11

**BEFORE THE MEDICAL REVIEW PANEL**
**OF THE STATE OF WYOMING**

RECEIVED
MEDICAL REVIEW PANEL
*August 13, 2014*

|  |  |
|---|---|
| IN THE MATTER OF THE CLAIM OF<br>MICHELLE OLIVER | )<br>)<br>) |
|  | ) |
| Claimant, | )<br>) |
| v. | )<br>) |
|  | ) |
| POWELL VALLEY HEALTHCARE, INC.,<br>JEFFREY HANSEN, M.D., and HEALTHTECH<br>MANAGEMENT SERVICES, INC. | )<br>)<br>) |
|  | ) |
| Respondents. | )<br>) |

MRP  14-30

### APPLICATION FOR CLAIM REVIEW

August 11, 2014

To:   Eric Easton, Director
      Wyoming Medical Review Panel
      P.O. Box 1507
      Casper, WY 82602

    Claimant Michelle Oliver, by and through her attorneys, Robert A. Krause, Mel C. Orchard, III and Elizabeth A. Richards, THE SPENCE LAW FIRM, LLC, and William L. Simpson, BURG, SIMPSON, ELDREDGE, HERSH & JARDINE, PC hereby present this Application for Claim Review to the Director of the Wyoming Medical Review Panel pursuant to the Wyoming Medical Review Panel Act of 2005, Wyo. Stat. Ann. §§ 9-2-1513 – 1523.

1.      **Claimant's name, address, and telephone number**

      a.    Michelle Oliver
            636 ½ Avenue East
            Billings, MT  59102
            (406) 403-1320



EXHIBIT
A

2. <u>Claimant's attorneys' names, addresses, email addresses, telephone and fax numbers</u>

Robert A. Krause, krause@spencelawyers.com
Mel C. Orchard, III, orchard@spencelawyers.com
Elizabeth A. Richards, richards@spencelawyers.com
THE SPENCE LAW FIRM, LLC
15 S. Jackson St.
P.O. Box 548
Jackson, WY 83001
(307) 733-7290
(307) 733-5248 (Fax)

William L. Simpson
BURG, SIMPSON, ELDREDGE, HERSH & JARDINE, PC
1135 14th Street
P.O. Box 490
Cody, WY 82414-0490
(307) 527-7891
(307) 527-7897 (Fax)

3. <u>Name and addresses of the health care providers against whom a claim has been filed</u>

Powell Valley Healthcare, Inc.
777 Avenue H
Powell, WY 82435
(307) 754-7257

Jeffrey N. Hansen, MD
1090 Road 10
Powell, WY 82435

HealthTech Management Services, Inc.
5110 Maryland Way
Suite 200
Brentwood, TN 37027
(Registered Agent:  Corporation Service Company, 1821 Logan Ave., Cheyenne, WY 82001)

4. <u>Description of injuries suffered</u>

As a direct and proximate cause of the negligent acts and omissions of Dr. Hansen, Claimant Michelle Oliver sustained serious physical and emotional injuries,

2

including, but not limited to, a botched ACL reconstruction necessitating additional surgery, rehabilitation and the risk of full knee replacement.

As a direct and proximate result of the acts and omissions as alleged herein, Claimant Michelle Oliver incurred the following damages:

    a.    Past and future physical pain and suffering;

    b.    Past and future emotional pain and suffering;

    c.    Past and future loss of enjoyment of life;

    d.    Past and future disability;

    e.    Past and future loss of income and earning capacity;

    f.    Past and future pecuniary loss;

    g.    Past and future medical and related expenses;

    h.    All allowable costs, expenses and fees associated with this litigation; and

    i.    Claimant reserves the right, if demonstrated by the evidence, to assert a claim for punitive damages as is fair and just.

Because Dr. Jeffrey Hansen was an employee of Powell Valley Healthcare, Inc. (PVHC), PVHC is vicariously liable for the damages listed above.

5.    **Statement of the elements of the health care providers' negligent conduct constituting malpractice claims and dates such conduct occurred**

On July 20, 2012, Michelle Oliver suffered a work-related trauma to her left knee. She was unloading a raft from a trailer, and when she stepped down from the trailer the boat moved causing her to fall backwards. The fall resulted in the hyperextension of her left knee. Dr. Jeffrey Hansen of PVH, Inc. evaluated Oliver's injury and on August 21, 2012, he performed a left ACL reconstruction.

Following this surgery, Oliver experienced pain and still had very limited movement in her knee. On March 5, 2013, Dr. Hansen performed a left knee scope with lysis of adhesions and another manipulation. This procedure proved to be ineffective in easing Oliver's continual pain. Dr. Hansen then performed a second manipulation on April 30, 2013. Dr. Hansen's second manipulation resulted in little improvement and Oliver's pain persisted.

Because Oliver had no improvement and was experiencing pain and instability, Montana Worker's Compensation approved a second opinion. Oliver traveled to Arkansas to see Dr. Christopher A. Arnold at Advanced Orthopedic Specialists in Fayetteville. On September 17, 2013, Dr. Arnold reviewed the x-rays that he ordered and noted that the "tibia tunnel is well positioned although it is somewhat vertical. The femoral tunnel is very narrow, about the anterior third of Blumensaat line. She has early medial joint space narrowing." Dr. Arnold recommended that Oliver undergo an ACL revision with patella tendon autograft.

On October 4, 2013, Dr. Arnold performed a left ACL reconstruction. Oliver has improved since this surgery, although she has been told that due to bone damage she will likely need a full knee replacement in the near future.

Oliver's injuries were caused by the negligent conduct of Dr. Hansen. Specifically, on August 21, 2012, Dr. Hansen performed an anterior cruciate ligament reconstruction, partial medial meniscectomy and lateral meniscus repair on Oliver. Dr. Hansens' surgical actions fell below the standard of care in that the femoral tunnel placement of his graft was grossly inappropriate, resulting in graft failure and continued knee instability. This instability contributed materially to the development of arthrofibrosis and continued degenerative changes to the knee. Consequently, several additional surgical interventions were necessary. Ultimately, a complete anterior reconstruction was required. Dr. Hansen's actions fell below the standard of care and caused harm to Oliver. The duty of care owed to Oliver was breached through Dr. Hansen's negligent acts and omissions, including, but not limited to, the following:

a.   Negligently failing to maintain a safe environment for patient treatment;

b.   Negligently failing to fully and properly examine, diagnose, evaluate and treat, or in the alternative, to properly refer and secure qualified and competent medical specialists to examine, diagnose, evaluate and treat Oliver;

c.   Negligently failing to monitor and asses the condition of Oliver;

d.   Negligently failing to properly evaluate and diagnose the condition of Oliver, and negligently failing to take appropriate steps based thereon;

e.   Negligently failing to comply with the standard of care requisite in the industry for orthopedic surgeons; and

f.   Negligently failing to exercise reasonable care under the circumstances.

Again, Dr. Jeffrey Hansen was an employee of PVHC, and PVHC is vicariously liable for the damages listed above.

Additionally, Dr. Hansen began his employment as an orthopedic surgeon with PVHC in May 2006. As early as 2007, PVHC became aware of complaints that Dr. Hansen was not competent to perform the procedures for which PVHC had granted him

4

privileges. PVHC was aware of complaints made by patients and other healthcare providers about Dr. Hansen's competency. PVHC was aware of Dr. Hansen's rate of surgical complications, and his failure to conform to the standards of care applicable to orthopedic surgeons.   Nevertheless, on information and belief, PVHC either failed to take steps, or took insufficient steps, to investigate and monitor Dr. Hansen's performance to ensure patient safety.

Michelle Oliver's injuries were caused by the negligent conduct of PVHC. PVHC was negligent in credentialing, hiring, supervising, monitoring, reviewing, training, and extending privileges to Dr. Hansen.  PVHC's negligence includes, but is not limited to, the following:

a.   Negligently failing to properly exercise its authority in granting, extending and continuing medical staff privileges to Dr. Hansen;

b.   Negligently failing to supervise and review Dr. Hansen's exercise of his medical staff privileges;

c.   Negligently misleading patients, including Michelle Oliver, into believing that Dr. Hansen was a suitable and competent physician;

d.   Negligently failing to modify and/or terminate the medical staff privileges granted to Dr. Hansen based upon his failure to provide appropriate patient care;

e.   Negligently failing to protect patients, including Michelle Oliver, from obtaining care from Dr. Hansen based upon information known to it about his credentials, training, experience, suitability and abilities;

f.   Negligently failing to investigate Dr. Hansen's surgical practices and post-surgical care;

g.   Negligently failing to adopt and enforce bylaws, policies and procedures sufficient for providing quality and safe health care to patients; and

h.   Negligently failing to act reasonably under the circumstances.

As a direct and proximate result of the acts and omissions as alleged herein, Claimant Michelle Oliver sustained serious physical and emotional injuries, including, but not limited to, a botched ACL reconstruction necessitating additional surgery, rehabilitation and the risk of full knee replacement.

Finally, at the time of the events described herein, HealthTech Management Services, Inc., (HealthTech) provided management services to PVHC.  Pursuant to a PVHC-HealthTech contract, HealthTech provided a CEO, along with management and other services described in the contract.  HealthTech agreed to provide, and did provide, a

CEO to oversee the recruitment, hiring, discharge, supervision, discipline and management of PVHC employees, including employed physicians such as Dr. Hansen.

