Robert A. Krause; krause@spencelawyers.com
Mel C. Orchard, III; orchard@spencelawyers.com
Elizabeth A. Richards; richards@spencelawyers.com
Sarah A. Kellogg; kellogg@spencelawyers.com
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290
(307) 733-5248 Fax

William L. Simpson; bsimpson@skelaw.com
Larry B. Jones; ljones@skelaw.com
Colin M. Simpson; csimpson@skelaw.com
BURG, SIMPSON, ELDREDGE, HERSH & JARDINE, PC
1135 14th Street, P.O. Box 490
Cody, Wyoming 82414
(307) 527-7891
(307) 527-7897 Fax

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF WYOMING

| | |
|---|---|
| MICHELLE OLIVER,<br><br>    Plaintiff,<br><br>v.<br><br>HEALTHTECH MANAGEMENT SERVICES, INC., WILLIAM D. PATTEN, JEFFREY HANSEN, M.D., and POWELL VALLEY HEALTH CARE, INC.,<br><br>    Defendants. | Civil No. 14 CV 168-S |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT OF DEFENDANTS HEALTHTECH MANAGEMENT SERVICES, INC. AND WILLIAM D. PATTEN

Plaintiff, Michelle Oliver, by and through her counsel, Robert A. Krause, Mel C.

Orchard, III, Elizabeth A. Richards, and Sarah A. Kellogg of THE SPENCE LAW FIRM, LLC, and

1

William L. Simpson, Larry B. Jones, and Colin M. Simpson, of BURG, SIMPSON, ELDREDGE, HERSH & JARDINE, PC, hereby files her response in opposition to Defendants' Motion to Dismiss, and states as follows:

## INTRODUCTION

On July 20, 2012, Plaintiff Michelle Oliver injured her left knee, setting in motion a series of failed surgeries due in part to the negligence of Defendant Dr. Hansen.  *First Amended Complaint & Jury Demand* (hereinafter *Amended Complaint*), at ¶¶ 23-27.   On August 21, 2012, Dr. Hansen, an employee of Powell Valley Health Care, Inc. (PVHC), performed a left ACL reconstruction on Ms. Oliver's knee.  *Id* at ¶ 24.   However, Dr. Hansen grossly misplaced the femoral tunnel.  *Id.* at ¶ 31.   After two additional procedures, Dr. Hansen's repair inevitably failed because of the original negligent placement of the tunnel.  *See id.* at ¶¶ 26, 31.   Ms. Oliver had to undergo a fourth knee surgery to attempt to reverse the damage from Dr. Hansen's original repair.  *Id.* at ¶ 27.   Because of Dr. Hansen's negligent treatment, Ms. Oliver endured four knee surgeries in the period of roughly fifteen months and developed athrofibrosis and degenerative changes to her knee.  *See id.* at ¶¶ 23-27, 32.

But this is only part of the story.   The next chapter brings us to the complete lack of oversight of Dr. Hansen by PVHC and its leadership, including the CEO, William Patten.  *See Amended Complaint*, at ¶¶ 38-51.   In 2006, when Dr. Hansen was hired, PVHC was managed by a third party management company, Brim Healthcare, Inc.  *Id.* at 38.   HealthTech Management Services, Inc. (HealthTech) purchased Brim in 2010 and assumed Brim's liability.  *Id.* at ¶ 42.   In 2010, HealthTech directly entered into a Management Agreement with PVHC.  *Id.* at ¶ 45.   Ever since, HealthTech managed PVHC by placing CEOs, including William Patten, at its helm.  *Id.*

at ¶ 44-45.  These HealthTech employees had control over, and participated in, hiring, firing, and disciplining PVHC employees, including Dr. Hansen.  *Id.* at ¶ 46.

In their leadership role at PVHC, Patten and HealthTech were privy to complaints, made by patients and other health care providers, about Dr. Hansen's competence.  *Amended Complaint,* at ¶ 48-49.  They also knew Dr. Hansen's rate of surgical complications.  *Id.* at ¶ 50.  Nevertheless, Patten did not exercise his discretion to discipline or fire Dr. Hansen.  *Id.* at ¶¶ 46-47, 51.  Instead, Dr. Hansen was allowed to continue seeing and operating on patients.  *Id.* at ¶¶ 50-51.  In this way Patten and HealthTech placed Ms. Oliver directly in harm's way.  *See id.* at ¶ 52.

On August 15, 2014, Ms. Oliver filed this action against HealthTech and Patten—six months later, she still has not received an Answer.  *See Document* 1 (Plaintiff's Complaint).  After waiving service, on November 6, 2014, HealthTech and Patten responded with their first Rule 12 motion to dismiss or stay the action until PVHC and Dr. Hansen could be joined.  *Document* 9.  The Court stayed the action, and on January 14, 2015, Ms. Oliver filed her First Amended Complaint & Jury Demand (*Amended Complaint*), adding PVHC and Dr. Hansen as defendants.  *Document* 22.  The claims against HealthTech and Patten remained materially unchanged from the initial Complaint.  *See Document* 22.  On January 27, 2015, HealthTech and Patten filed a second Rule 12 Motion to Dismiss.  *Document* 25.  This motion was procedurally improper because the Federal Rules of Civil Procedure do not allow multiple pre-answer Rule 12 motions to dismiss.  F.R.C.P. 12 (g).  Ms. Oliver's right to an answer has been unfairly delayed.  *See id.*

This latest motion asks the Court to hold that hospital management companies and their employees owe <u>no</u> duty of care to hospital patients.  This motion asks this Court to ignore the

