# Exhibit A

**Deposition of William Patten**

*Harris v. Jeffrey Hansen, M.D.*, No. 27038
In the District Court of Park County, Wyoming
Fifth Judicial District

Pages: 7, 14-15, 26-27, 45-51, 100

IN THE DISTRICT COURT OF PARK COUNTY, WYOMING

FIFTH JUDICIAL DISTRICT

CIVIL ACTION NO. 27038

---

AARON L. HARRIS and GLENNDA P.
HARRIS,

    Plaintiffs,

vs.

JEFFREY HANSEN, M.D.; and POWELL
VALLEY HEALTHCARE, INC.,

    Defendants.

---

DEPOSITION OF WILLIAM PATTEN

9:12 a.m., Wednesday
June 25, 2014

---

    PURSUANT TO NOTICE, the deposition of William Patten was taken on behalf of the Plaintiffs in accordance with the applicable Wyoming Rules of Civil Procedure at Powell Valley Hospital, 777 Avenue H, Powell, Wyoming, before Anne Bowline, a Registered Merit Reporter and Notary Public of the State of Wyoming.

```
 1      A.   Yes, he is.
 2      Q.   When you tried to get in touch with him,
 3 how did you do that?
 4      A.   Through my assistant, Sharon Christensen.
 5      Q.   As far as you know, does she have a number
 6 for his contact information?
 7      A.   Yes, she should.
 8      Q.   Okay.  There was a Cardwell, I think, who
 9 came after Mr. Barton.
10      A.   Paul.  Paul Cardwell.
11      Q.   Thank you.  Do you know what years Rod
12 Barton was the CEO?
13      A.   I do not.
14      Q.   Do you know approximately?
15      A.   13 years I was told is what he served, but
16 I don't know when he started and when he ended.
17      Q.   Do you know when Paul Cardwell started?
18      A.   March or April of '11, and he resigned in
19 September of '11, I believe.
20      Q.   Have you at any time reviewed Dr. Hansen's
21 application to practice medicine at Powell Valley?
22      A.   I have been part of a recredentialing
23 process for Dr. Hansen.
24      Q.   Did you ever go back and look at the
25 original credentialing file, I'll call it, or the
```

1  what information he got that he's aware of. It's a
2  public record.
3          MR. ORTIZ: You're asking him what
4  they got in a credentialing file that he reviewed.
5  If you want to ask him is he aware of a public
6  record that exists regarding past status with
7  Hansen, that's a different question.
8      Q.   (BY MR. KRAUSE) Let me reask it a
9  different way. Have you ever learned that Dr.
10 Hansen had his license suspended in Montana?
11         MR. ORTIZ: And I'm instructing you
12 not to answer that if you -- if you have to only
13 rely on what you learned through the credentialing
14 process. So if you know of that from an outside,
15 nonconfidential source, you can answer that. If you
16 can't, say you can't.
17     A.   I wouldn't be able to say where I came into
18 access for information related to any prior action
19 on Dr. Hansen's license, whether it was
20 credentialing or otherwise.
21     Q.   (BY MR. KRAUSE) Let me see if we can get
22 around this. Other than in the credentialing
23 process, did anyone else ever tell you that Dr.
24 Hansen had lost his license to practice medicine in
25 Montana?

```
 1            MR. ORTIZ:  You can answer that if it
 2   came from something outside of committee activity or
 3   a committee document.
 4        A.   Yes.
 5        Q.   (BY MR. KRAUSE)  Okay.  Where did you learn
 6   that information?
 7        A.   From Mike Gilmore, one of my vice
 8   presidents.
 9        Q.   What is his position?
10        A.   Vice president of outpatient services.
11        Q.   What did Mr. Gilmore tell you?
12        A.   That Dr. Hansen's license had been
13   suspended before we hired him.
14        Q.   And was that his license in Montana?
15        A.   That was my understanding, yes.
16        Q.   Did he say if he had had his license
17   suspended anywhere else?
18        A.   I don't recall.
19        Q.   What else did Mr. Gilmore tell you about
20   Dr. Hansen's license or suspension in Montana?
21            MR. ORTIZ:  Did it come -- if it's
22   something outside credentialing or a committee, you
23   can answer it.  But if it's something that was dealt
24   with or discussed during any of the committee
25   meetings or as part of recredentialing, I don't want
```

1   I'm using it very broadly, but that's what
2   I mean. You know, you're having lunch, talking to
3   someone, having a beer after dinner with someone, or
4   someone just comes into your office and blurts it
5   out and says, "Hey, Mr. Patten, Dr. Hansen,"
6   whatever.
7       A.   So my recollection would be that outside of
8   a credentialing committee meeting or outside of
9   reviewing credentialing committee meeting minutes, I
10  would have had a conversation or conversations with
11  Mike Gilmore where Mike reviewed with me his
12  recollection of Dr. Hansen's employment history at
13  Powell Valley Healthcare as well as past issues in
14  Billings.
15      Q.   Okay. What did Mr. Gilmore tell you?
16           MR. ORTIZ: And before you answer
17  that, was this just a conversation to get you up to
18  speed or was this part of an official monitoring
19  report, if you know?
20           THE DEPONENT: I don't believe it
21  would have been part of a monitoring report.
22           MR. ORTIZ: Go ahead and answer his
23  question, then.
24      A.   So I think it was more to make me aware of
25  the totality of the employment history with Dr.

