# Exhibit B

**Deposition of William Patten**

*Durose v. Powell Valley Healthcare*, No. 13-CV-216-S
United States District Court For the District of Wyoming

Pages: 1-4, 37-44, 73-80, 129-132

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

AUSTIN W. DUROSE, BY AND         ) 13-CV-216-S
THROUGH HIS NEXT FRIENDS AND     )
NATURAL PARENTS, WILLIAM K.      )
AND MINDY E. DUROSE, WILLIAM     )
K. DUROSE, AND MINDY E.          )
DUROSE,                          )
           Plaintiffs,)
                                 )
      v.                         )
                                 )
POWELL VALLEY HEALTHCARE,        )
INC.; POWELL HOSPITAL            )
DISTRICT NO. 1; POWELL           )
VALLEY HOSPITAL; JEFFREY         )
HANSEN, M.D., AND JOHN DOES      )
THROUGH 10,                      )
           Defendants.)
                                 )

DEPOSITION OF

WILLIAM PATTEN

Taken at Powell Valley Healthcare
777 Avenue H
Powell, Wyoming 82435
Thursday, July 31, 2014
8:12 a.m. - 11:44 a.m.

GRAF COURT REPORTING INC.
2704 Highland Park Place
Billings, Montana 59102
(406) 254-2576

Page 2

1  APPEARANCES:
2     MOYERS LAW P.C.
      BY: JON M. MOYERS, ESQUIRE
3     490 North 31st Street, Suite 101
      Billings, Montana 59101
4          AND
      BOGUE, PAOLI & THOMAS, LLC
5     BY: ALFRED F. PAOLI, JR., ESQUIRE
      1401 17th Street, Suite 320
6     Denver, Colorado 80202
           AND
7     KOHN LAW, P.A.
      BY: KATHRYN KOHN, ESQUIRE
8     P.O. Box 26234
      St. Louis Park, Minnesota 55426
9
      Counsel for Plaintiffs
10
11    WILLIAMS, PORTER, DAY, AND NEVILLE, P.C.
      BY: BRIAN J. MARVEL, ESQUIRE
12    159 North Wolcott, Suite 400
      Casper, Wyoming 82601
13
      Counsel for Defendants Powell Valley Healthcare,
14    Inc.; Powell Hospital District No. 1; and Powell
      Valley Hospital
15
16    CROWLEY FLECK PLLP
      BY: ERIC PETERSON, ESQUIRE
17    490 North 31st Street, Suite 500
      P.O. Box 2529
18    Billings, Montana 59103-2529
19    Counsel for Defendant Jeffrey Hansen, M.D.
20
21
      Reported by John B. Graf
22
23
24
25
          Graf Court Reporting Inc.
              (406) 254-2576

Page 3

1                    INDEX
2  WITNESS:                      PAGE:
3  WILLIAM PATTEN
4     BY MR. MOYERS                5
5
6
7  Certificate of Witness        141
8  Certificate of Court Reporter 142
9
                    EXHIBITS
10
   NO.:   DESCRIPTION:
11
   1      Mangum Notes
12
   2      Mangum Diary Excerpt
13
   3      Mangum Letter
14
   4      October 29, 2013, Letter
15
   5      Letter to Mr. Mangum
16
   6      February 14, 2014, Letter
17
   7      February 14, 2014, Letter
18
   8      Newspaper Article
19
20
21
22
23
24
25
          Graf Court Reporting Inc.
              (406) 254-2576

Page 4

                 STIPULATIONS
   It is hereby stipulated and agreed by and
among counsel for the respective parties that the
deposition be taken by John B. Graf, Freelance Court
Reporter and Notary Public for the State of Montana,
residing in Billings, Montana.

   It was also stipulated by and among counsel
for the respective parties that the deposition be
taken in accordance with the Federal Rules of Civil
Procedure.

   It was further stipulated by and among
counsel for the respective parties, and the deponent,
that the reading and signing of the deposition
transcript would be reserved.