Prior to the events giving rise to this application for claim review, HealthTech became aware of complaints that Dr. Hansen was not competent to perform the procedures for which he was granted privileges. HealthTech was aware of complaints made by patients and other healthcare providers about Dr. Hansen's competency. HealthTech was aware of Dr. Hansen's rate of surgical complications, and his failure to conform to the standards of care applicable to orthopedic surgeons. Nevertheless, on information and belief, HealthTech either failed to take steps, or took insufficient steps, to investigate and monitor Dr. Hansen's performance to ensure patient safety.

Michelle Oliver's injuries were caused by the negligent conduct of HealthTech. HealthTech was negligent in credentialing, hiring, supervising, disciplining, monitoring, reviewing, training, and extending privileges to Dr. Hansen. HealthTech's negligence includes, but is not limited to, the following:

    a.    Negligently failing to properly exercise its authority in granting, extending and continuing medical staff privileges to Dr. Hansen;

    b.    Negligently failing to supervise and review Dr. Hansen's exercise of his medical staff privileges;

    c.    Negligently misleading patients, including Michelle Oliver, into believing that Dr. Hansen was a suitable and competent physician;

    d.    Negligently failing to modify and/or terminate the medical staff privileges granted to Dr. Hansen based upon his failure to provide appropriate patient care;

    e.    Negligently failing to protect patients, including Michelle Oliver, from obtaining care from Dr. Hansen based upon information known to it about his credentials, training, experience, suitability and abilities;

    f.    Negligently failing to investigate Dr. Hansen's surgical practices and post-surgical care;

    g.    Negligently failing to adopt and enforce bylaws, policies and procedures sufficient for providing quality and safe health care to patients; and

    h.    Negligently failing to act reasonably under the circumstances.

As a direct and proximate result of the acts and omissions as alleged herein, Claimant Michelle Oliver sustained serious physical and emotional injuries, including, but not limited to, a botched ACL reconstruction necessitating additional surgery, rehabilitation and the risk of full knee replacement.

Specifically, as a direct and proximate result of the acts and omissions as alleged herein, Claimant Michele Oliver incurred the following damages:

a.    Past and future physical pain and suffering;

b.    Past and future emotional pain and suffering;

c.    Past and future loss of enjoyment of life;

d.    Past and future disability;

e.    Past and future loss of income and earning capacity;

f.    Past and future pecuniary loss;

g.    Past and future medical and related expenses;

h.    All allowable costs, expenses and fees associated with this litigation; and

i.    Claimant reserves the right, if demonstrated by the evidence, to assert a claim for punitive damages as is fair and just.

6.    **Names and addresses of all health care providers who have had contact with Claimant relevant to the claims and all witnesses.**

The following are witnesses and healthcare providers whom Claimant believes have knowledge of relevant facts concerning this claim and whom she may call as witnesses to appear before the Panel:

Jeffrey N. Hansen, MD (orthopedic surgeon)
1090 Road 10
Powell, WY 82435

Powell Valley Healthcare, Inc.
777 Avenue H
Powell, WY 82435

Terre Johnsey
Margaret Gifford
Thomas Asay (Radiology)
Patricia O'Hara
James Mcevoy, DO
Cherie Bieber, RN (completed pre-operative assessment on 3/05 and 8/21/13)
Brad Mangum, FNP-BC, D.C. (Assistant to Dr. Hansen on 3/05/2013)
Claudette Chretien, RN (Performed patient assessment on 3/05/2013)

Amber Kleiner, RN (Performed post operative care on 3/05/2013)
Chris Hoellwarth, CRNA (Anesthetist on 8/21/2012, post operative care on 3/05/2013)
Angela Redder (Assistant to Dr. Hansen on 8/21/2012)
Heather Baker, RN Circulator (8/21/2012)
Lindsey Loyning, RN Circulator (8/21/2012)
Amber Kleiner, PACU RN (8/21/2012)
Kristie Breitwiser, (scrub 8/21/2012)
Shauna Mignealt, (scrub 8/21/2012)
Powell Valley Healthcare
777 Avenue H
Powell, WY 82435

Christopher A. Arnold, M.D.
Cambre Brooks, RT(R), RMA
Elizabeth Harper, RN
Amanda Lykins, RN
Kathy Potter, RN
Eva Boddie, RMA (measured vital signs on 3/20/2014)
Judd Semingson, APN (Assistant to Dr. Arnold during Oliver's knee operation on
10/4/2013)
Bill Murray, MD (Anesthesiologist during Oliver's knee operation on 10/4/2013)
Advanced Orthopedic Specialists
3900 N. Parkview Dr.
Fayetteville, AR 72703

Michelle Oliver (Claimant)
636 ½ Avenue East
Billings, MT  59102

William Davis Patton, Jr.
c/o Powell Valley Healthcare, Inc.
777 Avenue H
Powell, WY  82435


7.    <u>Signed medical release form</u>

     A medical release form signed by Claimant Michelle Oliver is enclosed with
Claimant's Application for Claim Review.


8.    <u>Venue</u>

     The proper venue for a hearing, if necessary, is Park County, Wyoming, as this is
the county where the cause of action arose.  Wyo. Stat. Ann. § 1-5-109.


8

DATED this 11ᵗʰ day of August, 2014.

Robert A. Krause
krause@spencelawyers.com
Mel C. Orchard, III
orchard@spencelawyers.com
Elizabeth A. Richards
richards@spencelawyers.com
THE SPENCE LAW FIRM, LLC
15 S. Jackson St., P.O. Box 548
Jackson, WY 83001
(307) 733-7290
(307) 733-5248 (Fax)

William L. Simpson
bsimpson@skelaw.com
BURG, SIMPSON, ELDREDGE, HERSH &
JARDINE, P.C.
1135 14ᵗʰ Street
P.O. Box 490
Cody, WY  82414-0490
(307) 527-7891
(307) 527-7897 (Fax)

9

## AGREEMENT FOR MANAGEMENT SERVICES

### Parties

THIS AGREEMENT FOR MANAGEMENT SERVICES is entered into as of the 1st day of November 2010, by and between Powell Valley Healthcare, Inc., an acute care hospital licensed in the State of Wyoming with its offices located at 777 Avenue H, Powell, Wyoming 82435 ("Hospital") and HealthTech Management Services, Inc., an Oregon corporation with its offices located at 105 Westwood Place, Brentwood, Tennessee 37027 ("HTMS").

### Recitals

A.    Hospital provides acute general inpatient and outpatient services, nursing home services, and community health services as established by Hospital's governing board (the "Board").

B.    Hospital requires the services of an experienced chief executive officer ("CEO"), along with such management and services described herein, necessary for the administration of Hospital.

C.    Hospital desires to obtain HTMS's services, and HTMS agrees to provide a CEO, along with such management and other services described herein, upon the terms and conditions set forth herein.

### Agreement

NOW, THEREFORE, for good and valuable consideration and incorporating the recitals set forth above, Hospital and HTMS agree as follows:

1



# ARTICLE I
## SERVICES AND DUTIES

1.1    Engagement. Hospital retains HTMS to provide, and HTMS agrees to provide, the managerial services described herein.

1.2    Authority and Responsibility of HTMS. The Board authorizes HTMS, on the Board's behalf, to exercise, in accordance with written policies of the Board, the reasonable business judgment of a hospital management company in the discharge of its duties hereunder, including supervision and effective management of the day-to-day business operations of Hospital through the CEO. HTMS agrees to carry out such responsibilities in accordance with Hospital policy, rules and regulations and applicable law and to oversee that Hospital has appropriate systems to coordinate such Hospital policies, rules and regulations with patient care, financial management and medical education. Any powers not specifically delegated or granted by the Board to HTMS will remain with the Board. Except as otherwise noted herein, and in particular Section 4.3, all duties of HTMS hereunder shall be exercised through the CEO, or if one is engaged hereunder, the Interim CEO. Specifically, HTMS, through the CEO, shall have responsibility and commensurate authority, subject to the terms of this Agreement, the direction and prior approval of the Board, the written policies of the Board, and the budgets approved by the Board as hereinafter provided, to lawfully and reasonably ensure that the Hospital has in place appropriate systems and personnel to carry out the following activities:

1.2.1    Personnel Administration. HTMS shall:

(a)    Provide CEO-level oversight of the recruitment, hiring, promotion, discharge, supervision, disciplining and management of all employees of Hospital (including employed physicians), including overseeing that the Hospital has appropriate systems in place to administer compliance with the policies, rules, regulations, and compliance programs adopted by the Board, and including providing information and recommendations for the determination

2

from time to time of the numbers and qualifications of employees needed in the various departments and services of Hospital to promote efficiency and quality patient care, in accordance with the Board-approved policies and budgets of Hospital; provided, however, that HTMS's supervisory and management authority shall not extend to any aspect of such employees' professional medical judgment or medical actions, and provided further that HTMS shall not have responsibility for the wages, benefits, withholding, payroll taxes, and other expenses associated with such employees, nor shall HTMS have any liability for the acts or omissions of such employees.

(b)     Provide information to and recommendations for third party support of Hospital's human resources department's administration of wage scales, rates of compensation, employee benefits, rates and conditions of employment, in-service training, attendance at seminars or conferences, staffing schedules and job and position descriptions with respect to all employees of Hospital according to Board policies.

1.2.2    Collection of Accounts. HTMS shall provide CEO-level oversight of the collection of accounts and monies owed to Hospital, provided, however, that HTMS shall not have any authority to develop substantive billing or coding policies for the Hospital, which authority shall remain with the Board, and provided further that HTMS shall not provide any billing or coding services to Hospital under this Agreement.

1.2.3    Payment of Accounts and Indebtedness. HTMS shall provide CEO-level oversight of the payment of payroll, trade accounts, amounts due on short- and long-term indebtedness, taxes and all other financial obligations of Hospital; provided, however, that HTMS's responsibility under this paragraph shall be limited to the exercise of reasonable diligence and care to apply the funds collected in the operation of Hospital to its financial obligations in a timely and prudent manner.