3

only real purpose of running a hospital - a singular mission - to provide quality care to patients. *See Document* 25, 12.  Indeed, it is entirely foreseeable that running a hospital poorly can cause a reduction in the quality of patient care.  When HealthTech and Patten chose to accept the role PVHC's CEO, they automatically inherited the duties and responsibilities that Wyoming courts have long attached to hospital leadership.  *See Sharsmith v. Hill,* 764 P.2d 667, 673 (Wyo. 1988); *Greenwood v. Wierdsma*, 741 P.2d 1079, 1088 (Wyo. 1987) ("One of the hospital's primary functions is to screen physicians to 'insure' that only competent physicians are allowed to practice in the hospital.").  Even absent a pre-existing common law duty of care, HealthTech and Patten have voluntarily assumed a duty of care to Ms. Oliver by holding themselves out to the community as the responsible and trustworthy leaders of PVHC, and acknowledging the authority that existed in the custom and practice of the hospital where Patten could fire physicians.  *See In re Otero County Hosp. Ass'n, Inc.*, 514 B.R. 315, 328-229 (Bankr. D. N.M. 2014) (explaining that a CEO employed by a third party hospital management company may owe patients a duty of care).  Ms. Oliver's common law rights cannot be extinguished by the Management Agreement between HealthTech and PVHC, to which she was not a party.

### STANDARD OF REVIEW

A. *Rule 8 requires only "a short and plain statement showing that the pleader is entitle to relief"*

To survive a 12(b)(6) motion to dismiss, a pleading must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Khalik v. United Air Lines,* 671 F.3d 1188, 1190 (10th Cir. 2012)(quoting F.R.C.P. 8 (a)(2)).  In other words, Ms. Oliver need only nudge "[her] claims across the line from conceivable to plausible."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "Specific facts are not necessary; the statement need only give the defendant fair notice of what the…claim is and the grounds upon which it rests."

4

*Erikson v. Pardus*, 551 U.S. 89, 93 (2007).  In determining whether or not Ms. Oliver has met this standard, the Court must accept as true all factual allegations.  *Twombly*, 550 U.S. at 555. Factual allegations are only required "in those contexts where such amplification is needed to render the claim *plausible.*"  *Ashcroft v. Iqbal*, 556 U.S. 662, 670 (2009) (emphasis in the original).

B.      *The Management Agreement is not central to Ms. Oliver's claims*

Ordinarily, when a court relies on matters outside of the pleadings, a 12(b)(6) motion is converted into a motion for summary judgment.  F.R.C.P. 12(d).  However, "a document *central to the plaintiff's claim* and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute."  *Utah Gospel Mission v. Salt Lake City Corp*, 425 F.3d 1249, 1253-54 (10th Cir. 2005) (emphasis added).  Because Ms. Oliver's claims do not center on the Management Agreement, Plaintiff does not agree that the Court may rely on the Management Agreement without converting this into a motion for summary judgment.  *See id.*; F.R.C.P. 12(d).  To the extent that the Court holds otherwise, the following provisions should be considered:

> HTMS shall: Provide CEO-level oversight of the **recruitment, hiring, promotion, discharge, supervision, disciplining and management of all employees of Hospital (including employed physicians)**, including overseeing that the Hospital has appropriate systems in place to **administer compliance with the policies, rules, regulations, and compliance programs adopted by the Board, and including providing information and recommendations for the determination from time to time of the numbers and qualifications of employees** needed in the various departments and services of Hospital to promote efficiency and quality patient care…

*Document* 24-1, *Management Agreement*, at ¶ 1.2.1 (a) (emphasis added).

> HTMS shall review, monitor, and recommend managerial improvements or changes in the following areas of Hospital's operations…Quality Assurance and Risk Management Programs.

*Id.* at ¶ 1.5.6.

> The CEO shall perform the **usual and customary functions of a hospital CEO's position** subject to appropriate direction from the Board.  In that respect and in addition to other applicable responsibilities described earlier in the Agreement, the CEO of the Hospital has a CEO's responsibilities for and has commensurate authority to lawfully and reasonably accomplish the duties set forth below subject to direction by the Board: (a) **Exercise CEO-level supervision of Hospital's internal affairs and maintain order and discipline in the Hospital, for the efficient operation and management thereof….** (i) **Act as a source of authority in matters pertaining to major management decisions** and help coordinate the activities of the medical staff with Hospital.

*Id.* at ¶ 2.2.1 (emphasis added).

> C.      *In the alternative to dismissal, this Court may grant Ms. Oliver leave to amend her Complaint or convert this Motion into a summary judgment motion*

This is not a case where Ms. Oliver has filed a lawsuit intending to go on a fishing expedition during discovery.  *See Twombly*, 550 U.S. at 559 (expressing a concern that "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases").  If the Court feels that Ms. Oliver has not met the Rule 8 pleading standard, the Court should grant Ms. Oliver leave to amend her Complaint to include more specific factual allegations set forth below.  *See* F.R.C.P. 15(a)(2) ("The court should freely give leave when justice so requires.").  These facts, taken from the deposition testimony of Patten in two other cases alleging Dr. Hansen's medical malpractice,[1] demonstrate that Patten and HealthTech could have taken action to stop Dr. Hansen from hurting patients, but chose to look the other way:

---

[1] The depositions attached hereto were taken in *Durose v. Powell Valley Healthcare, Inc. et al.*, (D. Wyo.) (No. 13-CV-216-S) and *Harris v. Jeffrey Hansen, M.D. et al*, (Wyo. 5th D. Ct.) (No. 27038).  In addition to the *Stambaugh* case referenced by Defendants, and the *Durose* and *Harris* cases listed above, there are at least six open cases alleging medical malpractice of Dr. Hansen. *See McMillen v. HealthTech Management Services, Inc. et al*, (Wyo. 5th D. Ct.) (No. 27948); *Brinkerhoff v. HealthTech Management Services, Inc. et al*, (Wyo. 5th D. Ct.) (No. 27946); *DiPilla v. HealthTech Management Services, Inc. et al*, (Wyo. 5th D. Ct.) (No. 27947); *Snell v. HealthTech Management Services, Inc. et al*, (Wyo. 5th D. Ct.) (No. 27805); *Johnson v.*

- At the time that Dr. Hansen was hired, his medical license had previously been suspended in Montana. *Deposition of William Patten*, *Harris, Exhibit A*, at 14-15.