1  Hansen.  So I would have been told that there had
2  been an issue of some type, and I don't recall the
3  specifics of the issue, but I would describe it that
4  Dr. Hansen fell off the wagon and that the
5  organization took an appropriate response.  He
6  completed what I would describe as an appropriate
7  rehab process and was then fully reinstated to
8  practice.
9      Q.  (BY MR. KRAUSE)  When did this conversation
10 with Mr. Gilmore take place?
11     A.  I would assume it was in my first three to
12 six months of employment.
13     Q.  Did he -- during that conversation, did he
14 tell you what the issue was?
15     A.  I don't recall.
16     Q.  Okay.  What did you interpret Mr. Gilmore's
17 comment that Dr. Hansen had fallen off the wagon to
18 mean?
19         MR. ORTIZ:  You can talk about what
20 your perception was at the -- during the
21 conversation.
22     A.  For me, falling off the wagon either means
23 alcohol abuse or substance abuse of some type.
24     Q.  (BY MR. KRAUSE)  Did Mr. Gilmore ever tell
25 you which one it was?

1  A.   Pattern, P-A-T-T-E-R-N.
2  Q.   So first, I guess, who provided you with
3  that information?
4  A.   So I was aware of a subpoena that we
5  received from the Wyoming Board of Medicine
6  requesting records, I believe on five patients.
7  That would have been Christmas Eve day of '12 that I
8  became aware of that.
9  Q.   Was that the first and only time that
10 anyone raised a concern to you about Dr. Hansen's
11 prescribing pattern?
12 A.   First, I couldn't say.  Only, no.
13 Q.   Okay.  You got a copy from the Wyoming
14 Board of Medicine.
15      MR. KRAUSE:  And I'm assuming you're
16 taking a privilege as -- claiming privileges as
17 to --
18      MR. ORTIZ:  What they did, what they
19 said, absolutely.
20 Q.   (BY MR. KRAUSE)  Okay.  Have you learned --
21 what other information do you have, outside of a
22 privileged communication -- and I mean peer review,
23 credentialing, Wyoming Board of Medicine -- that Dr.
24 Hansen was overprescribing narcotics or there was a
25 concern about his prescribing pattern?

1   A.   So I had conversations with both Brad
2   Mangum and Angela Redder where they conveyed to me
3   their concerns regarding Dr. Hansen's prescribing
4   practice.
5   Q.   First, Brad Mangum and Angela Redder were
6   PAs that worked for Powell Valley Healthcare, Inc;
7   correct?
8   A.   That's correct.
9        MR. ORTIZ:   Let me object to the form
10  of the question.   Mangum's not a PA.
11       MR. KRAUSE:   I thought he was, but let
12  me find out.
13  A.   So Angela is a PA.   Brad is a nurse
14  practitioner and a doctor of chiropractic.
15  Q.   (BY MR. KRAUSE)   Okay.   They both worked
16  under Dr. Hansen's supervision; correct?
17  A.   Physician assistants require a supervising
18  physician; nurse practitioners do not.
19  Q.   Did they both work under Dr. Hansen's
20  supervision, though?
21  A.   They both worked in the practice, but Ms.
22  Redder would have been under his supervision.   Mr.
23  Mangum, while in the practice, would not have
24  required a supervising physician.
25  Q.   I know it's not, quote, required.   What I'm

1  saying is, in practice, he was working under Dr.
2  Hansen's supervision, wasn't he?
3      A.   I -- I guess I'm not sure what you're
4  meaning by "supervision." Did Brad have to have his
5  chart signed by Dr. Hansen? Did he have to have his
6  prescriptions signed by Dr. Hansen? I don't believe
7  so. Were they part of the overall care of a similar
8  panel of patients? Yes.
9      Q.   Okay. Let me ask you this: Who was Brad
10 Mangum's direct supervisor?
11     A.   When it comes to employment issues, that
12 would have been me.
13     Q.   Okay. What about for clinical issues?
14     A.   Dr. Hansen would have been the one who
15 would have been directly responsible for overseeing.
16     Q.   Okay. So at least in that context, he
17 supervised Brad Mangum; correct?
18     A.   And I'm not meaning to be argumentative,
19 but "supervision" means a specific thing in our
20 organization. There are supervision agreements that
21 we have in place for physician assistants. So I'm
22 not meaning to be argumentative; I just don't want
23 to misstate what "supervision" actually means.
24     Q.   Okay. So let me drag this out, then. What
25 supervisory functions did Dr. Hansen have over Brad

```
 1  Mangum?
 2              MR. ORTIZ:  Let me object on
 3  foundation.
 4          But answer if you know.
 5      A.  As it relates to job description or
 6  anything like that, I wouldn't be able to speak to
 7  anything specific.
 8      Q.  (BY MR. KRAUSE)  Okay.  What about for
 9  patient care issues?
10      A.  Brad had some of his own patients.  Some of
11  the patients he shared with Dr. Hansen.  So did Dr.
12  Hansen tell Brad how to practice medicine?  I don't
13  believe so.
14      Q.  Other than Dr. Hansen, who would Brad
15  Mangum go to for a patient care issue?
16              MR. ORTIZ:  Object on foundation.
17          Go ahead.
18      A.  Dr. Rieb is chief of surgery.  Dr.
19  Lengfelder is chief of staff.  Dr. Tracy is medical
20  director of the clinics.
21      Q.  (BY MR. KRAUSE)  Where was Brad Mangum's
22  office?
23      A.  It was in the ortho suite.
24      Q.  Right next to Dr. Hansen's office?
25      A.  I believe so.
```