          Graf Court Reporting Inc.
              (406) 254-2576

### Page 37

1  you're not going to tell me about?
2  A. Correct.
3  Q. So help me out a little bit on the
4  organizational structures.
5     Can you tell me what standing committees
6  the hospital has that would relate to patient safety,
7  physician privileges, scope of practice, you know,
8  contract renewals, salaries, kind of that array.
9     Do you have an executive committee?
10  A. So there is a board executive committee.
11  But it really just serves to take emergent actions
12  when the board isn't able to meet.
13     Quality council would be the sort of
14  highest ranking. And it's a board-level committee
15  that oversees all quality aspects of the
16  organization.
17  Q. Would that include patient safety?
18  A. It does.
19  Q. Would that include the qualifications of a
20  physician?
21  A. Typically not. So that would be two other
22  committees. And these would --
23  Q. Before you move off the quality, would it
24  be the committee that would be involved in reviewing
25  and setting policies and procedures for the hospital
Graf Court Reporting Inc.
(406) 254-2576

### Page 38

1  staff?
2  A. Quality-related policies and procedures,
3  yes.
4  Q. "Quality" meaning what?
5  A. So an example would be handwashing. That
6  would be something that it would do as opposed to
7  physician credentialing.
8  Q. What other committees?
9  A. So at a medical staff level you would have
10  PPEC, Professional Practice Evaluation Committee.
11  And that would be the peer-review committee.
12     And then you have the credentialing
13  committee. That would be the group that would
14  actually go through and look at qualifications and
15  recommend to the board privileges and credentials.
16     Med exec has input on, but not final
17  authority related to, credentials. So credentials
18  committee does their work. Their recommendations are
19  forwarded to med exec for review and comment, but
20  it's credentials that actually has the authority to
21  recommend to the board.
22     There's the infection prevention and safety
23  committee. I think of that as a subset of the
24  quality committee, but it is a separate committee.
25     There is also the pharmacy and therapeutics
Graf Court Reporting Inc.
(406) 254-2576

### Page 39

1  committee, which I also think of as a subset of the
2  quality committee. And it's very focused in that it
3  deals with pharmaceuticals.
4  Q. So would the pharmacy committee be the
5  committee that would be looking at the prescribing
6  practice of a physician?
7  A. It would not. It would look at what the
8  formulary should be. PPEC would be the one that
9  would be looking at prescribing practices.
10  Q. So if there's a question whether a patient
11  should be prescribed fentanyl patches after an
12  operative procedure, that would be a pharmacy
13  committee review matter?
14  A. It would not. That would be PPEC.
15  Pharmacy would say should fentanyl be on the
16  formulary. But they wouldn't, then, look at how the
17  formulary is used.
18  Q. Thank you. Any other committees?
19  A. Ad council is the highest ranking
20  administrative council. So that's myself, my vice
21  presidents, and three physicians. And that's the
22  group that has oversight of the entire organization,
23  if you will. It's my right arm in managing the
24  organization.
25     The three physicians that serve on that are
Graf Court Reporting Inc.
(406) 254-2576

### Page 40

1  the chief of staff, Dr. Lengfelder; the medical
2  director of the clinic, Dr. Tracy; and the medical
3  director of the care center, Dr. Christensen.
4  Q. Thank you.
5  A. And let me just think. Are there other
6  committees? I mean, there's surgery committee.
7  There's the OB, peds committee, all of which deal
8  within their own silo with specific issues.
9  Q. If a surg tech or a nurse practitioner had
10  complaints regarding a surgeon, where would those
11  complaints go?
12  A. They'd have a variety of ways that they
13  could move forward with that. They could work
14  through HR. They could work through our hotline if
15  they felt like they needed to report something
16  anonymously. They could look to the director of the
17  OR, the medical director of the OR, the director of
18  nursing, the chief nursing officer.
19     And I certainly would be one of the ones
20  that they could reach out -- so there are a variety
21  of ways. We typically encourage chain of command.
22  So if it's a staff member in the OR, we would ask
23  them to start with the OR director or the OR medical
24  director. And if they didn't get satisfaction, then
25  to move up the chain unless the person they were
Graf Court Reporting Inc.
(406) 254-2576

10 (Pages 37 to 40)