3

1.2.4   <u>Accounting and Financial Records</u>. HTMS shall provide CEO-level oversight of the establishment and administration of accounting procedures and controls, in accordance with generally accepted accounting principles, and provide CEO-level oversight of the establishment and administration of systems for the development, preparation and safekeeping of records and books of account relating to the business and financial affairs of Hospital (the originals to remain at Hospital), all subject to Board review.  Included in the foregoing will be the following:

(a)      Preparation and delivery to the Board at the first regular board meeting occurring at least twenty (20) days after the end of each calendar month, of a balance sheet, dated the last day of such month, and a statement of income and expenses for such month relating to the operation of Hospital.

(b)      Within sixty (60) days after the end of each fiscal year of Hospital, preparation and delivery to the Board of a balance sheet, dated the last day of said fiscal year, and a statement of income and expenses for the year then ended.

(c)      From time to time, as may be required by law or determined to be needed, preparation and filing of accounting forms and reports under any federal, state or local law.

(d)      HTMS shall, through the CEO, as applicable, oversee that Hospital prepares its annual cost reports in connection with reimbursement under Medicare, Medicaid, Blue Cross and other third party payment contracts and programs, in which Hospital may from time to time participate; provided, however, that Hospital, shall have ultimate responsibility for the submission of its cost reports.  Once prepared, all cost reports shall be submitted to the Board for approval.

1.2.5   <u>Depositories for Funds</u>. HTMS shall, in accordance with the state laws of Wyoming, provide CEO-level oversight of the maintenance of accounts, including certificates of deposits, in such banks, savings and loan associations and other financial institutions as the

4

Board may from time to time select with such balances therein (which may be interest bearing or non-interest bearing) as HTMS shall from time to time deem appropriate. All such bank accounts shall be maintained in the name of Hospital and controlled by the Hospital in accordance with applicable Medicare reassignment rules. Checks withdrawing funds from said bank accounts and said depositories shall be signed only in a manner determined from time to time by the Board.

1.2.6   Purchase Agreements.

    (a)    To the extent available, subject to applicable law and to HTMS's membership criteria, HTMS shall offer Hospital access to purchasing agreements in which HTMS may from time to time participate. Hospital agrees to utilize the purchasing agreements for products and services available through the program whenever reasonable. Hospital acknowledges that the overall commitment and utilization of the purchasing agreements by Hospital will affect HTMS's ability to maximize savings to Hospital.

    (b)    All purchases shall be in the name of Hospital and comply with Hospital's procurement rules. Hospital shall be solely responsible for payment therefore, and HTMS shall not be deemed a merchant with respect thereto, within the meaning of the applicable provisions of the Uniform Commercial Code enacted in the State of Wyoming or of other applicable provisions of law. Any purchase agreement with an annual expenditure in excess of fifty thousand dollars ($50,000.00) or a term in excess of twenty-four months, which has not previously been approved as part of the annual budgeting process shall be subject to prior approval of the Board.

1.2.7   Maintenance of Licensure and Certification. The CEO shall direct Hospital's efforts to maintain its licenses and certifications in good standing, provided that the Hospital has the ultimate responsibility to obtain and maintain in good standing such licenses and certifications.

1.2.8   Charges.  Make recommendations, as appropriate, for third party support concerning the establishment, maintenance, revision and administration of the overall charge structure of Hospital pursuant to pertinent regulations, including, but not limited to, patient room charges, charges for all ancillary services, charges for supplies, medication and special services.

1.3   Budgets.  Not later than thirty (30) days prior to the end of Hospital's fiscal year during the existence of this Agreement, HTMS shall submit to the Board for approval the following budgets covering Hospital's operations for the next fiscal year:

1.3.1   Capital Expenditures.  A capital expenditure budget outlining a program of capital expenditures for the next fiscal year.

1.3.2   Operating Budget.  A budget setting forth an estimate of operating revenues and expenses for the coming fiscal year, together with recommendations regarding operation of the Hospital on a sound financial basis and an explanation of anticipated significant changes from previous year, which may include facility utilization, changes in services offered to patients, charges to patients, payroll rates and positions, non-wage cost increases and other factors.

1.3.3   Cash Flow Projection.  A projection of cash receipts and disbursements based upon the proposed operating and capital budgets, together with recommendations as to the use of projected cash flow in excess of short-term operating requirements and/or as to the source and amounts of additional cash flow that may be required to meet operating requirements and capital requirements.

1.4   Contract Services.  Subject to any applicable legal and regulatory requirements, applicable Board policies, and budgets as defined in Section 1.3 above, HTMS shall be empowered to negotiate, enter into, terminate, and administer on behalf of Hospital and in the name of Hospital, such contracts as are necessary for the operation of Hospital, including without limitation contracts for equipment, drugs, supplies and other materials and services, and for maintenance and repair of the physical plant of Hospital; provided, however, that HTMS shall not execute the following types of contracts without the specific prior approval of the Board:

1.4.1   Collective bargaining contracts;

1.4.2   Contracts for the purchase or lease of real estate;

1.4.3   Physician contracts and guarantees (including, but not limited to, recruitment agreements, etc.)

1.4.4   Any contract with an annual expenditure in excess of fifty thousand dollars ($50,000.00) or a term in excess of twenty-four months which has not previously been approved as part of the annual budgeting process.

1.5   Management Support Services.  HTMS shall review, monitor, and recommend managerial improvements or changes in the following areas of Hospital's operations, provided, however, that HTMS shall not provide any marketing or advertising services to Hospital under this Agreement:

1.5.1   Administration.  Management systems for Hospital departments.

1.5.2   Management Training and Development.  Education and training programs shall be encouraged, including at the department head level and those supporting nursing, accounting and business office functions.

1.5.3   Nursing. HTMS shall provide a corporate nursing specialist to advise and consult with administration, nursing administration, Hospital's designated nursing in-service personnel and others as appropriate.

1.5.4   Periodic Board Education programs.

1.5.5   Labor Management. Productivity management programs, through which HTMS shall review and make recommendations regarding utilization of labor and standards for performance according to the particular needs and circumstances of Hospital and its departments.

7

1.5.6   Quality Assurance and Risk Management Programs.

1.5.7   Joint Commission or State Survey Preparedness.

1.5.8   Financial Operations.

1.5.9   Business Office.

1.5.10  Material Management and Purchasing.

1.5.11  Other Hospital Departments (as mutually agreed to by HTMS and the Board).

1.5.12  Strategic and Financial Planning, including:

    (a)   Market analysis;

    (b)   Business planning;

    (c)   Medical staff development planning, which shall include consideration of objectively identifiable community needs and information to the Board regarding recruitment of medical staff.

1.5.13  Facilities review, as requested by the Board and agreed to by HTMS, under which HTMS shall recommend a third party to analyze the existing Hospital facilities program and ongoing special studies and projects and advise in connection therewith. The fee for any new architectural and engineering studies shall be negotiated by the Hospital and any third party providing such studies.

1.6   <u>Special Projects Not Included</u>.   At the Board's request, any special projects, such as physician recruitment, marketing surveys and/or studies, financial feasibility studies for new financing for Hospital or a major portion thereof or other work not specifically included in HTMS's obligations hereunder, may be performed pursuant to written agreements to be separately negotiated by the parties from time to time.

8

1.7   Good Faith. Although the parties recognize and acknowledge that HTMS is not able to, and does not, guarantee any particular results under this Agreement, HTMS agrees to act in good faith and use commercially reasonable efforts in performing all of its obligations under this Agreement.

1.8   Limitation of Warranties. HTMS HEREBY DISCLAIMS AND EXLUDES ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED (WHETHER ARISING UNDER LAW OR EQUITY OR CUSTOM OR USAGE), INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH REGARD TO ANY SUPPLIES, GOODS OR SERVICES PROVIDED TO THE HOSPITAL UNDER THIS AGREEMENT OR THROUGH THE GROUP PURCHASING PROGRAM AND THE HOSPITAL EXPRESSLY WAIVES RELIANCE UPON ANY SUCH WARRANTIES. HOWEVER, NOTHING IN THIS SECTION SHALL BE INTERPRETED TO LIMIT OR MODIFY ANY CLAIM WHICH THE HOSPITAL, AS AN ORIGINAL PURCHASER, MAY HAVE AGAINST THE MANUFACTURER OR SUPPLIER (OTHER THAN HTMS) OF ANY SUPPLIES, GOODS AND SERVICES.

ARTICLE II
EMPLOYEES

2.1   General. Except for the position of CEO, all operating and service personnel as necessary for the proper operation and maintenance of Hospital shall be employees of Hospital. Notwithstanding the fact that HTMS may have authority under this Agreement to direct or supervise certain non-medical aspects of Hospital's employees, each Hospital employee shall remain the responsibility of Hospital. Each Hospital employee shall be on Hospital's payroll and shall continue to receive employee benefits in accordance with Hospital's policies. No Hospital employee shall have any claim under this Agreement, or otherwise, against HTMS for vacation pay, sick leave, employment insurance, worker's compensation, disability benefits or employee benefits of any kind.

2.2   HTMS Provided Personnel.

9

2.2.1   <u>HTMS Personnel at Hospital</u>.  In furtherance of its obligations under this Agreement during the term hereof, HTMS shall place at Hospital an employee of HTMS to act as Hospital's CEO.  At the time of placement at Hospital, and throughout the term of this Agreement, the CEO shall be an at-will employee of HTMS, subject to all policies and procedures of HTMS, and shall be paid by HTMS.  The CEO shall perform the usual and customary functions of a hospital CEO's position subject to appropriate direction from the Board.  In that respect and in addition to other applicable responsibilities described earlier in this Agreement, the CEO of the Hospital has a CEO's responsibility for and has commensurate authority to lawfully and reasonably accomplish the duties set forth below subject to direction by the Board:

(a)    Exercise CEO-level supervision of Hospital's internal affairs and maintain order and discipline in the Hospital, for the efficient operation and management of thereof.