- While employed at PVHC, Dr. Hansen "fell off the wagon" and completed a rehab process. *Exhibit A*, at 27:4-8. Afterwards, he was fully reinstated to practice. *Id.*

- Dr. Hansen was PVHC's top income generating physician. *Deposition of William Patten, Durose, Exhibit B*, at 75:6-8.

- If other health care providers had complaints about Dr. Hansen, they could voice these complaints directly to Patten as the hospital CEO:

  > Q: If a surg tech or a nurse practitioner had complaints regarding a surgeon, where would those complaints go?

  > A: They'd have a variety of ways that they could move forward with that…And I certainly would be one of the ones that they could reach out [to]---so there are a variety of ways.

  *Exhibit B*, at 40:9-21.

- Other health care providers, including Dr. Hansen's nursing staff, approached Patten to express their concerns about Dr. Hansen. *Exhibit A*, at 46:1-4. This included concerns about Dr. Hansen's surgical technique, selection of patients for surgery, and prescribing practices. *Exhibit A*, at 46:1-4, 51:12-14.

- In fact, Brad Mangum, a nurse practitioner and doctor of chiropractic, who worked closely with Dr. Hansen, approached Patten with concerns about specific patients and cases. *Exhibit A,* at 46:13-14, 51:12-14.

---

*HealthTech Management Services, Inc. et al*, (Wyo. 5th D. Ct.) (No. 27821); *Sommerville v. HealthTech Management Services, Inc. et al*, (Wyo. 5th D. Ct.) (No. 27813).

- When Brad Mangum complained to Timothy Seeley, the Director of Risk Management at PVHC, he was told "We're not going to get rid of our golden goose until we get a new goose." *Exhibit B,* at 77-78.  Patten was made aware of this conversation.  *Id.*

- All the while, according to his own testimony, Patten had the authority to suspend Dr. Hansen's privileges if he had credible concerns for patient care <u>without</u> consulting the PVHC hospital board:

  > Q: Are there any steps that you have to go through as the CEO to suspend a physician's privileges for patient care issues?

  > A: Not as outlined in—again, it's the same answer.  I don't think the bylaws are specific as to process.

  > Q: Let me ask you your understanding.  If a physician came to you with a patient care issue related to another physician and you believed that report was credible, could you at that moment suspend the other physician's privileges?

  > A: You choice of words, "could," yes I could.

  *Exhibit A,* at 100:10-21.

- Patten was also an ex officio member of the committees charged with ensuring patient safety, reviewing physician qualifications, and credentialing physicians.  *Exhibit B,* at 37-38 (discussing the committees); 41:23-42:2 (explaining Patten's role).  It was within Patten's power to encourage these committees to have taken swifter action with regards to Dr. Hansen:

  > Q: I meant to ask: When you--in your ex officio role sitting on the various committees, would it have been within your ability to have prodded the various committees to take more prompt action in dealing with the issues raised about Dr. Hansen?

  > A: Say I think we need to deal with this more quickly?

  > Q: Yes.

A: Yes.

*Exhibit B*, at 130:24- 131:7.

- When asked about Dr. Hansen's disciplinary or employment record, Patten repeatedly asserted that this information was privileged. *See Exhibit A,* at 27.

- Not only did Patten fail to terminate Dr. Hansen, he participated in the re-credentialing process:

  Q: Have you at any time reviewed Dr. Hansen's application to practice medicine at Powell Valley?

  A: I have been part of a recredentialing process for Dr. Hansen.

*Exhibit A,* at 7:22-23.

The Court may also rely on the materials discussed above by converting this Motion into a summary judgment motion.  F.R.C.P. 12 (d).[2]  If the Court converts this motion, it should allow the parties to take discovery before ruling.  F.R.C.P. 56 (d).  An affidavit, detailing Plaintiff's need for discovery is attached hereto as Exhibit C.  *See id.*

### ARGUMENT

This Court must deny HealthTech and Patten's motion because it is untimely and procedurally improper.  *See* F.R.C.P. 12 (g)(2).  Moreover, HealthTech and Patten's motion is substantively deficient because it asks this Court to hold that a hospital CEO cannot owe a duty of reasonable care to a patient, even when entrusted with the leadership of a hospital.  *See Greenwood*, 741 P.2d at 1088 (holding that hospitals owe a duty of care to patients); *Otero County Hosp. Ass'n Inc.*, 514 B.R. at 328-29 (explaining that hospital management companies

---

[2] "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to an not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  F.R.C.P. 12 (d).

may owe a common law duty of care to patients). This argument wrongly assumes that contract between a hospital and a management company can bargain away the common law rights of a third party. *See Throckmartin v. Century 21 Top Realty*, 2010 WY 23, ¶19, 226 P.3d 793, 804 (Wyo. 2010) (explaining that contracting parties cannot contract around tort duties owed to nonparties).

A.    *This motion is procedurally improper because the Federal Rules of Civil Procedure expressly prohibit multiple pre-answer motions to dismiss*

The Court should deny HealthTech's second pre-answer motion to dismiss because it is procedurally improper. Rule 12 (g)(2) bars a party from making a second pre-answer motion to dismiss that raises a defense previously available, but omitted from an earlier Rule 12 motion. F.R.C.P. 12(g)(2).[3] Rule 12 (g)(2) promotes expediency and "avoid[s] unnecessary delay at the pleading stage by encouraging 'the presentation of an omnibus pre-answer motion in which the defendant advances every available Rule 12 defense and objection he may have that is assertable by motion.'" *Albers v. Board of County Com'rs of Jefferson County, Colo.*, 771 F.3d 697, 702 (10th Cir. 2014) (quoting Charles Alan Wright & Arthur R. Miller, 5C Federal Practice & Procedure § 1384 (3d ed. 2014)).