1  Q.  When did Brad Mangum first come to you with
2  concerns over Dr. Hansen's prescribing practice?
3  A.  I wouldn't be able to recall a date.
4  Q.  Can you give me a year or month?
5  A.  Month, I couldn't.  Year, Brad started, I
6  believe, December of '12, so it would have been in
7  '13, would be my assumption.  But I -- I couldn't
8  say whether it was March or whether it was May.
9  Q.  Do you remember what Mr. Mangum told you?
10 A.  In general terms, he was concerned with the
11 amount of narcotics that Dr. Hansen was prescribing
12 and the frequency with which he was prescribing
13 them.
14 Q.  Other than what might be privileged, as we
15 discussed several times, did you do any follow-up
16 after that information was conveyed to you by Brad
17 Mangum?
18 A.  So I participated in the document
19 submission process related to the subpoena.  I
20 participated in conversations where arrangements
21 were made for Dr. Hansen, Angela Redder, and Dr.
22 Lengfelder to attend a -- and I forget what the term
23 of the conference is, but a conference designed to
24 help educate providers on current prescribing best
25 practice.

```
 1            MR. ORTIZ:  And although it's already
 2   come out, I'm -- that's clearly a quality assurance
 3   function.  I mean, just be careful, because that's
 4   the other privilege that applies from your hospital
 5   side, is the QA system issues.
 6       Q.   (BY MR. KRAUSE)  Did you learn that Dr.
 7   Hansen was sent to that -- I don't know if it was a
 8   continuing medical education course?
 9       A.   It would have qualified for CMEs, yes.
10       Q.   Outside of some type of privileged
11   communication, did someone tell you outside of peer
12   review or credentialing or quality assurance?
13       A.   Again, I wouldn't recall where I came into
14   access to that information.
15       Q.   It's your understanding that Angela Redder
16   and Dr. Lengfelder also went to that conference?
17       A.   Yes.
18       Q.   You also said you had a conversation -- was
19   that the only conversation that you had with Brad
20   Mangum about overprescribing of narcotics or
21   overprescribing issues with prescriptions with Dr.
22   Hansen?
23       A.   I don't know that it was a single
24   conversation.
25       Q.   So there may have been multiple?
```

```
 1      A.    (Nodding head.)
 2      Q.    Do you remember anything else that Brad
 3  Mangum said during any of those conversations?
 4      A.    He expressed other concerns, yes.
 5      Q.    What other concerns did he express?
 6      A.    The concerns evolved over time.  Initially
 7  the concerns were generic in nature:  questioning
 8  surgical technique, selection of patients for
 9  surgery --
10      Q.    Hold on.  I need to write this down.  Go
11  ahead.  I'm sorry.
12      A.    As time passed, the concerns became more
13  specific, and he began to name specific cases and
14  specific patient names.
15      Q.    And don't tell me any -- if you have to
16  refer to someone, call them John Doe or Jane Doe or
17  Patient A.  You're aware of HIPAA but -- so I don't
18  have to interrupt you.  Keep going.
19      A.    Based on those concerns -- your question
20  was what other concerns?
21      Q.    Yes.
22      A.    Those are the concerns that he brought
23  forward.
24      Q.    Other than what might be privileged, did
25  you do anything in response to those concerns
```

1  A. Yeah. I don't know whether that was Rod or it could have been Robyn. So when Rod left, there were interim CEOs before Paul took over.

4  Q. Okay.

5  A. And Robyn served at some point. I think it was a seven- or eight-month window where Robyn was interim CEO.

8  Q. And what's Robyn's last name?

9  A. Rolling.

10  Q. Are there any steps that you have to go through as the CEO to suspend a physician's privileges for patient care issues?

13  A. Not as outlined in -- again, it's the same answer. I don't think that the bylaws are specific as to process.

16  Q. Let me ask you your understanding. If a physician came to you with a patient care issue related to another physician and you believed that report was credible, could you at that moment suspend the other physician's privileges?

21  A. Your choice of word, "could," yes I could.

22  Q. I just want to make sure. Your understanding is you have that authority to do it?

24  A. Yes.

25  Q. If you chose not to exercise that authority