Graf Court Reporting Inc.
(406) 254-2576

Page 41

1  talking to was the problem. Then you skip that
2  person.
3      Q. If a surg tech felt like they were not
4  being adequately trained in new technologies and
5  devices, then your answer would be that they would
6  take that up through their chain of command. And if
7  they didn't feel like they had adequate attention to
8  that or there's a response, then they could go to the
9  director of operations or --
10     A. Right. Ultimately, they would come to me.
11 And as we discussed at just the last board meeting,
12 board members are approachable, if, in fact, someone
13 feels like I'm not doing my job.
14     Q. Do you attempt to maintain an open forum
15 here so that people should feel comfortable to voice
16 their complaints without fear of retribution?
17     A. Yes. We call it psychological safety, that
18 we want folks to feel safe voicing dissenting
19 opinions.
20     Q. Is there a manner in which they can make
21 anonymous complaints?
22     A. That's the hotline that I referred to.
23     Q. Of the committees that you've mentioned, as
24 the CEO do you have a preordained position on any one
25 of those?

Graf Court Reporting Inc.
(406) 254-2576

Page 42

1      A. I would be considered ex officio. I'm
2  pretty much anything, yes.
3      Q. Of these committees that meet, then, do
4  they maintain minutes?
5      A. Yes.
6      Q. Are those minutes accessed by you?
7      A. Yes.
8      Q. I mean, is that part of what you see
9  yourself needing to do as a CEO?
10     A. That's why I attend as many of the meetings
11 as I can in person. And then the minutes are also
12 reported to med exec. So surgery committee, P&T
13 committee, OB committee, all of those minutes go to
14 med exec and medical staff for review.
15     Q. If there were concerns that a doctor was
16 operating beyond his expertise and -- or acting
17 outside of his scope of practice, where would those
18 complaints go in the typical chain of command?
19     A. Typically, they'd start with PPEC. So
20 however they got there, whether it was through Tim,
21 whether it was through chief of staff or a department
22 chair. But PPEC is the place where those sorts of
23 complaints typically would start.
24     Q. What is that process, if you know?
25     A. So the concern would be investigated. If

Graf Court Reporting Inc.
(406) 254-2576

Page 43

1  charts were necessary, they would be pulled and
2  reviewed. Whatever additional data was necessary
3  would be assembled. And then PPEC would reach a
4  decision, make a recommendation, whatever the
5  circumstances warranted.
6      Q. If the physician in concern was an
7  orthopedic surgeon, are you capable here of having
8  peer reviews?
9      A. We would use external peer review.
10     Q. Do you use Monida, or who do you use?
11     A. I don't know off the top of my head. Tim
12 Seeley would know that.
13     Q. Does Tim Seeley sit on the PPEC board?
14     A. Yes. He is the administrative leader of
15 that. Dr. Bohlman is the medical chair of that.
16     Q. Spell the last name.
17     A. B-o-h-l-m-a-n.
18     Q. Thank you. Are you a member of the board?
19     A. I'm not.
20     Q. Is there more than one board here?
21     A. Powell Valley Healthcare has a board of
22 ten. Seven members are from the Powell Hospital
23 District, three are physicians: Chief of staff, by
24 virtue of office, and then two physicians that are
25 appointed by the medical staff. The Powell Hospital

Graf Court Reporting Inc.
(406) 254-2576

Page 44

1  District, those seven members are elected by people
2  within the district.
3      Q. What's your understanding of the
4  relationship between Powell Valley Hospital District
5  and Powell Valley Healthcare Inc.?
6          MR. MARVEL: I'm going to just lodge an
7      objection to the extent it calls for a legal
8      conclusion and/or lacks foundation.
9          Go ahead and answer, though.
10         THE WITNESS: So my understanding as a
11     layperson --
12 BY MR. MOYERS:
13     Q. I know you're not a lawyer. I'm not asking
14 for a legal opinion, and I appreciate counsel's
15 concerns here. But this is the world in which you
16 work, so . . .
17     A. Yeah. I'll explain my understanding. So
18 Powell Hospital District is the governmental entity
19 organized under statutes of the state to achieve the
20 mission of providing healthcare services to the
21 community. It then --
22     Q. And it has a board?
23     A. It has the elected board, the seven-member
24 board.
25         It owns the assets, the land, the