(b)    Provide CEO-level oversight that Hospital carries out objectives established, approved and/or authorized by the Board.

(c)    Recommend a detailed annual management plan for the operation of Hospital to the Board.

(d)    Develop an appropriate organizational structure to facilitate achievement of the annual management plan.

(e)    Solicit community acceptance of Hospital's programs and services and promote an excellent public image for the Hospital.

(f)    Keep the Board informed as appropriate on a continuing basis with the progress and phases of Hospital's activities, attend meetings of the Board, refer to the Board matters of major importance relative to the growth and development of Hospital for the purpose of securing Board decision or authorization, and comply with the Board's policies regarding employees, medical staff and the general public.

10

(g)     Recommend to the Board a long-range plan that establishes the direction and methodology for achievement of the overall objectives of Hospital approved by the Board. Coordinate the provision of new facilities or services approved by the Board in accordance with the community needs, institute planning schedules for Hospital's affairs based on continued reevaluation of Board-approved objectives and results, and coordinate these items with capital requirement plans.

(h)     Conduct periodic performance reviews of those personnel directly accountable to the CEO.

(i)     Act as a source of authority in matters pertaining to major management decisions and help coordinate the activities of the medical staff with Hospital.

(j)     Develop cooperative relationships with other hospitals for the exchange of information and services, with community agencies to develop an understanding of Hospital's programs and with professional organizations and other groups.

(k)     Foster effective relationships with the medical staff in a manner that is consistent with the Board's overall objectives.

(l)     Coordinate such representation and involvement as is deemed appropriate and necessary by the Board in national, state and local hospital association boards, planning agencies, consumer groups and related health agencies or groups.

(m)     Recommend for the Board's consideration Hospital policy positions concerning national and state legislation, government administrative policies and other matters of public policy.

(n)     Review and secure Board approval of financial and other major reports directed to Hospital's community.

2.2.2   Placement of HTMS Employees at Hospital.  Prior to placing a CEO at Hospital, HTMS shall communicate with the Board to establish the qualifications and initial salary

11

range for the CEO to be so placed.  Thereafter, HTMS shall seek to identify candidates for the position to be placed that fit such desired qualifications within the established salary range.  Upon identifying appropriate candidates acceptable to HTMS and the Board, HTMS shall present HTMS's recommended candidate to the Board for approval.   If the recommended candidate is acceptable to the Board, HTMS shall promptly seek to employ the recommended candidate.   If, however, such candidate declines HTMS's offer of employment, HTMS shall so notify the Board and shall meet with the Board to present an alternate candidate or to establish expanded parameters for the recruitment of further candidates for the position.

2.2.3   Personnel Compensation. The CEO, as an employee of HTMS, shall be paid a salary or hourly wage by HTMS and, in addition thereto, shall receive benefits from HTMS in accordance with HTMS's then standard policies regarding the provision of benefits to its employees.  Hospital shall reimburse HTMS for such salary and benefits by paying to HTMS, an amount equal to the sum of the salary for the CEO, together with █████ percent '(███) thereof to pay for benefits and the administration thereof.  In addition, Hospital shall reimburse HTMS for the following costs and expenses incurred by HTMS in connection with the CEO: (i) travel, lodging, meals, and other out-of-pocket expenses associated with the recruitment of candidates for the position of CEO; (ii) costs and expenses associated with relocating the successful candidates for the position of CEO; and (iii) the cost and expenses for severance pay associated with the termination of the CEO in accordance with the following guidelines:

(a)    Hospital shall reimburse HTMS for the cost and expenses for severance pay associated with the termination of the CEO if, without documented cause ("Documented Cause") the CEO is (i) terminated upon mutual agreement of the parties or (ii) removed from Hospital at the request of Hospital.  It is specifically agreed between Hospital and HTMS that the CEO is an employee of HTMS, and not Hospital, and that nothing herein shall be construed in any manner to make the CEO a Hospital employee for any purpose whatsoever.

12

(b)     For the purpose of this section, the following shall constitute Documented Cause:

    (i)     Any acts of willful misconduct; gross negligence of the CEO's duties; continual failure to comply with established policies or procedures approved by the Board; willful disruption of hospital operations; acts of fraud; violation of law or regulation (except minor traffic offenses) deemed by the Board and HTMS to be adverse to the best interest or reputation of the Hospital; unauthorized disclosure or use of trade secrets or other confidential information used commercially or competitively; and conviction of a felony or any situation involving moral turpitude that Hospital and HTMS mutually determine renders the CEO unsuitable for continued employment.

(c)     In the event the CEO is terminated without Documented Cause, the CEO shall be eligible for one of the following three severance alternatives, which alternative shall be selected by Hospital at its option:  (i) six months' notice of CEO termination during which time period the CEO shall continue to function as CEO for the Hospital, or (ii) severance in an amount equal to six months of the CEO's base salary and benefits plus an additional month's salary for every year of service as CEO to Hospital up to six years of service (such severance in no event to exceed twelve (12) months' salary and benefits), or (iii) a combination of notice of CEO termination and severance that provides the CEO at least six months' income following the date of such notice.  Any award of severance to the CEO is due only upon execution by the CEO of a release agreement ("Severance Agreement") in a form satisfactory to HTMS and Hospital, the approval of which shall not be withheld unreasonably.

(d)     Hospital shall reimburse HTMS for the cost and expenses of the severance in monthly payments and HTMS shall pay such to the CEO in accordance with HTMS's normal payroll practices.

(e)     Such severance payments to CEO shall be discontinued if the CEO obtains terms of employment or a contract position making at least the base pay received prior to

13

receiving the severance allowance. At Hospital's option, Hospital may require that the Severance Agreement provide that if the CEO finds employment at a lesser salary, the severance amount will be re-calculated to be the difference between the base salary at Hospital and the CEO's new salary. In addition, at Hospital's option, Hospital may require that the Severance Agreement provide that if the CEO accepts interim employment, the severance will be so adjusted during the interim assignment. Prior to executing any Severance Agreement HTMS shall submit the proposed Severance Agreement to Hospital for Hospital's review and approval and for Hospital's consideration of whether or not to exercise Hospital's options as referenced in this Section 2.2.3(e).

2.2.4    Interim CEO. If there is a vacancy in the CEO position, a temporary, interim chief executive officer ("Interim CEO") shall be assigned by HTMS to Hospital, until a regular CEO is recruited and placed as described in Section 2.2.2 herein. Such Interim CEO, as an employee of HTMS, shall be paid a salary by HTMS and, in addition thereto, shall receive benefits from HTMS in accordance with HTMS's then standard policies regarding the provision of benefits to its employees. Hospital shall reimburse HTMS for such salary and benefits by paying to HTMS an amount equal to HTMS's costs and other expenses associated with such temporary assignment of an Interim CEO which costs and expenses shall include, without limitation, the salary or hourly wage paid by HTMS to such employee, together with an applicable amount (not more than ▆▆▆ percent (▆▆▆ thereof) to pay for benefits and administration thereof. In addition, Hospital shall reimburse HTMS for the reasonable travel, lodging, meals, local transportation, and other out-of-pocket expenses which are related to the Interim CEO's duties.

2.2.5    Hospital shall pay for travel, lodging, meals, and other out-of-pocket expenses of the CEO when they are attending meetings or conferences on behalf of Hospital, subject to Board policy.

2.3      Non-Solicitation and No-Hire Covenant.

14

(a)   Hospital. During the term of this Agreement and for the period of one year beginning with the date this Agreement terminates, whether upon its expiration or by earlier termination, Hospital shall not, directly or indirectly, through subsidiary or affiliated companies or separate employee lease or staffing companies or otherwise, solicit for employment or hire any person to work at the Hospital who is employed by HTMS at the time of such solicitation or hire, nor shall Hospital solicit for employment or hire any person who provided services at Hospital as an employee of HTMS within one year of Hospital's solicitation or hire, whether or not such employee is employed by HTMS at the time of such solicitation or hire; provided, that this provision shall not apply to persons who were employed by Hospital immediately prior to their employment by HTMS. In the event HTMS terminates the Agreement or elects not to renew the Agreement at the end of the normal term of the Agreement, Hospital may solicit for employment the Hospital CEO employed by HTMS in such position as of the date of termination or non-renewal; provided, however, that such termination or non-renewal by HTMS is not based upon any default or breach of this Agreement by Hospital.

(b)   HTMS. During the term of this Agreement and for the period of one year beginning with the date this Agreement terminates, whether upon its expiration or by earlier termination, HTMS shall not directly or indirectly, through subsidiary or affiliated companies or separate employee lease or staffing companies or otherwise, solicit for employment or hire any person to work for HTMS who is employed by Hospital at the time of such solicitation or hire, nor shall HTMS solicit for employment or hire any person who provided services at Hospital as an employee of Hospital within one year of HTMS's solicitation or hire, whether or not such employee is employed by Hospital at the time of such solicitation or hire; provided, that this provision shall not apply to persons who were previously employed by HTMS prior to

15

their employment with Hospital or were otherwise known to HTMS independent of HTMS's relationship with Hospital.