In *Albers v. Board of County Com'rs of Jefferson County, Colo.*, the Tenth Circuit reviewed a district court's decision to grant a second, unconsolidated, pre-answer motion to dismiss. *Id.* at 702-703. The court noted that it was error for the district court to grant a second motion, but ultimately upheld the dismissal as a harmless error. Nevertheless, the opinion demonstrates that the Tenth Circuit favors a strict interpretation of Rule 12(g)(2). *See id.* at 703. The Tenth Circuit relied on the language of Rule 12(h)(2), which specifies, once a pre-answer

---

[3] "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." F.R.C.P. 12(g)(2).

motion to dismiss has been filed, a party may subsequently raise a 12(b)(6) defense <u>only</u> in a pleading, a motion for judgment on the pleadings, or at trial.  *Id.*

In this case, Defendants' no duty argument was available at the time the November 6, 2014 motion to dismiss was filed.  In fact, HealthTech and Patten made a similar argument in the *Stambaugh* case on October 27, 2014.  *Document* 24-2, Order in *Stambaugh v. HealthTech Management Services Inc.*, at 2.  Apparently HealthTech and Patten made the strategic decision to omit this argument from their November 6, 2014 motion because they wanted to first see how a state court, considering a different complaint, containing different allegations, would rule.  *See id.*  Ms. Oliver has waited six months for an answer to her Complaint.  HealthTech and Patten should not be able to flaunt the Rules of Civil Procedure and continue to needlessly delay this action.  *See* F.R.C.P. 12(g)(2).

> B.      *Ms. Oliver has sufficiently alleged that HealthTech and Patten owe her a common law duty of care*

Moreover, Defendants' motion fails on its merits because by choosing to fill the shoes of hospital CEO, Patten and HealthTech owed Ms. Oliver a common law duty of care.  *See Daniels v. Carpenter*, 2001 WY 11, ¶¶ 15-16, 62 P.2d 555, 560 (Wyo. 2003) (explaining that duty is an element of a negligence claim).  Duty may be derived from: (1) common law, (2) statute, or (3) contract.  *Id.* at ¶ 16, 560.  A 12(b)(6) dismissal is appropriate only where there is no recognized common law or statutory duty or the plaintiff has not alleged facts sufficient to show that a duty plausibly exists.  *See id.* at ¶ 23, 564.  HealthTech and Patten's duty to exercise care in the hiring, supervision, and credentialing of physicians is based on existing Wyoming common law.  *See Greenwood*, 741 P.2d at 1088-89.  Even absent a common law duty, however, HealthTech and Patten undertook management functions at PVHC sufficient to impart a duty of care under a theory of voluntary undertaking.  *See Otero County Hosp. Ass'n, Inc.*, 514 B.R. at 328-29.  The

Management Agreement between HealthTech and PVHC may not be read to bypass Ms. Oliver's common law rights because she was not a party to the agreement.  *See Throckmartin*, 2010 WY 23, ¶ 19, 226 P.3d at 804.

      i.     <u>Common Law Duty: A hospital CEO owes patients a common law duty of care</u>

Hospitals have a common law duty to "exercise that degree of care and skill usually exercised or maintained by other reputable hospitals in the extension and continuation of medical staff privileges to physicians." *Greenwood*, 741 P.2d at 1088.  This includes the duty to "properly supervise the qualifications and privileges of their medical staffs." *Id.*  The Wyoming Supreme Court has been clear that imposing these duties on hospitals serves "an important public policy—the preservation of quality health care for the citizens of this state." *Id.*; *see Sharsmith*, 764 P.2d at 673 (explaining that a hospital may be liable for negligence supervision if "it knows or should have known of the deficient treatment or if the physician's negligence is obvious.").

Hospital management companies re-arrange the traditional structure of hospitals by substituting their employees into leadership roles traditionally held by hospital employees.  *See Document* 24-1, at ¶ 2.2.1 ("The CEO shall perform the usual and customary functions of a hospital CEO's position").  This structural change does not alter the common law duties historically attached to hospital leadership.  By simply alleging that Patten and HealthTech filled the role of CEO at PVHC, Ms. Oliver has alleged sufficient facts to establish that they owed her the duties of care traditionally associated with hospital leadership.  *See Iqbal*, 556 U.S. at 670 (explaining that the level of factual allegations required depends on the context).

Even assuming these duties do not automatically attach to HealthTech and Patten when they step into the role of a hospital CEO, the Wyoming Supreme Court would favor extending these duties to hospital management companies and their employees.  In *Gates v. Richardson*,

the Wyoming Supreme Court set forth eight factors (*Gates* factors) to consider when deciding

whether to recognize a new common law duty of care:

> (1) foreseeability of harm to the plaintiff, (2) closeness of the connection
> between the defendant's conduct and injury suffered, (3) the degree of
> certainty that the plaintiff suffered injury, (4) the moral blame attached to
> the defendant's conduct, (5) the policy of preventing future harm, (6) the
> extent of the burden upon the defendant, (7) the consequences to the
> community and the court system, (8) the availability, cost and prevalence
> of insurance for the risk involved.

*Gates v. Richardson,* 719 P.2d 193, 196 (Wyo. 1986); *see Daniels,* 2003 WY 11, ¶ 21, 62 P.3d at

563 (applying the *Gates* factors).  Each of these factors indicates that a hospitals' common law

duty of care in hiring, supervising, and monitoring physicians also runs to HealthTech and

Patten.  *See Sorensen v. State Farm Auto Insurance Co.*, 2010 WY 101, ¶ ¶ 28-34, 234 P.3d

1233, 1242 (Wyo. 2010)(applying the *Gates* factors).