Graf Court Reporting Inc.
(406) 254-2576

11 (Pages 41 to 44)

Page 73

1  Q. How about referrals to physical therapy?
2  A. Yes.
3  Q. And any sense of how much additional
4  revenue was -- or billings was generated as a
5  consequence of his surgical activities?
6  A. No, I wouldn't have.
7  Q. We talked earlier about him being on a
8  production-based salary system.
9      Was there a percentage that he was paid of
10 his pro fees?
11 A. Of the net --
12 Q. Net.
13 A. Of the net billings, that's the way. And
14 it was a tiered approach, so the higher his
15 production, the higher the percentage, which is a
16 common model.
17 Q. Do you remember what those tiers were for
18 Dr. Hansen?
19 A. I do not.
20 Q. There was no direct correlation between the
21 pro fees and the other income that would be generated
22 for the technical services; it would just depend on
23 the patient?
24 A. He saw no benefit from the technical
25 income. We're very careful about that.
        Graf Court Reporting Inc.
            (406) 254-2576

Page 74

1  Q. No, I know. But I mean, as I understand
2  it, a patient comes in and if he needs one MRI or a
3  thousand MRIs, it's that other income from the MRI
4  scans that he's not compensated for and you can't
5  quantify for us today?
6  A. Correct.
7  Q. Your reason for not compensating the
8  physician for these technical charges is what?
9  A. It's illegal.
10 Q. Is that a Stark Act?
11 A. Stark, antikickback. They sort of all
12 bundle into the same happy collection for me.
13 Q. Because you don't want a doctor churning
14 the MRI scanner just to make more money to pay off
15 his boat, something like that?
16 A. Something like that.
17 Q. Have you attempted to quantify what the
18 loss of income has been to the hospital as a
19 consequence of Dr. Hansen no longer being here?
20     MR. MARVEL: I'm going to object to the
21 form of the question. And I'll object to
22 relevance as well.
23     Go ahead and answer, Bill.
24     THE WITNESS: So we haven't quantified as
25 we have explained the loss that we've
        Graf Court Reporting Inc.
            (406) 254-2576

Page 75

1  experienced this past year. We know that an
2  element of that is Dr. Hansen. But we haven't
3  said of the 2.2 million, he accounts for X. We
4  haven't done that level of detail, no.
5  BY MR. MOYERS:
6  Q. Was Dr. Hansen your number one physician in
7  generating income?
8  A. I would say yes.
9  Q. Was he the most active surgeon?
10 A. Yes.
11 Q. In terms of number of procedures performed?
12 A. Yes.
13 Q. And income generated?
14 A. Yes.
15 Q. Do you know approximately how many surgical
16 procedures he was averaging per year?
17 A. Oh, per year?
18 Q. However you want to look at it.
19 A. I usually look at it monthly. And so I
20 would say his average was something in the
21 neighborhood of 40 to 60 -- at the most, 70 --
22 procedures per month. Procedures, not necessarily
23 surgeries. So an I&D would count as a procedure, but
24 I wouldn't think of that as a surgery.
25 Q. He would be charging, though, in addition
        Graf Court Reporting Inc.
            (406) 254-2576

Page 76

1  for his surgeries, also for his clinical work?
2  A. Office work?
3  Q. Yes.
4  A. Yes.
5  Q. His pre-op, post-op, follow-up?
6  A. Correct, he would.
7  Q. And that would be part of his pro fees?
8  A. Correct.
9  Q. Do you have a sense as to his performance
10 relative to other surgeons here?
11 A. I don't. Other than it being higher. But
12 is it double? Is it 50 percent? I couldn't
13 estimate, no.
14 Q. You had referenced Dr. Hansen as being a,
15 quote, workhorse, in the article to the Powell Trib.
16     Was that a quote from you?
17 A. It was a term of endearment.
18 Q. Meaning what?
19 A. Dr. Hansen was great about covering the ED.
20 If he was in town and they needed help, he would
21 respond. He was great about covering the OR. So
22 "workhorse" was not intended in any way to be a
23 negative description. He was a hard worker.
24 Q. Right. Have you ever heard him referred to
25 as the golden goose?
        Graf Court Reporting Inc.
            (406) 254-2576