16

## ARTICLE III
### DIVISION OF AUTHORITY AND RESPONSIBILITY

3.1   <u>The Board</u>.  The full authority and ultimate control of Hospital shall at all times remain exclusively with the Board.  The Board shall retain all authority placed on it by law, its bylaws, and any other governing documents of Hospital, all as may be amended from time to time, and the Board shall retain such other authority as shall not have been specifically delegated by it to HTMS as an independent contractor pursuant to the terms of this Agreement.  The Board shall retain the full responsibility for compliance by Hospital with all applicable federal, state, and local laws, including, without limitation, compliance with federal and state laws relating to "fraud and abuse" by hospitals and other healthcare providers, including compliance with the federal Stark law of 42 U.S.C. §1395nn et. seq. The Hospital shall have, maintain, and implement through the term of this Agreement a compliance program that is consistent with the Office of Inspector General's "Model Compliance Guidelines for Hospitals."   The Board shall represent Hospital in matters pertaining to the interpretation of this Agreement; provided, that in any situation in which, pursuant to the terms hereof, the Board shall be required or permitted to take any action, to give any approval, or to receive any report, HTMS shall be entitled to rely upon the written statement of the representative or representatives of the Board who shall be designated in writing by the Board to act on its behalf under this Agreement (the "Designated Representative"), or in the absence of any such designation, the de facto Designated Representative shall be the Chair of the Board, to the effect that any such action or approval has been taken or given.  Delivery of any such report to the Designated Representative shall constitute delivery to the Board.  The Board agrees to respond promptly to requests from HTMS for direction and shall provide such decisions to HTMS in a timely fashion after receiving written request for direction.

3.2   <u>Medical Staff; Medical and Professional Matters</u>.  Hospital's medical staff shall be organized and shall function according to its medical staff bylaws and the laws and regulations of the State of Wyoming, as they may be amended from time to time.  HTMS shall consult with the medical staff and the Board, as may from time to time be appropriate, with respect to issues relevant to the medical staff.  All matters requiring professional medical judgment shall remain the sole

responsibility of Hospital's medical staff, nurses, and allied health professionals. HTMS, its employees, and contractors shall have no responsibility, control over, or liability whatsoever for such medical judgments and HTMS shall not in any way be responsible for the credentialing of any healthcare professionals on staff at the Hospital. HTMS may rely on the recommendations of the Hospital's medical staff and its designated committees and department chairmen relative to the quality of professional services provided by individuals with clinical privileges and on recommendations of the Board and the medical staff or any jointly appointed or Board appointed committee or representative as to the adequacy and proper state of repair of all medical equipment and the professional competency, training and requisite supervision of nurses, medical technicians, and other allied health professionals and medical staff.

3.3    Non-contravention. Hospital is not in breach of any contract, obligation, or covenant that would affect its ability to perform hereunder and, as a result of entering into this Agreement, will not breach any such contract, obligation, or covenant.

3.4    Notice of Tax-Exempt Funds. During the Initial Term of this Agreement or any Renewal Term thereof Hospital will not issue or be the beneficiary or recipient of any tax-exempt bond or funds without giving HTMS at least sixty (60) days' prior written notice.

3.5    Hospital Advisors. Hospital has consulted with its tax and legal advisors to ensure this Agreement does not jeopardize Hospital's tax-exempt status or the tax-exempt status of Hospital's financing, if applicable.

3.6    Hospital Responsibility for Costs. The Hospital shall be responsible for all costs and expenses incurred to operate the Hospital. Such costs shall include, without limitation the following: (a) all costs related to the employment by the Hospital of the Hospital employees; (b) all costs related to the contracting of professional services from providers, including the medical director, practicing physicians, and nurse practitioners; (c) all supplies used at the Hospital; (d) occupancy costs associated with the facilities used by the Hospital; (e) taxes incurred by the Hospital; (f) furniture, fixtures, leasehold improvements, signs and equipment used in facilities owned or operated by the Hospital; (g) insurance purchased for the Hospital; (h) attorney's fees incurred in the name

18

and on behalf of Hospital; (i) costs of advertising the Hospital's services; (j) direct costs of marketing materials for the Hospital's services; (k) costs associated with information systems developed by or for the Hospital; and (l) reimbursement of costs associated with the CEO. Costs which are the responsibility of the Hospital shall be paid from the funds of the Hospital in the Hospital's accounts and the Hospital shall at all times maintain sufficient funds in such accounts for such purposes. Nothing contained herein shall obligate HTMS to make any payments from its own funds or resources, incur any costs, or assume any liabilities either primarily or as guarantor on behalf of the Hospital, or to advance any monies to the Hospital.

ARTICLE IV
COMMUNICATIONS AND REPORTS

4.1     Monthly Reports.  HTMS shall present written monthly reports to the Board summarizing HTMS's actions and results, and such other written reports as HTMS or the Board considers appropriate to keep the Board informed as to the status and condition of Hospital, including as an example, reports concerning overall results achieved by the Hospital in terms of effective management of patient care services.

4.2     Consultation.  Throughout the term of the Agreement, the Board shall cooperate with HTMS and take action with regard to any matter presented to it for approval by HTMS in a timely fashion.

4.3     Officer of HTMS.  HTMS shall provide an officer of HTMS (who shall be a vice president) who shall:

4.3.1   Be available to periodically attend meetings of the Board and also attend meetings of the medical staff upon request of the chief executive officer.

4.3.2   Provide supervision of, and coordinate support for, the CEO.

4.3.3   Evaluate the CEO's performance following input and discussion with the Board.

4.3.4   Coordinate the services of HTMS as appropriate to the needs of Hospital.

19

4.3.5  Provide consultation in preparing material for Board decisions, operational issues/problems, special projects, and leadership development.

4.3.6  Submit and present an annual accountability report to the Board of services provided by HTMS under this Agreement.

ARTICLE V
LICENSING, ACCREDITATION

5.1    <u>Licensing</u>.  Hospital has and shall maintain throughout the term of this Agreement all licenses and permits relating to the ownership and operation of Hospital, without restriction or subject to any disciplinary or corrective action.  Hospital has and shall maintain throughout the term of this Agreement all customary narcotics and controlled substances numbers and licenses.  Hospital is and shall continue to remain throughout the term of this Agreement, a participating provider in the Medicare and Medicaid programs; and Hospital is not under any governmental investigation or subject to any action that currently or might reasonably in the future be expected to result in the sanction, restriction, or expulsion of Hospital from further participation in any state or federal healthcare program.  It shall be the Hospital's responsibility to keep and maintain its establishment and operating licenses under the laws of the State of Wyoming and to ensure that all Hospital services comply with all pertinent provisions of federal, state and local statutes, rules and regulations. Each party further covenants that it will do nothing willful or wanton to jeopardize Medicare, Medicaid and other third party reimbursement agreements. Both Board and HTMS agree to abide by all applicable laws, ordinances, rules and regulations of state, local or federal governments pertaining to Hospital's ownership and the parties' performance of their respective duties under this Agreement.

5.2    <u>Provider Relations</u>.  Hospital shall conduct all of its relationships with providers, including its medical staff, in full compliance with all applicable laws.  Hospital covenants and agrees that prior to admitting a new member to the medical staff or entering into a new agreement with a contractor, Hospital will conduct appropriate credentialing of those providers, including, but not limited to, taking reasonable steps to determine whether those providers have ever been included

20

on the OIG's "exclusion list" of providers sanctioned or excluded from participation in a federal or state healthcare program.

ARTICLE VI
COMPENSATION

6.1    Base Fee. As compensation for all services rendered by HTMS under this Agreement, Hospital shall pay to HTMS a base annual management fee of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ annually (the "Base Annual Management Fee"). This Base Annual Management Fee is in addition to, and not in lieu of, all other payments and reimbursements to be made by Hospital to HTMS under the terms of this Agreement. Both parties acknowledge that Hospital exists for charitable purposes and to benefit the community. At no time during the Initial Term or any Renewal Term of this Agreement shall either party allow Hospital revenue or profits to take precedence over Hospital fulfilling such charitable purposes and community benefit.

6.2    Payment of Base Fee. The Base Annual Management Fee shall be paid in twelve (12) equal monthly installments throughout the term of this Agreement, commencing the month in which this Agreement becomes effective. Each monthly payment shall be made by Hospital upon submission of a billing by HTMS upon the close of each month during which HTMS renders services. The fee must be paid by the tenth (10th) day of the succeeding month. Payment for any partial month shall be that proportion of the monthly installment then due which the number of days to be worked by HTMS during such partial month bears to the total number of working days in said month.

6.3    Annual Escalator. The Base Annual Management Fee provided for in Section 6.1 shall be adjusted annually on the anniversary date of each Commencement Date (as defined below) by the percentage increase or decrease in the Medical Care Component of the Consumer Price Index for "All Cities-U" for the preceding twelve (12) months.

6.4    Other Reimbursable Expenses.

21

6.4.1    Personnel Related Expenses.  As provided for in Article II herein, Hospital shall be responsible for the payment of expenses incurred by HTMS relating to HTMS's personnel. Each month during the term of this Agreement, HTMS shall provide Hospital an invoice detailing such costs and expenses incurred for that month and Hospital agrees to submit payment for such costs and expenses upon receipt of the invoice.

6.4.2    Out-of-Pocket Expenses.  Additionally, Hospital will be responsible for payment of the reasonable travel, lodging, meals, local transportation and out-of-pocket costs and expenses of HTMS's employees and/or consultants while performing on-site services for Hospital, not to exceed $15,000.00 annually without prior Hospital approval.  HTMS shall bill such costs and expenses each month to Hospital, with such bill being due and payable by the last day of the month in which it was received.