The first three *Gates* factors address the foreseeability of harm, the closeness of the

connection between the injury suffered and the conduct, and the likelihood of harm.  *See Gates*,

719 P.2d at 196.  Wyoming Courts have already implicitly determined that harm to patients is

foreseeable, likely, and closely connected when hospital leadership is negligent in hiring,

credentialing and supervising physicians.  *See Greenwood*, 741 P.2d at 1089.  Such harm is just

as likely when an outside management company, charged with hiring, firing, and disciplining

physicians, turns a blind eye to a bad doctor.  *See Document* 24-1, at ¶ 1.2.1 (a) (placing the CEO

in charge of recruitment, hiring, promoting, discharging, supervising, and managing physicians);

*see, e.g., Exhibit A*, at 100:10-21 (Patten had the ability to discharge Dr. Hansen for patient

safety concerns).  This is especially true, and especially concerning, when the bad doctor is

referred to as a "golden goose."  *See Exhibit B* at 77-78.

Under the fourth *Gates* factor, the fact that Patten and HealthTech ignored all indications that Dr. Hansen was unfit to operate on patients is just as morally repugnant whether Patten was employed directly by PVHC or by HealthTech. *See Sorensen*, 2010 WY 101, ¶ 31, 234 P.3d at 1242. The Wyoming Supreme Court has explained that "[M]oral blame generally results from situations in which the defendant has direct control over establishing and ensuring proper procedures to avoid the harm caused or where the defendant is the party best in the position to prevent the injury." *Id.* Patten and HealthTech were privy to information about Dr. Hansen's problems and complications rates as a surgeon, and had the authority to act on credible concerns for patient safety. *Amended Complaint*, at ¶ 48-52; *Document* 24-1, at ¶ 1.2.1, 1.5.6, 2.2.1; *see Exhibit A*, at 46:1-4, 51:12-14. Given that kind of notice Patten and HealthTech were required to implement procedures to ensure patient safety. *See Greenwood*, 741 P.2d at 1088 (explaining that hospitals owe a duty of care to patients). Ms. Oliver could not have known any of this information. *See Sorensen*, 2010 WY 101, ¶ 25, 234 P.3d at 1241 ("sufficient moral blame attached to the company's conduct because it benefited financially from providing the services, had direct control over the procedures used, had the ability to hire and train personnel to perform the services …") (discussing *Duncan v. Afton, Inc.*, 991 P.2d 739, 746 (Wyo. 1999)). These facts imply the type of information and power disparity that Wyoming courts find troubling and dangerous. *See id.*

Perhaps the most important consideration, analyzed under the fifth *Gates* factor, is the public policy of advancing quality health care expressed in *Greenwood*:

> Having undertaken one of mankind's most critically important and delicate fields of endeavor, concomitantly therewith the hospital must assume the grave responsibility of pursuing this calling with appropriate care. The care and service dispensed through this high trust, however technical, complex and esoteric its character may be, must meet standards of responsibility commensurate with the undertaking to

preserve and protect the health, and indeed, the very lives of those placed in the hospital's keeping.

These considerations convince us that a hospital should be required to exercise reasonable care not only in determining whether to extend or continue staff privileges, but also in maintaining adequate supervision and review of treatment rendered by those physicians. Accordingly, we join those jurisdictions which impose upon a hospital a duty of exercising reasonable care in supervising and reviewing the treatment of patients by its staff physicians.

*See Greenwood*, 741 P.2d at 1088-89.

Allowing hospitals, such as PVHC, to contract away leadership and management functions to third parties immune from tort liability, would dangerously undercut this important public policy.  Patten was charged with making important personnel and leadership decisions. *See Document* 24-1, at ¶ 1.2.1 (a)(giving Patten the authority to hire, fire, and discipline physician).  The Management Agreement also implies a structure of incentive compensation if HealthTech and Patten reach certain benchmarks.[4]  *See Document* 24-1, at ¶ 6.7.  Assuming these benchmarks are tied to financial indicators, Patten and HealthTech had an incentive to keep a high grossing doctor on staff, even in the face of known patient safety concerns.  *See Document* 42-1, at ¶ 6.7 (creating an incentive compensation payment scheme); *Exhibit B*, at 75:6-8 (demonstrating that Dr. Hansen was PVHC's highest grossing physician); *Exhibit B*, at 77-78 (referring to Dr. Hansen as "golden goose.").  The absence of any tort liability for the harm caused to patients because of HealthTech and Patten's <u>own</u> conduct would further skew these

---

[4] The Management Agreement states:

> Hospital and HTMS agree that during the first ninety (90) days of this Agreement they will negotiate in good faith to establish an incentive compensation payment for each fiscal year within the term of this Agreement in the event HTMS surpasses measurable benchmarks agreed upon by the Board and HTMS prior to each fiscal year…

*Document* 24-1, at ¶ 6.7.  Plaintiff does not know the specifics of any such agreement.

15

incentives and undermine well-established public policy goals.   In other words, "we care about patient safety" would become another meaningless marketing message.

Under *Gates* factor seven, recognizing that a hospital CEO owes patients a duty of care in hiring, supervising, and credentialing physicians, does not impose negative externalities on the community or court system.  *See Gates*, 719 P.3d at 197.   In *Gates*, the Court adopted the tort of negligent infliction of emotional distress.  *Id.* at 198.  The court held that imposing a duty to avoid purely mental harm was unlikely to increase the burden on the court system because negligent infliction of emotional distress claims would often be joined with claims for the underlying injury.  *Id.* at 197.  Likewise, an actionable claim for negligent hiring, supervising, or credentialing of a physician will necessarily entail an injury from the doctor's malpractice.  *See Sharsmith*, 764 P.2d at 673.  Many plaintiffs will join negligent hiring, supervision, or credentialing claims with their claims against the doctor.  *See Gates,* 719 P.3d at 197.