19 (Pages 73 to 76)

Page 77

1   A. I have.
2   Q. And how have you heard him referred to as
3 golden goose?
4   A. Brad Mangum made that statement to me.
5   Q. What do you remember Brad Mangum saying
6 about that?
7   A. That he could understand why I wouldn't
8 want to kill the golden goose.
9   Q. Is that true?
10  A. He made the statement. He attributes it to
11 me. I never made such a statement.
12  Q. Are you aware of Mr. Seeley ever telling
13 anyone that he considered Dr. Hansen the hospital's
14 golden goose?
15  A. I'm under -- to understand that a
16 conversation between Mr. Mangum and Mr. Seeley took
17 place where Tim used that phrase.
18  Q. Have you ever talked to Mr. Seeley about
19 using that phrase?
20  A. Yes.
21  Q. Tell me about that discussion.
22  A. He acknowledges that it took place, and in
23 hindsight wishes he hadn't said it.
24  Q. And what I understand the full quote to be
25 was something in the order of we're not going to get

Graf Court Reporting Inc.
(406) 254-2576

Page 78

1 rid of our golden goose until we get a new goose.
2       Is that how you understood that comment?
3   A. That's my -- what I've been told, yes.
4   Q. What is your understanding of what the
5 facility's ethical and legal duty is to patients who
6 come here for care?
7       MR. MARVEL: Object to the extent it's
8   vague and ambiguous.
9       But you can go ahead and answer, Bill.
10      THE WITNESS: So I would point to our
11  mission statement. Out mission talks about the
12  reason we exist is to improve the quality of
13  people's lives. We do that both by the services
14  that we provide, but also by the contribution we
15  make to local economy through the employment and
16  the purchasing that we do.
17      I believe that part of improving the
18  quality of people's lives includes a
19  responsibility to do things the best we can. So
20  whether that's the provision of services,
21  whether it's the billing that we do.
22      And when we find that we have stubbed our
23  toe, we have a responsibility to -- to improve,
24  to learn from that experience, and to get
25  better.

Graf Court Reporting Inc.
(406) 254-2576

Page 79

1 BY MR. MOYERS:
2   Q. Right. Do you believe that it's the
3 obligation of the facility to place patient safety
4 ahead of other concerns?
5   A. Most --
6       MR. MARVEL: And I'll object to the form of
7   the question. I think it calls for a legal
8   conclusion.
9       But, Bill, go ahead.
10 BY MR. MOYERS:
11  Q. To clear the air on that, I'm not asking
12 for a legal opinion, and I understand you're not a
13 lawyer. I'm just asking what you understand to be
14 the purpose and function of this institution of which
15 you are the chief executive officer.
16      So my questions are in the nature of how
17 you understand your priorities and duties here,
18 so ...
19  A. Patient safety clearly is one of our
20 foremost responsibilities. There is always a
21 tension. You've heard the mission versus margin.
22 There is always a tension there. But if we're going
23 to miss it, we're going to miss it on the side of
24 quality and safety.
25  Q. You would be critical of a hospital that

Graf Court Reporting Inc.
(406) 254-2576

Page 80

1 would put its bottom line ahead of patient safety?
2   A. Most certainly.
3   Q. And do you feel that the legacy of Dr.
4 Hansen, as you reflect back about it, is essentially
5 a stubbed toe for the hospital?
6   A. So ...
7   Q. I mean that honestly. I mean, I'm not
8 trying to --
9   A. So knowing what we know now, would things
10 have been done differently? Hindsight many times
11 allows us to second-guess. But based on what we knew
12 at the time we knew it, I would have a hard time
13 being critical.
14      The challenge that I face as the leader of
15 the organization now is that I'm looking at issues
16 that have unfolded over a long period of time. And
17 looking at all of that now, this collection today,
18 it's easy to reach one conclusion.
19      But if you take each page individually on
20 each individual day and say is there a problem here,
21 I think it's difficult to be critical. So when I
22 think of myself personally and how I want to be
23 judged, I expect people to recognize that on each
24 individual day I may not have had the whole story.
25 And if I made the best decision I could on that day