6.5    Group Purchasing Organization Safe Harbor.  Hospital acknowledges that as part of an agreement to furnish goods or services to Hospital, HTMS, acting as a group purchasing organization as defined in 42 C.F.R. §§1001.952(j) (commonly known as the "group purchasing organization safe harbor" to the Anti-Kickback law), may receive payment from the vendor thereof in connection with certain products that are purchased, licensed or leased by Hospital and, to the extent such products are billable in whole or in part to federal healthcare programs, are billed by Hospital and not by the vendor of the product, such payment to HTMS from each such vendor may not exceed three percent (3%) of the purchase price of the goods or services provided by the participating vendor.  To the extent required by the group purchasing organization safe harbor, HTMS will disclose in writing to the Hospital at least annually, and to the Secretary of Health and Human Services upon request, the amount received from each vendor with respect to purchases made by or on behalf of the Hospital.

6.6    Subject to the provisions of Article VII hereof, the Base Annual Management Fee during any extension period shall be agreed to in writing and set out in amendments to this Agreement, not less than ninety (90) days prior to the first day of any extension period, or by mutual consent of the parties thereafter, but prior to the first day of any extension period. The Base Annual

Management Fee in any extension period shall be payable in twelve (12) equal monthly installments in the manner specified in Paragraph 6.2 above.

6.7   Incentive Program.   Hospital and HTMS agree that during the first ninety (90) days of this Agreement they will negotiate in good faith to establish an incentive compensation payment for each fiscal year within the term of this Agreement in the event HTMS surpasses measurable benchmarks agreed upon by the Board and HTMS prior to each fiscal year.  Provided the parties reach agreement the amount of such payment (which may be specified as a mathematical formula), the benchmarks to be used, and the other agreed-upon terms and conditions pertaining to such payment shall be set forth in a written document agreed to by the parties, which document will be deemed to supplement and amend this Agreement.

ARTICLE VII

TERM OF AGREEMENT

7.1   Subject to prior termination under Article VIII, the initial term of this Agreement shall be for five years, commencing on September 1, 2010 (the "Commencement Date") and terminating on August 31, 2015 (the "Initial Expiration Date"). Either party may cancel this Agreement without cause or penalty on August 31, 2013 (the "Early Cancellation Date") provided that the party provides at least ninety (90) days written notification of such cancellation to the other party.  In the event no timely cancellation notification is given, the Agreement shall continue through the Initial Expiration Date of August 31, 2015. This Agreement may be extended after the Initial Expiration Date for successive five (5) year terms provided that the parties have mutually agreed in writing to extend the term within ninety (90) days prior to the end of the initial term or within ninety (90) days prior to the end of any extension period.

ARTICLE VIII

TERMINATION

8.1   For Cause Termination.  Either party may terminate this Agreement for Cause at any time by giving written notice to the other.  Such notice shall state that the termination is for Cause and the nature of such Cause.  If the Cause is such that the defaulting party has an opportunity to cure

23

the default pursuant to Section 8.2 or 8.3 below, and the default is not cured within the applicable cure period, then the Agreement shall be terminated effective the first day after the expiration of the cure period:

8.2     For Cause Termination by the Board.  Hospital shall have Cause for termination of this Agreement:

8.2.1   if HTMS shall default in the performance of any material covenant, agreement, term, or provision of this Agreement to be kept, observed or performed by HTMS and such default shall not be cured for a period of ninety (90) days after written notice is given to HTMS by Board stating the specific default;

8.2.2   if HTMS shall do any of the following: apply for or consent to the appointment of a receiver, trustee, or liquidator of HTMS or all or a substantial part of its assets; file a voluntary petition in bankruptcy or admit in writing its inability to pay its debts as they become due; make a general assignment for the benefit of creditors; file a petition or an answer seeking reorganization or arrangement with creditors; take advantage of any insolvency law; or, if an order, judgment or decree shall be entered by a court of competent jurisdiction, on the application of a creditor, adjudicating HTMS bankrupt or insolvent or approving a petition seeking reorganization of HTMS or appointing a receiver, trustee or liquidator of HTMS of all, or of a substantial part of its assets;

8.2.3   if Board reasonably determines to close Hospital due to financial necessity, in which event HTMS shall be entitled to sixty (60) days' written notice and all amounts payable under this Agreement by Hospital;

8.2.4   if HTMS should continually fail to pursue the lawful and commercially reasonable major recommendations of Hospital and not demonstrate a willingness to work cooperatively with Hospital's senior management personnel and such failure should continue for at least sixty (60) days after written notice thereof by Board shall have been given to HTMS's Chief Executive Officer.

24

8.3    For Cause Termination By HTMS.  HTMS shall have Cause for termination of this Agreement:

8.3.1   if Hospital shall default in the performance of any material covenant, agreement term or provision of this Agreement to be kept, observed or performed by the Board or Hospital, (excluding the payment of any sum due to HTMS from Hospital) and such default shall not be cured for a period of ninety (90) days after written notice is given to Hospital by HTMS stating the specific default;

8.3.2   if Hospital shall default in the performance of its covenant to pay any fees or expenses due to HTMS, and such default shall not be cured for a period of thirty (30) days after written notice is given to Hospital by HTMS stating the specific default;

8.3.3   if, through no fault of HTMS, Hospital's Medicare or Medicaid participation is terminated or any license of Hospital necessary for Hospital to operate as an acute care hospital cannot be obtained or is at any time suspended, terminated or revoked;

8.3.4   if Hospital ceases operation as an acute health care provider;

8.3.5   if the Hospital shall apply for, or consent to, the appointment of a receiver, trustee, or liquidator of Hospital or all or a substantial part of its assets, file a voluntary petition in bankruptcy, or admit in writing its inability to pay its debts as they become due, make a general assignment for the benefit of creditors, file a petition or an answer seeking reorganization or arrangement with creditors or taking advantage of any insolvency law, or if an order, judgment or decree shall be entered by a court of competent jurisdiction, on the application of a creditor, adjudicating Hospital a bankrupt or insolvent or approving a petition seeking reorganization of Hospital, or appointing a receiver, trustee, or liquidator of Hospital, or of all or a substantial part of its assets;

8.3.6   (a) if Hospital engages in any activity that violates federal or state law or in billing or coding documentation activities that HTMS in good faith believes are improper or illegal and HTMS, in exercising its oversight functions pursuant to this Agreement, requests but

25

Hospital refuses promptly to correct or to cooperate with HTMS in correcting such activities pursuant to applicable governmental requirements; or (b) if the parties' competent healthcare regulatory or tax counsel, as applicable, jointly and reasonably believe that all or any material part of this Agreement has become illegal, voided, voidable, or otherwise unenforceable (whether by court order, legislative enactment, promulgation of rule, judicial decision, or otherwise), provided that, in such event, payment of the CEO severance pursuant to Section 2.2.3(c) shall be at Hospital's option.

### ARTICLE IX
### INSURANCE

9.1     <u>Hospital's Insurance</u>.  Hospital, at its cost, shall maintain insurance coverage during the term of this Agreement, with responsible companies. Such coverage shall be as normally carried with respect to comparable sized hospitals, including but not limited to the following:

9.1.1   <u>Liability Insurance</u>. Hospital shall maintain hospital professional and general liability insurance coverage with limits of liability of not less than $5,000,000 per occurrence and $5,000,000 annual aggregate with an insurance company approved by HTMS with either an A.M. Best's rating of –A VIII or better or at least $10,000,000 of umbrella coverage. Such policies shall be endorsed naming HTMS and its employees as an additional insured. During the term of this Agreement, and extending not less than five (5) years following termination of this Agreement, Hospital shall continue to provide liability insurance in these amounts covering HTMS and its employees for claims incurred during the term of this Agreement but not reported until after termination of this Agreement. Hospital may purchase an extended reporting endorsement (tail coverage) providing extended claim reporting for a minimum of five (5) years as part of its liability insurance policy covering HTMS and its employees. This endorsement shall provide coverage for claims incurred during the term of this Agreement but not reported until after termination of this Agreement to satisfy the five (5) year requirement of liability coverage after termination of this Agreement.

9.1.2   <u>Directors' and Officers' Liability Coverage</u>. Hospital shall maintain Directors' and Officers' Liability Coverage with limits of liability of not less than $2,000,000 per

26

occurrence and $2,000,000 annual aggregate with an insurance company approved by HTMS with an A.M. Best's rating of –A VIII or better.  Such coverage shall include an endorsement to the policy providing entity and individual coverage for employment practices liability and will name HTMS and its employees as an additional insured.  During the term of this Agreement, and extending not less than five (5) years following termination of this Agreement, Hospital shall continue to provide Directors' and Officers' liability coverage including employment practices liability in these amounts covering HTMS and its employees for claims incurred during the term of this Agreement but not reported until after termination of this Agreement.  Hospital may purchase an extended reporting endorsement (tail coverage) providing extended claim reporting for a minimum of five (5) years as part of their Directors' and Officers' liability coverage.   This endorsement shall provide coverage for claims incurred during the term of this Agreement but not reported until after termination of this Agreement to satisfy the five (5) year requirement of liability coverage after termination of this Agreement.

9.1.3   Fidelity Bond.  Hospital shall maintain Fidelity insurance bond with limits of liability of not less than $200,000 per occurrence and $200,000 annual aggregate with an insurance company approved by HTMS with an A.M. Best's rating of –A VIII or better.  Policies will be endorsed naming HTMS and its employees as an additional insured.  During the term of this Agreement, and extending not less than five (5) years following termination of this Agreement, Hospital shall continue to provide a Fidelity insurance bond in these amounts covering HTMS and its employees for claims incurred during the term of this Agreement but not reported until after termination of this Agreement.