Under *Gates* factor eight, a hospital management company can just as easily insure against the risk of negligent hiring, supervision, and credentialing claims.  *See id*. at 196.  In fact, HealthTech and Patten have already insured against this type of risk.  The Management Agreement requires PVHC to carry liability insurance naming HealthTech and its employees as an additional insured.  *Document* 24-1, at ¶ 9.1.1.

Even factor six, the burden on HealthTech and Patten, weighs in favor of holding HealthTech and Patten responsible for their conduct.  *See Gates*, 718 P.2d at 197.  This factor does not measure the mere burden of having to pay for one's wrongdoings.  *Id*. ("any time a defendant must pay for his wrongs he is burdened.").  Instead, it allows the court to consider the unintended externalities of imposing a tort duty.  For example, in *Lucero v. Holbrook*, a meth addict stole the defendant's car from her driveway while she ran inside to grab her purse.  2012

WY 152, ¶ ¶ 3-5, 288 P.3d 1228, 1231 (Wyo. 2012).  He then collided with the plaintiff's car,

injuring the plaintiff and her two children.  *Id.*  The Court explained that imposing a duty "not to

leave the motor running in a vehicle in one's driveway" would create liability for every person

who warms his or her car on a cold winter day.  *Id.*  At most, HealthTech and Patten can argue

that they are burdened by having to compensate an innocent bystander for her loss caused by

their own conduct.  This is not the type of burden weighed under factor six.  *See Gates,* 719 P.2d

at 197 ("Increased insurance premiums are 'unwarranted' only when we decide that a loss should

fall on the innocent victim rather than the guilty tortfeasor, his insurer, and the public.").

On balance, the *Gates* factors strongly indicate that Patten and HealthTech owed a duty

of care to Ms. Oliver with regards to the hiring, supervising, and credentialing Dr. Hansen.  *See*

*Gates,* 719 P.2d at 196.  Whether or not HealthTech and Patten contracted for this liability is

inconsequential to whether or not they now owe a common law duty of care in this area.  *See*

*Throckmartin*, 2010 WY 23, ¶ 19, 226 P.3d at 804*; Otero County Hosp. Ass'n, Inc.*, 514 B.R. at

328-29.

ii.     Voluntary Undertaking: In the absence of a pre-existing duty of care, Patten and
        HealthTech assumed a duty of care through their voluntary undertakings

Even if Wyoming law did not otherwise prescribe a duty of care to hospital management

companies, HealthTech and Patten assumed a duty by undertaking some of the traditional

oversight required of a hospital.  *See Ortero County Hosp. Ass'n, Inc*, 514 B.R. at 328-29; *see*

*also Daniels,* 2003 WY 2011, ¶ 21, 62 P.3d at 563 (implying that the duty analysis should be

performed under the *Gates* factors before turning to a theory of voluntary assumption).  In *Berry*

*v. Tessman*, the Wyoming Supreme Court embraced the Restatement view of voluntary

undertaking, explaining:

> One who undertakes, gratuitously or for consideration, to render services
> to another which he should recognize as necessary for the protection of
> the other's person or things, is subject to liability to the other for physical
> harm resulting from his failure to exercise reasonable care to perform his
> undertaking if (a) his failure to exercise such care increases the risk of
> such harm, or (b) the harm is suffered because of the other's reliance
> upon the undertaking.

*Berry v. Tessman*, 2007 WY 175, ¶ 13, 170 P.3d 1243, 1246 (Wyo. 2007).  Indeed, by holding

themselves out as a source of discipline and authority at PVHC, fielding complaints, and then

failing to act on these complaints, Patten and HealthTech increased the danger to Ms. Oliver.

*See Amended Complaint*, at ¶ ¶ 51-52.

    In *Ortero County Hosp. Ass'n, Inc.*, the United States Bankruptcy Court for the District

of New Mexico held that a hospital management company could assume a duty of care to

patients through a voluntary undertaking.  514 B.R. at 328-29.  In that case, the hospital and

management company had a contract stating that the management company "had no right to

direct the Hospital or its employees in the performance of their medical judgments or duties." *Id.*

at 320.  Nevertheless, the court held that the CEO could still owe patients a duty of care if the

facts demonstrated that the CEO voluntarily undertook the hospital's duties of privileging and

supervising a doctor.  *Id.* at 328.

    Ms. Oliver has alleged sufficient facts to demonstrate that Patten and HealthTech

assumed a duty to supervise Dr. Hansen.  *Amended Complaint*, at ¶ 46; *Document* 24-1, at ¶

1.2.1 (a).  As CEO, Patten was privy to complaints from patients and other health care providers

relating to Dr. Hansen's competence, rate of surgical complications, and failure to conform to the

standard of care.  *Amended Complaint*, at ¶ 48-49.  Patten's deposition testimony confirms that

these complaints were at times highly specific.  *See Exhibit A*, at 46:1-14; 51:12-14.  For

example, Brad Mangum provided Patten with specific patients and cases that he was concerned

about. *Exhibit A,* at 51:12-14.  These health care providers and others reasonably relied on Patten's own representations that he was an appropriate person to field these complaints and trusted him to take action to protect patients.  *See Exhibit B,* at 40:9-21 (explaining that if a health care provider had a complaint, "I [Patten] certainly would be one of the ones that they could reach out [to].").