Graf Court Reporting Inc.
(406) 254-2576

20 (Pages 77 to 80)

Page 129

1  Q. And the next question is: Nettie was
2  replaced by another manager, too, who was also
3  terminated. Were you involved in her decision, too?
4  A. And what was that name?
5  Q. She couldn't remember it.
6  (Whereupon, a break was taken.)
7  MR. MARVEL: For the record, too, Jon, I
8  just want to let you know that the reasons and
9  the status of Nettie leaving are subject to a
10 confidential settlement agreement. But I've
11 advised the client the limited bases to explain
12 that.
13 But the nature and everything that's
14 involved in the settlement agreement, I want to
15 keep under the confidentiality provision until I
16 have a chance to review it.
17 MR. MOYERS: That's fine.
18 THE WITNESS: So the record shows that she
19 resigned and that she would be eligible for
20 rehire.
21 BY MR. MOYERS:
22 Q. So does Dr. Hansen's.
23 A. Yes. You know how that works. So we
24 didn't fire her. But there was a separation
25 agreement, and a severance package was paid.

Page 130

1  Q. Thank you.
2  A. And it's my understanding that her
3  replacement was Donna -- and I'm blanking on Donna's
4  last name -- who was an interim. But Donna did a
5  fine job. We would have been happy for Donna to stay
6  on as permanent, but she enjoyed the travelling life.
7  And then after Donna, I think Lisa took
8  over. So I don't recall someone in between there
9  that also got fired.
10 Q. That's fine. Can you say if part of the
11 issues that had been raised with Nettie concerned the
12 lack of training that was being provided to the scrub
13 techs?
14 MR. MARVEL: You can go ahead and answer
15 that, Bill.
16 THE WITNESS: I don't recall that. It was
17 more interpersonal.
18 BY MR. MOYERS:
19 Q. Conflict that was created in the --
20 A. Folks not getting along, lack of
21 leadership.
22 Q. Doesn't play well with others?
23 A. Including surgeons.
24 Q. I meant to ask: When you -- in your ex
25 officio role sitting on the various committees, would

Page 131

1  it have been within your ability to have prodded the
2  various committees to take more prompt action in
3  dealing with the issues raised about Dr. Hansen?
4  A. Say I think we need to deal with this more
5  quickly?
6  Q. Yes.
7  A. Yes.
8  Q. Do you feel that the amount of time that it
9  took from the initial complaints in spring of 2013
10 until November 2013 to have been too long of a
11 process?
12 MR. MARVEL: And I'll object to the extent
13 it lacks foundation. Calls for speculation.
14 But you can go ahead and answer, Bill.
15 THE WITNESS: So in my experience I would
16 ask the question: How long should it take to
17 ruin someone's career? That's one side of it.
18 BY MR. MOYERS:
19 Q. Right.
20 A. The other side of it is: If it's my family
21 member that's being operated on and there's a
22 question, how long do I want the organization to
23 take?
24 Q. Right.
25 A. So from my perspective, I think that we

Page 132

1  dealt with it in a responsible manner.
2  Q. Recognizing you all have changed some of
3  those procedures since?
4  A. (Indicating.)
5  Q. Yes?
6  A. Yes.
7  Q. But in that time, Dr. Hansen was seeing
8  hundreds of patients and would have performed -- you
9  can do the math -- hundreds of procedures?
10 A. Correct.
11 Q. Do you feel that as part of the patient
12 bill of rights that a patient needs to have
13 sufficient information about the physician so they
14 can make an informed decision about the propriety of
15 the surgeon operating?
16 A. That's a very difficult question to answer,
17 because we have not only the rights of the patient
18 but the rights of the physician. So while -- using a
19 hypothetical, while a physician is being
20 investigated, for lack of a better word, does the
21 patient have a right to know about that
22 investigation?
23 Because if the investigation turns out to
24 say there wasn't a problem, then would you have
25 caused concern -- unnecessary concerns in a patient's