9.2   HTMS's Insurance.  HTMS, at its cost, shall maintain insurance coverage for itself and its employees during the term of this Agreement, provided, however, HTMS's insurance coverage is intended to cover and only covers HTMS, its employees and contractors.  Such insurance shall include professional and general liability insurance coverage with limits of liability of not less than $5 million per occurrence and $5 million annual aggregate, and directors' and officers' liability coverage, with limits of liability of not less than $2 million per occurrence and $2 million annual

27

aggregate, with insurance companies having the same or better rating than that required of the Hospital in paragraph 9.1. HTMS's insurance does not extend to or cover Hospital, its employees, its officers, its directors or its Board. Upon Hospital's request, HTMS shall provide certificates of insurance to Hospital evidencing such policies.

9.3     All insurance policies and fidelity bonds maintained pursuant to Paragraph 9.1 above shall name HTMS as an additional named insured and shall contain an endorsement to the policy or bond stating that the policy or bond is primary insurance regardless of any other valid and/or collectible insurance. Such policies or bond shall contain an affirmative notice obligation of not less than ninety (90) days written notice to HTMS and Hospital of cancellation or non-renewal. Hospital shall provide certificates of insurance to HTMS evidencing such policies and provisions.

## ARTICLE X
## INDEMNIFICATION

10.1     By HTMS.  HTMS shall indemnify, defend and hold harmless Hospital and its employees, officers, and agents, from any and all expense (including but not limited to reasonable attorneys' fees and court costs), loss, liability, and claims of any kind whatsoever for damage to property or for injury to or death of any person, directly or indirectly arising from or alleged to arise from or in any way connected with the performance by HTMS of its obligations under this Agreement where such expense, loss, liability or claim is incurred by Hospital primarily as a result of (a) the grossly negligent acts or omissions of HTMS or (b) the willful and wanton misconduct of HTMS.

10.2     By Hospital.  Hospital shall indemnify, defend and hold HTMS, its officers, employees and agents harmless from and against any and all expense (including but not limited to reasonable attorney fees and court costs), loss, liability, and claims of any kind whatsoever directly or indirectly   arising from or alleged to arise from or in any way connected with the ownership or operation of the Hospital or the performance by the Board and/or  Hospital of their respective obligations under this Agreement (including but not limited to errors or omissions in the Hospital's cost reports), unless such claim is caused primarily as a result of (a) the grossly negligent acts or omissions of HTMS or (b) the willful and wanton misconduct of HTMS.

28

10.3   <u>Limitation on HTMS's Liability</u>.  HTMS's liability to Hospital under this Agreement, including liquidated damages, shall be limited to an amount not to exceed $750,000.  The limitation on HTMS's liability provided for herein shall not apply in the event HTMS is deemed to have engaged in willful and wanton misconduct in performing its obligations hereunder and shall not be applied against any amounts which are recoverable by Hospital under any valid and/or collectible insurance.

10.4   <u>Limitation on Hospital's Liability</u>.  In the event Hospital is found to have breached its obligations under this Agreement, (except for their indemnity obligations under 10.1 and 10.2) Hospital's liability to HTMS for such breaches shall be limited to an amount equal to all management fees, salaries, fringe benefit, liquidated damages, and severance obligations due HTMS for the remaining term of this Agreement and bonuses previously earned and due HTMS.

### ARTICLE XI
### CONFIDENTIALITY OF PROTECTED HEALTH INFORMATION

11.1   <u>Individually Identifiable Health Information</u>.   The parties shall comply with all applicable federal and state laws and regulations regarding the confidential and secure treatment of individually identifiable health information and with the terms of the Business Associate Addendum attached as <u>Schedule 11.1</u> hereto and incorporated herein by reference.

### ARTICLE XII
### MISCELLANEOUS

12.1   <u>Compliance with Laws</u>.  In performing their respective duties hereunder, HTMS and Hospital shall conduct themselves in full accordance with all applicable state, federal, and local laws and regulations, including, but not limited to, the federal physician self-referred law (commonly known as the "Stark II Law", 42 U.S.C. § 1395nn <u>et</u>. <u>seq</u>.) and the anti-fraud and abuse provisions of the Social Security Act (42 U.S.C. 1320a-7 <u>et</u>. <u>seq</u>.).  Nothing in this Agreement shall require either party to arrange for or to send patients to the other party or to the other party's affiliated hospitals or providers.

29

12.6   Authorization for Agreement. Each of the parties to this Agreement represents and warrants to the other that is has full power and authority to enter into this Agreement and to carry out the terms hereof.

12.7   Applicable Law. The laws of Wyoming shall govern this Agreement and any dispute, claim or counterclaim arising out of or relating thereto, whether in contract or tort or otherwise, even if Wyoming's choice of law rules would require that the laws of another forum apply.

12.8   Attorney Fees. In any dispute arising under or relating to this Agreement or the relationship established by the Agreement, if awarded by a court of competent jurisdiction or other binding decision maker appointed by the parties, such as an arbitrator, the prevailing party may recover its reasonable legal expenses. Legal expenses may include but not be limited to reasonable attorney fees, expert witness fees, and costs.

12.9   Headings/Recitals. The headings to the various paragraphs of this Agreement and the recitals have been inserted for convenience reference only and shall not modify, define, limit or expand the expressed provisions of this Agreement.

12.10   Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute but one (1) and the same agreement.

12.11   Arbitration of Disputes. Any disputes, claims, or counterclaims arising under or relating to this Agreement may, at the mutual agreement of the parties, be submitted to binding arbitration under the rules of conciliation and arbitration of the American Arbitration Association.

12.12   Legal Proceedings. If HTMS is notified of a legal proceeding against Hospital, HTMS shall notify Hospital and shall coordinate legal matters and proceedings with Hospital's counsel. With respect to actions relating to Hospital brought against both Hospital and HTMS or HTMS alone, Hospital shall, at HTMS's request, defend HTMS except that HTMS shall reimburse Hospital's legal fees in defending HTMS in those instances where HTMS is required to indemnify Hospital as provided in Article X.

31

12.13  _AHA Membership_.  HTMS believes that membership in the American Hospital Association ("AHA") confers significant benefits on member hospitals.  It is important to HTMS that all its managed hospitals participate as member hospitals of AHA in order to ensure that HTMS and its managed hospitals will benefit from certain group discounts, lobbying efforts, and other benefits provided by AHA.  Accordingly, during the term of this Agreement, Hospital agrees to maintain membership as a member hospital of the AHA.

## ARTICLE XIII
## SUCCESSORS AND ASSIGNS

13.1  _Assignment_.  Neither party hereto may assign its interest in or delegate the performance of its obligations under this Agreement to any other person without obtaining the prior written consent of the other party, except that HTMS may assign its interest or delegate the performance of its obligations to an Affiliated Entity or to a successor corporation to HTMS that is qualified to manage Hospital in the State of Wyoming and Hospital may assign its interest to a duly authorized successor in interest provided that any such assignee shall expressly assume in writing the obligations of Hospital to HTMS or set forth herein.  For purposes of this paragraph, an "Affiliated Entity" to HTMS shall include any entity wholly owned by HTMS or under common ownership with HTMS.

13.2  _Successors and Assigns_. The terms, provisions, covenants, obligations and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and the successors in interest and the assigns of the parties hereto, provided that no assignment, transfer, pledge, or mortgage by or through either party, as the case may be, in violation of the provisions of this Agreement, shall vest any rights in the assignee, transferee, pledge, or mortgagee.

## ARTICLE XIV
## NOTICES

14.1  _Notices_.  Any notice by either party to the other shall be in writing and shall be deemed to have been given the earlier of: (a) the date on which it is delivered personally or by

32

Case 2:14-cv-00168-SWS   Document 14-4   Filed 12/11/14   Page 79 of 86

facsimile transmission or overnight delivery, or (b) four (4) days after it is deposited in the United States mail, postage pre-paid and certified with return receipt requested.

To HTMS:                HealthTech Management Services, Inc.
                        405 Duke Drive, Suite 210
                        Franklin, TN 37067
                        ATTN: President

With copy to:           HealthTech Management Services, Inc.
                        405 Duke Drive, Suite 210
                        Franklin, TN 37067
                        ATTN: Legal Counsel

To Hospital:            Powell Valley Healthcare, Inc.
                        777 Avenue H
                        Powell, WY 82435
                        ATTN: President, Board of Trustees

With copy to:           Copenhaver, Kath, Kitchen & Kolpitchke, LLC
                        P.O. Box 839
                        Powell, WY  82435

### ARTICLE XV
### ACCESS TO BOOKS AND RECORDS OF HTMS

15.1  Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, HTMS or any other related organization providing services with a value or cost of Ten Thousand and 00/100 Dollars ($10,000.00) or more over a twelve (12) month period, shall make available to the Secretary the contracts, books, documents and records that are necessary to certify the nature and extent of the costs of providing such services.  Such inspection shall be available up to four (4) years after the rendering of such services.  This paragraph is not intended to prohibit or impede any state audits pursuant to state law or to waive any attorney-client or physician-patient privilege.  In the event the statutory amount reflected herein is revised during the term of this Agreement, this paragraph shall be deemed to be amended, without further action required by the parties hereto, to reflect said revised statutory amount.

34

## ARTICLE XVI
## NO DISCRIMINATION

16.1    Neither party shall discriminate against any person on the grounds of race, color, national origin, handicap, disability, religion or sex in the discharge of its duties and obligations herein.

## ARTICLE XVII
## ENTIRE AGREEMENT

17.1    This Agreement constitutes the sole and only agreement of the parties hereto with respect to the management of Hospital and correctly sets forth all the rights, duties and obligations of each to the other as of its date.  Any and all prior agreements, promises, proposals, negotiations or representations, whether written or oral, which are not expressly set forth in this Agreement are hereby superseded and are of no force or effect.