The conclusion that Patten and HealthTech assumed a duty to supervise Dr. Hansen is further bolstered by the level of control Patten and HealthTech actually exercised.  *See Amended Complaint*, at ¶ 46.  Patten has testified under oath that he could suspend Dr. Hansen's privileges upon credible concerns for patient safety.  *Exhibit A*, at 100:10-21.  He has also testified that he was an ex officio member of the committees formally charged with credentialing physicians and ensuring patient safety and exercised influence over these committees.  *Exhibit B*, at 37-38, 41:23-42:2, 130:24-131:17.  Further, the Management Agreement charged Patten with the oversight of PVHC's risk management and quality assurance programs.  *Document* 24-1, at ¶ 1.2.1 (a); *see Chesser v. LifeCare Management Services, L.L.C.*, 356 S.W.3d 613, 628, 631 (Tx. Ct. App. 2011)(holding that a hospital management company charged with creating policies, procedures, bylaws, rules, and regulations that governed a hospital "had a duty to manage, control, direct, supervise, and evaluate the care, services, competence, and quality of care and services provided at Hospital.")

This logic also extends to the duties of hiring and credentialing.  The Management Agreement confirms Ms. Oliver's allegation that HeathTech and Patten were responsible for the hiring of doctors, including Dr. Hansen.  *Amended Complaint*, at ¶ 46; *Document* 24-1, at ¶ 1.2.1 (a).  Patten himself has testified that he participated in the re-credentialing of Dr. Hansen. *Exhibit A,* at 7:22-23.  HealthTech and Patten plausibly undertook sufficient involvement with

the hiring, supervision, and credentialing of hospital physicians to impart a common law duty of care. *See Ortero County Hosp. Ass'n*, 514 B.R. at 328-29.  Because this analysis is highly fact specific, dismissal is inappropriate at this early stage. *See id.* (holding that factual questions remained at the summary judgment stage).

> iii.   Contract: HealthTech, Patten and PVHC cannot contract away a duty otherwise owed to Ms. Oliver in tort—the Management Agreement is relevant only to the extent that it bears on HealthTech and Patten's common law duty

Finally, HealthTech and Patten attempt to spin their duty argument into one of contract interpretation.  Although HealthTech and PVHC may have contracted to establish a division of labor or liability amongst themselves, they cannot contract away a tort duty owed to Ms. Oliver, a third party:

> **Contract principles that govern the parties to a contract are not controlling on claims against nonparty professionals whose duties arise in tort.**  Our precedent reveals a recognition that tort duties and liabilities imposed by the legislatures and courts are supported by underlying social policies which require the imposition of obligations on a defendant to act reasonably for the protection of a plaintiff. By imposing tort duties, courts and legislatures have externally allocated the risks arising from certain relationships for the protection of the public. Having done so, individual parties are limited in shifting those burdens from the obligor to the obligee by private action.

*Hulse v. First Am. Title Co. of Crook Cnty.*, 2001 WY 95, ¶ 56, 33 P.3d 122, 139 (Wyo. 2001) (emphasis added); *see Throckmartin*, 2010 WY 23, ¶ 19, 226 P.3d at 804.  The Management Agreement is relevant to the duty argument only to the extent that it is probative of the hiring, supervision, or disciplinary roles <u>actually</u> exercised by Patten and other HealthTech CEOs for purpose of establishing a common law duty under the analysis set forth above. *See Otero County Hosp. Ass'n, Inc.*, 514 B.R. at 327 (explaining that the key analysis is whether or not the management company actually exercised control over or participated in the privileging and supervision of a physician).

In *Ortero County Hosp. Ass'n, Inc.*, the court explained that the hospital and the defendant management company could not contract around the tort duty owed by the CEO to the hospital's patients.  514 B.R. at 326-27 (explaining "the duties imposed by tort law are not limited to those imposed by contract.").  This was true even though the management agreement stated that the management company "had no right to direct the Hospital or its employees in the performance of their medical judgments or duties."  *Id.* at 320, 327.  The management company's duty to patients was defined only by the common law.[5]  *Id.* at 327.  Defendants call the Court's attention to provisions in the Management Agreement, which specify that HealthTech will not assume responsibility for the medical judgment of physicians.  *See Otero County Hosp. Ass'n, Inc.*, 514 B.R. at 328-329 (citing a nearly identical provision and holding that a duty of care could still exist).  In doing so, the Defendants make the exact argument rejected in *Ortero County Hosp. Ass'n, Inc.  See id.*

This legal framework distinguishes Ms. Oliver's case from the *Stambaugh* case.  The *Stambaugh* court did not address whether HealthTech and Patten owe patients a common law duty of care—presumably because the Plaintiff did not advance this argument.  *See Document* 24-2, Order from Judge Cranfill, at 7.  The court also did not address whether there was a voluntary undertaking of this duty.  *Id*.  Instead, it appears that the *Stambaugh* plaintiff argued that any duty owed by HealthTech and Patten was derived solely from the Management Agreement.  *See id*.  Because the existence of a common law duty necessarily turns on more than

---

[5] The court also disposed of the defendant's freedom of contract argument stating:
> The public policy favoring freedom of contract…does not apply here; as stranger to the Agreement, the UTC claimants [i.e. patients] did not exercise any freedom in negotiating its terms.

*Otero County Hosp. Ass'n, Inc.,* 515 B.R. at 327.

the four-corners of the Management Agreement, this Court should not rely on the *Stambaugh* order provided by Defendants.

HealthTech and Patten further argue that this Court cannot rely on Ms. Oliver's allegations that they had control over or participated in the monitoring, reviewing, credentialing, supervision, disciplining or hiring of Dr. Hansen because the Management Agreement contradicts these factual allegations. *Document* 25, at 18. In the cases that they rely on for this proposition, the plaintiff was a party to a contract that specifically set forth each side's duties. *Rehnberg v. Hirshberg*, 2003 WY 21, ¶ 10, 64 P.3d 115, 118 (Wyo. 2003)(setting forth the plaintiff's theories of recovery, which are all based on contract); *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1382, 1385 (10th Cir. 1996) (considering whether a contract satisfied the statute of frauds requirement). Because Ms. Oliver is not asserting a contract duty, and was not a party to the Management Agreement, its terms should not be weighed against Ms. Oliver's factual allegations. Further, the provisions cited by the Defendants are irrelevant because Ms. Oliver is not asserting that HealthTech and Patten are vicariously liable for the medical judgment or malpractice of Dr. Hansen. She is only asserting claims based on HealthTech and Patten's negligent personnel decisions.