## ARTICLE XVIII
## AMENDMENTS

18.1    This Agreement may not be amended, modified or terminated orally, and no amendment, modification, termination or attempted waiver shall be valid unless in writing and signed by both parties.

*[Signatures follow on next page.]*

35

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed by their authorized representatives on the dates shown beneath their respective signatures below, provided that this Agreement is effective as of the Commencement Date set forth in Article VII of this Agreement.

HEALTHTECH MANAGEMENT SERVICES, INC.

By: _Derek Morkel_

Derek Morkel, President and CEO

10/15/2010
Date

POWELL VALLEY HEALTHCARE, INC.

By: _mark schwarz MD_

MARK S WURZEL, Board Chair
(printed name and title)

10/1/10
Date

36

Schedule 11.1

BUSINESS ASSOCIATE ADDENDUM

This Business Associate Addendum ("Addendum") supplements and is made part of that certain Agreement for Management Services effective as of November 1, 2010 ("Agreement"), by and between Powell Valley Healthcare ("Entity") and HealthTech Management Services, Inc. ("Associate").

Entity and Associate agree that the parties incorporate this Addendum into the Agreement in order to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5) ("ARRA") and their implementing regulations set forth at 45 C.F.R. Parts 160 and 164 (the "Privacy and Security Rule"). To the extent Associate is acting as a Business Associate of Entity pursuant to the Agreement, the provisions of this Addendum shall apply and Associate shall be subject to the penalty provisions as specified by ARRA (42 USC §§ 17931(c), 17934(c)).

1.  **Definitions.** Capitalized terms not otherwise defined in this Addendum shall have the meaning set forth in the Privacy and Security Rule. References to "PHI" mean Protected Health Information created or received by Associate from Entity or on Entity's behalf.

2.  **Uses or Disclosures.** Associate will neither use nor disclose PHI except as permitted or required by this Addendum or as Required By Law. Associate will not sell PHI or use or disclose PHI for purposes of marketing or fundraising, as defined and proscribed in the Privacy and Security Rule and ARRA. Associate is permitted to use and disclose PHI:

    (i)     to perform any and all obligations of Associate as described in the Agreement, provided that such use or disclosure would not violate the Privacy and Security Rule, if done by Entity directly;

    (ii)    as otherwise permitted by law, provided that such use or disclosure would not violate the Privacy and Security Rule, if done by Entity directly and provided that Entity gives its prior written consent;

    (iii)   to perform Data Aggregation services relating to the health care operations of Entity;

    (iv)    to report violations of the law to federal or state authorities consistent with 45 C.F.R. § 164.502(j)(1);

    (v)     as necessary for Associate's proper management and administration and to carry out Associate's legal responsibilities (collectively "Associate's Operations"), provided that Associate may only disclose PHI for Associate's Operations if the disclosure is Required By Law or Associate obtains reasonable assurance, evidenced by a written contract, from the recipient that the recipient will: (1) hold such PHI in confidence and use or further disclose it only for the purpose for which Associate disclosed it to

37

the recipient or as Required By Law; and (2) notify Associate of any instance of which the recipient becomes aware in which the confidentiality of such PHI was breached;

(vi)  de-identify PHI in accordance with 45 C.F.R. § 164.514(b), provided that such de-identified information may be used and disclosed only consistent with applicable law.

In the event Entity notifies Associate of a restriction request that would restrict a use or disclosure otherwise permitted by this Addendum, Associate shall comply with the terms of the restriction request.

3.   **Information Safeguards.**  Associate will maintain appropriate administrative, technical and physical safeguards to prevent use or disclosure of PHI not permitted by this Addendum and shall maintain policies and procedures to detect, prevent, and mitigate identity theft based on PHI or information derived from PHI. Associate will also maintain administrative, technical and physical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of electronic PHI in compliance with the Privacy and Security Rule.

4.   **Subcontractors and Agents.**  Associate will require any of its subcontractors and agents, to which Associate discloses any PHI, to agree to comply with the same privacy and security obligations as Associate with respect to such PHI.

5.   **Minimum Necessary.**  Associate represents that the PHI requested, used or disclosed by Associate shall be the minimum amount necessary to carry out the purposes of the Agreement. Associate will limit its uses and disclosures of, and requests for, PHI (i) when practical, to the information making up a Limited Data Set; and (ii) in all other cases subject to the requirements of 45 CFR § 164.502(b), to the minimum amount of PHI necessary to accomplish the intended purpose of the use, disclosure or request.

6.   **Obligations of Entity.**  Entity shall (i) provide Associate with a copy of the notice of privacy practices that Entity produces pursuant to 45 C.F.R. § 164.520, and Entity shall promptly furnish Associate with copies of any material changes to such notice; (ii) notify Associate of any changes in, or revocation of, permission by an individual to use or disclose PHI, if such changes affect Associate's permitted or required uses or disclosures; (iii) notify Associate of any confidential communication request or restriction to the use or disclosure of PHI affecting Associate that Entity has agreed to in accordance with 45 C.F.R. § 164.522.

7.   **Access and Amendment.**  Associate shall permit Entity or, at Entity's request, an individual (or the individual's personal representative) to inspect and obtain copies of any PHI about the individual that is in Associate's custody or control and that is maintained in a Designated Record Set. Associate will, upon receipt of notice from Entity, promptly amend or permit Entity access to amend any portion of PHI so that Entity may meet its amendment obligations under 45 C.F.R. § 164.526.

8.   **Disclosure Accounting.**  Except for disclosures excluded from the accounting obligation by

38

the Privacy and Security Rule and regulations issued pursuant to ARRA, Associate will record for each disclosure that Associate makes of PHI the information necessary for Entity to make an accounting of disclosures pursuant to the Privacy and Security Rule. Associate will make this information available to Entity promptly upon Entity's request for the period requested, but for no longer than the six (6) years preceding Entity's request for the information (except Associate need not have any information for disclosures occurring before the effective date of this Addendum or with respect to disclosures required to be recorded by ARRA, the effective date of the ARRA regulations with respect to Entity).

9.     **Inspection of Books and Records.**  Associate will make its internal practices, books, and records, relating to its use and disclosure of PHI, available upon request to Entity or the Secretary of U.S. Department of Health and Human Services ("HHS") to determine Entity's compliance with the Privacy and Security Rule.

10.    **Reporting.**  To the extent known to or discovered by Associate, Associate shall promptly report to Entity any use or disclosure of PHI not permitted by this Addendum, any Security Incident involving electronic PHI, any Breach of Unsecured Protected Health Information and any Red Flag (as defined at 16 CFR § 681.2(b)) related to any individual who is the subject of PHI. Associate shall mitigate, to the extent practicable, any harmful effect known to it of a Security Incident, Breach or use or disclosure of PHI by Associate not permitted by this Addendum. Notwithstanding the foregoing, the parties acknowledge and agree that this section constitutes notice by Associate to Entity of the ongoing existence and occurrence of attempted but Unsuccessful Security Incidents (as defined below) for which no additional notice to Entity shall be required. "Unsuccessful Security Incidents" shall include, but not be limited to, pings and other broadcast attacks on Associate's firewall, port scans, unsuccessful log-on attempts, denials of service and any combination of the above, so long as no such incident results in unauthorized access, use or disclosure of electronic PHI. All reports of Breaches shall be made in compliance with 45 CFR § 164.410.

11.    **Term and Termination.**

11.1   **Term.** This Addendum shall be effective as of the effective date of the Agreement and shall remain in effect until termination of the Agreement. Either party may terminate this Addendum and the Agreement effective immediately if it determines that the other party has breached a material provision of this Addendum and failed to cure such breach within thirty (30) days of being notified by the other party of the breach. If the non-breaching party determines that cure is not possible, such party may terminate this Addendum and the Agreement effective immediately upon written notice to other party. If termination is not feasible, the non-breaching party shall report the breach to HHS.

11.2   **Obligations upon Termination.** Upon termination of this Addendum for any reason, Associate will, if feasible, return to Entity or destroy all PHI maintained by Associate in any form or medium, including all copies of such PHI. Further, Associate shall

39

recover any PHI in the possession of its agents and subcontractors and return to Entity or destroy all such PHI. In the event that Associate determines that returning or destroying any PHI is infeasible, Associate may maintain such PHI but shall continue to abide by the terms and conditions of this Addendum with respect to such information and shall limit its further use or disclosure of such information to those purposes that make return or destruction of the information infeasible.

11.3   Survival. Upon termination of this Addendum for any reason, all of Associate's obligations under this Addendum shall survive termination and remain in effect (a) until Associate has completed the return or destruction of PHI as required by Addendum Section 11.2 and (b) to the extent Associate retains any PHI pursuant to Addendum Section 11.2.

12.   General Provisions. In the event that any law, final regulation or amendment to final regulations is promulgated by HHS or other government regulatory authority with respect to PHI or is enacted by legislative authority, the parties shall negotiate in good faith to amend this Addendum to remain in compliance with such law and/or regulations. In the absence of any such amendment, this Addendum shall be amended as a matter of law to conform to the requirements of law. Any ambiguity in this Addendum shall be resolved to permit Entity to comply with the Privacy and Security Rule. Nothing in this Addendum shall be construed to create any rights or remedies in any third parties or any agency relationship between the parties. A reference in this Addendum to a section in the Privacy and Security Rule means the section as in effect or as amended. The terms and conditions of this Addendum override and control any conflicting term or condition of the Agreement. All non-conflicting terms and conditions of the Agreement remain in full force and effect.