Nevertheless, the Management Agreement is relevant to the extent that it is probative of HealthTech and Patten's common law duty. *See Otero County Hosp. Ass'n, Inc.*, 514 B.R. at 328-329. For example, the Contract endows Patten (and other HealthTech CEOs) with oversight of "recruitment, hiring, promotion, discharge, supervision, disciplining and management of all employees," including Dr. Hansen. *Document* 24-1, at ¶ 1.2.1 (a). HealthTech was charged with reviewing, monitoring and recommending managerial improvements to PVHC's quality assurance and risk management programs. *Document* 24-1, at ¶ 1.5.6. HealthTech explicitly

agreed to provide "the usual and customary functions of a hospital CEO."  *Document* 24-1, at ¶ 2.2.1.  Finally, the CEO was charged with "maintain[ing] order and discipline in the Hospital." *Document* 24-1, at ¶ 2.2.1 (a).  These provisions show that Patten and HealthTech likely exercised control over or participated in the hiring, supervising, and credentialing of Dr. Hansen.

iv.   Statute: Wyoming law demonstrates the legislature's intent that hospital leadership should owe a duty of care to their patients

Finally, HealthTech and Patten argue that Wyoming statute unambiguously and exclusively places the duty to supervise physicians on the PVHC hospital board.  Although Plaintiff agrees that hospitals have these obligations, it is unclear how Defendants derive the notion that this duty is <u>exclusive</u> to hospitals.  Instead, the Wyoming statute lends support to the argument that a hospital's common law duties relating to hiring, supervising and credentialing physicians, are of this highest importance to the legislature and cannot be tossed aside when a third party takes a leadership role.  *See* W.S. § 35-3-910.

Defendants point to W.S. § 35-2-910, which assigns quality management functions to health care facilities.  Under the statute, to maintain a license, a hospital must review "the professional practices in the hospital for the purposes of reducing morbidity and mortality and for the improvement of the care of patients in the hospital."  W.S. § 35-2-910.  It is ironic that HealthTech and Patten now argue that this duty cannot be shared with an outside management company, given their Management Agreement with PVHC explicitly entrusts the CEO with maintaining PVHC's licensing.  *See Document* 24-1, at ¶ 1.2.7 ("The CEO shall direct Hospital's efforts to maintain its licenses and certifications in good standing…").  Further, Patten has repeatedly asserted the peer review privilege, demonstrating that he saw himself as part of this

process.[6]  *Exhibit A*, at 27; *see* W.S. § 35-17-105.  In other words, Patten and HealthTech ask this Court to hold that the person charged with maintaining PVHC's licensing under W.S. § 35-2-910 can have no duties under the statute.

A more appropriate reading of this statute focuses on its stated purpose, improving patient care.  *See* W.S. § 35-2-910 (c).  This purpose supports the argument that the common law duty of care, long recognized as running from hospitals to patients, automatically extends to third party management companies and their employees, like HealthTech and Patten.  *See Greenwood,* 741 P.2d at 1088-89 (explaining the common law duty of care).

### CONCLUSION

Defendants HealthTech and Patten have asked this Court to grant an untimely and procedurally improper motion.  In doing so, they have unfairly delayed answering Ms. Oliver's Complaint.  Further, HealthTech and Patten's arguments fail on their merits because a hospital CEO owes a duty of care to the hospital's patients.  Nevertheless, to the extent that this Court is inclined to grant Defendants' Motion, Ms. Oliver asks for leave to amend her Complaint to set forth the allegation above.  Alternatively, this Court may convert this Motion to a summary judgment motion if it wishes to rely on the facts found in the deposition testimony of Patten.

Dated this 10th day of February, 2015.

/s/ Mel C. Orchard, III
Mel C. Orchard, III (WSB # 5-2894)
Robert A. Krause
Elizabeth A. Richards
Sarah A. Kellogg
THE SPENCE LAW FIRM, LLC

---

[6] By asserting this privilege, Patten implies that he was a member of a "committee of medical staff in a hospital having the responsibility of evaluation and improvement of the quality of care rendered in the hospital."  W.S. § 35-17-101.  He now argues that he could not have exercised authority over evaluating the quality of care at PVHC.

15 S. Jackson Street, P.O. Box 548
Jackson, WY 83001
(307) 733-7290
(307) 733-5248 Fax

William L. Simpson
Larry B. Jones
Colin M. Simpson
BURG, SIMPSON, ELDREDGE, HERSH & JARDINE, PC
1153 14th Street, P.O. Box 490
Cody, WY 82414
(307) 527-7891
(307) 527-7897 Fax

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above of was served upon the following, as indicated below on this 10th day of February 2015, and addressed as follows:

George Powers                                      __x__ Electronic Filing
Paul A. Kapp
SUNDAHL, POWERS, KAPP & MARTIN, LLC
P.O. Box 328
Cheyenne, WY 82003
*Attorneys for HealthTech and William Patten*

Christopher Voigt                                  __x__ Electronic Filing
Eric Peterson
CROWLEY FLECK, P.L.L.P
Transwestern Plaza II, Suite 500
490 North 31st  St
P.O. Box 2529
Billings, MT 59103
*Attorney for Jeffrey Hansen, M.D.*

Scott E. Ortiz                                     __x__ Electronic Filing
Brian J, Marvel
WILLIAMS, PORTER DAY & NEVILLE, P.C.
P.O. Box 10700
Casper, WY 82602
*Attorneys for Powell Valley Health Care, Inc.*

                                                   /s/ Mel C. Orchard, III
                                                   Mel C. Orchard, III
                                                   *Attorney for Plaintiff*